**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC,
120 Maryland Avenue NE
Washington, DC 20002;

DCCC,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC GOVERNORS ASSOCIATION,
1225 Eye Street NW, Suite 1100
Washington, DC 20005;

U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER,
Notice of address to be filed under seal pursuant to LCvR 5.1(c);

U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES,
Notice of address to be filed under seal pursuant to LCvR 5.1(c);

NEVADA STATE DEMOCRATIC PARTY,
2200 S Rancho Drive, Suite 100
Las Vegas, NV 89102;

ERICK JOSE JIMENEZ,
Notice of address to be filed under seal pursuant to LCvR 5.1(c),

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530;

Case No. 1:26-CV-3674

TODD BLANCHE, in his official capacity as
U.S. Attorney General,
950 Pennsylvania Avenue NW
Washington, DC 20530;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. For over a decade now, President Donald J. Trump has bombarded the American people with lies and misinformation about American elections and voter fraud. While these lies have been debunked at every turn, that has never deterred the President from employing them as a pretext to seize control over elections, even as courts overwhelmingly reject that effort. This case concerns two of the most recent iterations of this disturbing trend.

2. *First*, the administration has asserted the right to dictate how States administer their elections, even as to matters that have long been reserved to the States under the Constitution and federal law. Over the past few months, the Department of Homeland Security ("DHS") has serially demanded that States review shoddily compiled lists of supposed noncitizens—target lists that have crumbled upon the barest inspection. In Nevada, for example, DHS insisted it had found nearly 16,000 noncitizens on the rolls, quickly reduced that claim to just 185 voters, and then failed to substantiate even that narrower assertion after Nevada officials indicated that every single one

of those voters appeared to be citizens. More glaringly, the administration recently demanded that California—with just 48 hours' notice—refuse to issue ballots to more than 20,000 registered voters or, if already issued, segregate and refuse to count their ballots. That list, too, has proven remarkably slapdash—upon just a cursory sample review, the Los Angeles County Registrar found that many of these registrations had already been cancelled and that more than a *quarter* of the sample reflected individuals who listed a birthplace within the United States, among many other errors.[1]

3. *Second*, and relatedly, Department of Justice ("DOJ") and DHS officials have sought to bolster their interference efforts through a persistent stream of threats and intimidation directed towards state and local election officials across the country. Indeed, this past summer, prominent members of the Trump administration have engaged in a consistent course of issuing threats to state election officials, culminating in the President's own proclamation just days ago that—if state officials in California do not bend to his will—"**They will all go to jail for a long period of time!!!**"[2] This pattern of intimidation is not rooted in any legitimate belief that election officials are engaged in misconduct; rather, it is meant to frighten officials into complying with the administration's demands to unlawfully remove voters from the rolls; to deny ballots to lawfully registered voters; and to segregate lawful ballots cast by registered voters based on spurious and unreliable claims that they are not citizens.

4. None of this is lawful. The Executive Branch enjoys *no* authority to superintend state voter list maintenance, to supplant state determinations of who is qualified to vote, or to

---

[1] Opp'n to Ex Parte Application for TRO at 17, *United States v. California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 20, 2026), ECF No. 32-1.

[2] Jasper Ward, *Trump Threatens California Officials with Imprisonment over Stance on Mail Ballots*, Reuters (Oct. 16, 2026), https://perma.cc/44RT-JDV4.

dictate who gets a ballot or whose ballot gets segregated—Congress has kept that responsibility with the States, subject only to a narrow civil enforcement power the administration has declined to invoke during its recent efforts. Nor does the Executive Branch get to decide which voters appear on a State's voter rolls, which registered voters can receive a ballot, or whose ballots are counted. The Constitution "invests the States with responsibility for the mechanics of congressional elections," *Foster v. Love*, 522 U.S. 67, 69 (1997). That includes as to "registration," "protection of voters," and the "counting of votes," *Smiley v. Holm*, 285 U.S. 355, 366 (1932), subject only to Congress's power to "make or alter such Regulations," U.S. Const. art. I, § 4, cl. 1. In that design, "[t]he President does not feature at all," *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d 135, 159 (D.D.C. 2025), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026), consistent with "the Framers' aversion to concentrated power," *Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 17 (2013).

5. This lawlessness did not arise in a vacuum. It comes as courts across the country have broadly enjoined the President's Executive Orders concerning elections, forbidden his attempt to nationalize rules for voting by mail, and refused his demands that States turn over their unredacted voter rolls to the DOJ. Further still, Congress has steadfastly refused to enact the President's preferred election legislation. Thwarted in Congress and the courts, the administration has now simply disregarded the tools Congress provided it and fashioned its own cudgels instead. It once more falls to the judiciary to staunch the resulting lawlessness, which violates Section 11(b) of the Voting Rights Act, reflects a suite of *ultra vires* actions, and offends the Tenth Amendment's reservation of powers to the States and prohibition on commandeering state officials and election operations to fulfill the Executive's policy preferences.

6. Plaintiffs—DSCC, DCCC, the Democratic Governors Association ("DGA"), Nevada State Democratic Party ("NSDP"), Erick Jose Jimenez, and the Democratic Leaders of the U.S. Senate and House of Representatives—are directly harmed by Defendants' lawless actions, which force Plaintiffs and their candidate members to compete in elections conducted under unlawful federal coercion. Defendants' actions further threaten to disenfranchise Plaintiffs' members and supporters—including Mr. Jimenez and many similarly situated members and supporters—who will be purged, denied ballots, or have their ballots set aside based on unauthorized, unverified, and ever-evolving lists that have already misidentified citizens as noncitizens. Defendants' misconduct further requires DSCC, DCCC, DGA, and the NSDP to divert scarce resources, in the final days before the election, to protect voters and to support election officials facing Defendants' threats.

7. Plaintiffs seek declaratory and injunctive relief to protect them and their members and supporters from this severe and irreparable harm. They ask the Court to enjoin Defendants from directing States to remove registered voters from their rolls, to withhold their ballots, or to segregate or refuse to count the ballots they have cast—all of which are assertions of executive authority with no grounding in federal law. Plaintiffs also ask the Court to enjoin Defendants from continuing to threaten state and local election officials for doing nothing more than their lawful duties, including issuing and counting the ballots of registered voters. Such threats intimidate and coerce election officials who aid and urge registered voters to cast ballots, as well as lawful voters—particularly naturalized citizens—who seek to exercise their most fundamental right.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal law claims, including claims arising under the U.S.

Constitution and the Voting Rights Act (52 U.S.C. § 10307). They also seek relief pursuant to the Declaratory Judgment Act. *See* 28 U.S.C. § 2201.

9. Venue is proper under 28 U.S.C. § 1391 because all Defendants reside in this district and carry out their official duties in this district. Furthermore, a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

10. Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. DSCC pursues its mission by working with Democratic Senate candidates to encourage and assist Democratic Party members and supporters in successfully casting ballots. This mission requires preserving the legal rights of its members and voters who wish to successfully cast their ballots free from intimidation or coercion. DSCC's members include Democratic members of the U.S. Senate, as well as active Democratic candidates for U.S. Senate. DSCC currently has members in 44 States (every State except for Indiana, Missouri, Nebraska, North Dakota, South Dakota, and Utah). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States. Both DSCC itself and DSCC's members, including its members who are Democratic candidates for office, are directly impacted by Defendants' threats to State election officials, as well as their efforts to federalize aspects of state election administration. *See infra* § V.

11. Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. Like DSCC, DCCC pursues its mission by working with Democratic congressional candidates and their campaigns to encourage and assist supporters of the Democratic Party in successfully casting

ballots. This mission further requires preserving the legal rights of its members and voters who wish to successfully cast their ballots free from intimidation or coercion. DCCC's members include Democratic members of the U.S. House, as well as active Democratic candidates for U.S. House. DCCC currently has members in all 50 States and D.C. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters, whose voting rights it seeks to protect. Both DCCC itself and DCCC's members, including its members who are candidates for office, are directly impacted by Defendants' threats to State election officials, as well as their efforts to federalize aspects of state election administration. *See infra* § V.

12. Plaintiff Democratic Governors Association is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal voting rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices and policies, including as to managing, administering, and budgeting for federal, State, and local elections. DGA's members include all incumbent Democratic governors—representing 24 States, Guam, and the U.S. Virgin Islands—as well as the Mayor of the District of Columbia. At least 10 incumbent Democratic governors are candidates for office in their respective States in the 2026 general election. Both DGA itself and DGA's members, including its members who are candidates for office, are directly impacted by Defendants' threats to State election officials, as well as their efforts to federalize aspects of state election administration. *See infra* § V.

13. Plaintiff Charles E. "Chuck" Schumer is the senior U.S. Senator from New York and the leader of the Senate Democratic Caucus, presently serving as Senate Minority Leader.

Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Senate Democratic Caucus, as the Caucus's ability to pass and influence legislation depends in significant part upon the size of its membership. Increasing the size of the Senate Democratic Caucus, both by electing new Democratic senators and reelecting incumbent Democratic senators, is therefore an essential part of Leader Schumer's mission and duties. Leader Schumer is often directly involved in campaigns across the country to elect Democratic senators, including in competitive battleground States. Relatedly, Leader Schumer works closely with DSCC and its leadership to help elect Democratic Senate candidates. Leader Schumer has been elected to the U.S. Senate five times and to the U.S. House of Representatives nine times prior to that. He is also a candidate for the U.S. Senate in 2028 and is directly impacted by Defendants' threats to State election officials, as well as their efforts to federalize aspects of state election administration. *See infra* § V.

14. Plaintiff Hakeem S. Jeffries is a member of the U.S. House of Representatives from the Eighth Congressional District of New York. He is the leader of the House Democratic Caucus and presently serves as House Minority Leader. Leader Jeffries is responsible for helping to elect Democratic Party candidates in congressional elections across the country. This responsibility is critical to Leader Jeffries' ability to serve as an effective leader of the House Democratic Caucus, as increasing the size of the Caucus is central to improving its ability to pass and influence legislation, and its ability to pursue the mission and platform of the Democratic Party. To that end, Leader Jeffries is directly involved in helping Democratic congressional candidates to campaign in races across the country, including in key battleground districts that may resolve which party controls the House of Representatives. He is also up for reelection in the upcoming 2026 midterm elections.

15. Leader Jeffries works closely with DCCC and its leadership to help elect Democratic congressional candidates. As Leader of the House Democratic Caucus, and as a candidate for the U.S. House of Representatives in New York's Eighth Congressional District, Leader Jeffries is harmed by Defendants' threats to State election officials, as well as their efforts to federalize aspects of state election administration. *See infra* § V.

16. Plaintiff Nevada State Democratic Party is the official state party committee for the Democratic Party for the State of Nevada. The NSDP's mission is to elect Democratic candidates to office across Nevada, up and down the ticket. It represents a diverse group of Democrats, including elected officials, candidates for elected office, state committee members, advisory caucuses, affiliate groups, and voters, many of whom are naturalized citizens. Defendants' attempt to threaten and coerce election officials to remove voters from the rolls, refuse to issue ballots to registered voters, and segregate (and potentially discount) such ballots injures NSDP members, including voters who are naturalized citizens, and impairs its candidates' interest in a fair electoral process. *See infra* § V.

17. Plaintiff Erick Jose Jimenez, a registered and active California voter, who proudly became a naturalized United States citizen in 2006. Since that time, he has eagerly and consistently exercised his right to vote in State, local, and federal elections. Mr. Jimenez plans to vote in the 2026 general election, but has learned of Defendants' attempts to coerce State and local officials to purge voters whom Defendants believe to be noncitizens, and to prevent such voters from receiving mail ballots or from having their ballots counted. Mr. Jimenez is aware that Defendants have often misidentified naturalized citizens like himself as noncitizens, and Mr. Jimenez fears that he will be unlawfully targeted for voting and disenfranchised (or worse), as a direct response to threats by the federal government against State and local election officials. Mr. Jimenez is not

sure what steps he could take to mitigate this risk, in part because it is not clear how Defendants are compiling lists of supposed noncitizens. Even so, in order to safeguard his right to vote, Mr. Jimenez would be forced to take additional steps to confirm his citizenship status, including by needing to reach out to various federal agencies whose records Defendants have relied upon.

18. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

19. Defendant the U.S. Department of Justice is a federal agency headquartered in Washington, D.C. Defendant Todd Blanche is the U.S. Attorney General and is sued in his official capacity.

20. Defendant the U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

## STATEMENT OF LAW AND FACTS

### I. The Constitution vests the power to administer elections in the States, unless Congress purposefully chooses to preempt State procedures.

21. The Constitution's Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject only to Congress's power to "preempt state legislative choices." *Foster*, 522 U.S. at 69; *see* U.S. Const. art. I, § 4, cl. 1.

22. Accordingly, absent intervention by Congress, the States are charged with establishing "a complete code for congressional elections," including as to "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U.S. at 366. "[I]n short," where Congress has not chosen to act, *States* are responsible for

"enact[ing] the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right" to vote. *Id.*

23. Congress may displace these requirements under the Elections Clause, which governs the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. That authority, however, is limited to "regulat[ing] *how* federal elections are held, but not *who* may vote in them," *ITCA*, 570 U.S. at 16, consistent with "the Framers' aversion to concentrated power," *id.* at 17. Even when Congress exercises its Elections Clause authority, that power extends "so far as it is exercised, and no farther." *Id.* at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

24. Though the Constitution extends to the Executive Branch certain enumerated powers, the regulation of elections is not one of them; any power it exercises must be derivative of authority granted to it by Congress. Accordingly, the President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024).

25. "The Constitution's allocation of authority over federal elections between Congress and the States . . . is no accident. Instead, this design was the product of carefully considered compromises among our Constitution's Framers." *LULAC I*, 780 F. Supp. 3d at 158. Under that framework, "[t]he States have initial authority to regulate elections," "Congress has supervisory authority over those regulations," and "[t]he President does not feature at all." *Id.* at 159.

## II. Congress afforded federal agencies narrow, carefully circumscribed roles concerning state voter registration and ballot counting processes.

26. Exercising its Elections Clause authority, as well as related authority under the Reconstruction Amendments, Congress has enacted certain federal laws pertaining to the electoral

process, which establish the outer bounds of the federal government's role in election administration. The Executive Branch can, where granted authority by Congress, enforce such laws as prescribed, but it can proceed "no farther" when it comes to election administration. *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 392).

27. For example, in the wake of the Civil War, Congress enacted the Enforcement Act of 1870 and the Ku Klux Klan Act of 1871. The former grants the Executive Branch certain powers to suppress criminal conspiracies to prevent the exercise of voting rights, *see* 18 U.S.C. §§ 241, 242, while the latter creates various civil causes of action to enforce federal rights, including voting rights, *see* 42 U.S.C. §§ 1983, 1985, 1986. Each of these laws operates through criminal or civil actions; none grant the Executive Branch the power or authority to intrude upon state election procedures.

28. During the Civil Rights Era, Congress enacted the Civil Rights Acts of 1957, 1960, and 1964, which codified certain enforcement powers for the federal government to protect individual rights. For example, the Civil Rights Acts guarantee that qualified citizens may vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. § 10101(a)(1). They also constrain what election officials can demand of voters, *id.* § 10101(a)(2)(A), and prevent individuals from being denied the right to vote because of an error or omission on a record or paper that "is not material in determining whether such individual is qualified under State law to vote," *id.* § 10101(a)(2)(B). They further prohibit all persons—including federal officials—from intimidating, threatening, or coercing voters. *Id.* § 10101(b). No provision authorizes the federal government to set voter qualifications or control ballot casting or counting.

29. In the same era, Congress enacted the Voting Rights Act of 1965, which addresses *specific* forms of unlawful vote dilution and denial of the right to vote. *See* 52 U.S.C. §§ 10301,

10308. Building upon the Civil Rights Acts, the law also prohibits anyone—including federal officials—from intimidating, threatening, or coercing voters or those who urge or aid a person seeking to vote. *See id.* § 10307(b).

30. In the modern era, Congress enacted the National Voter Registration Act ("NVRA") in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501.

31. While the NVRA concerns the maintenance of state voter rolls, it charges *States*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.* § 20507(c)–(g). It similarly makes States the custodians of voter lists. *See Husted*, 584 U.S. at 761. The Executive Branch is empowered to bring a civil action to enforce the terms of the NVRA, *see* 52 U.S.C. § 20510(a), but doing so requires it to plausibly allege a substantive violation of federal law, such as a failure to make "a reasonable effort to remove the names of ineligible voters" who have become ineligible due to death or change in residence. *Id.* § 20507(a)(4). Nothing in the NVRA grants the Executive Branch freestanding authority to superintend how States administer their voter rolls, never mind how they administer their elections more generally.

32. The NVRA also prescribes certain requirements for voter registration forms used to register individuals for federal elections. For example, it requires that any federally created voter registration form "contain[] an attestation that the applicant meets each . . . requirement" for registration, "including citizenship." 52 U.S.C. § 20508(b)(2). It places the same requirement upon any state-created voter registration form used for federal elections. *See id.* § 20505(a)(2).

33. This attestation reflects the "presumptive minimum amount of information necessary for state election officials to carry out their eligibility-assessment and registration duties." *Fish v. Kobach*, 840 F.3d 710, 717 (10th Cir. 2016). States may only demand more of voter registration applicants seeking to vote in federal elections by establishing it "is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," 52 U.S.C. § 20508(b)(1) (emphasis added).[3] The Executive Branch, however, has no authority to quarrel with what information States demand on their own voter registration forms, save where States transgress specific limitations within the NVRA itself.

34. States are thus well within their authority to rely on a voter's attested statement that they meet all eligibility requirements, including citizenship, when it comes to registering voters for federal elections—and such attestations are sufficient for registration in most jurisdictions.[4]

35. Following the NVRA, Congress enacted the Help America Vote Act ("HAVA") in the wake of the 2000 elections to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017).

---

[3] Notably, the Conference Committee that finalized the NVRA specifically rejected a provision adopted by the Senate that would have allowed States to "requir[e] presentation of documentation relating to citizenship of an applicant for voter registration." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.). The Committee concluded that such a requirement was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.*

[4] *See Voter Registration and Citizenship*, Nat'l Conf. of State Legis. (May 21, 2026), https://www.ncsl.org/elections-and-campaigns/voter-registration-and-citizenship (explaining "in most cases, citizenship is addressed by asking for a voter's attestation, not documentary proof").

36. HAVA regulates how States maintain their voter rolls but leaves the maintenance of those rolls to the States themselves, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). It also requires States to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2)(A). HAVA is clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Further, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085.

37. HAVA also established a right to cast a provisional ballot when an otherwise qualified and registered voter's name "does not appear on the official list of eligible voters." 52 U.S.C. § 21082(a). But nothing in HAVA grants the Executive Branch authority to declare that registered voters whose names *do* appear on a State's voter rolls can *only* cast a provisional ballot.

38. Instead, HAVA authorizes the Attorney General to file suit "as may be necessary to carry out" its uniform and nondiscriminatory election technology and administration requirements, 52 U.S.C. § 21111, but again grants no freestanding election administration powers.

39. Finally, the Attorney General possesses additional *criminal* enforcement tools when it comes to noncitizen voting, *see* 18 U.S.C. § 611, or to noncitizens making false claims of citizenship in order to register to vote, *id.* § 1015(f); *see also* 52 U.S.C. § 20511. But it is beyond cavil that the Attorney General may only enforce these statutes *through the criminal process itself*, which affords defendants procedural rights and requires that the government establish guilt beyond a reasonable doubt before a jury.

40. The Attorney General cannot, at will, convert these laws into grants of authority to seek *civil* remedies, like an injunction or declaratory judgment, or to simply demand that a State alter its election administration procedures. That is because "a bare criminal statute" does not

confer any broader *civil* enforcement power, *Cort v. Ash*, 422 U.S. 66, 80 (1975), and courts of equity are similarly restrained to "those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).

41. Such equitable jurisdiction does not reach enforcement of *criminal* laws. *See United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969); *see also* Aditya Bamzai & Samuel L. Bray, *Debs and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 709 (2022) (explaining that "[e]quity will not enjoin a crime"). In other words, while the Executive Branch can lawfully prosecute criminal offenses, it cannot convert criminal laws into freestanding authority to manage elections.

42. In addition to these criminal enforcement tools, the Executive Branch can take immigration-related actions related to unlawful noncitizen voting or registration. *See, e.g.*, 8 U.S.C. § 1182(a)(6)(C)(ii), (a)(10)(D). But these consequences, too, may be imposed only through the procedures Congress prescribed. Removal proceedings before an immigration judge are "the sole and exclusive procedure" for determining whether a noncitizen is inadmissible or deportable. *Id.* § 1229a(a)(3). The noncitizen is entitled to written notice of the charges, *id.* § 1229(a)(1); to counsel of his choosing, *id.* § 1229a(b)(4)(A); and to a reasonable opportunity to examine the evidence against him, present his own evidence, and cross-examine the government's witnesses, *id.* § 1229a(b)(4)(B). Where the noncitizen has been admitted, the government bears the burden of proving deportability by clear and convincing evidence. *Id.* § 1229a(c)(3)(A); *see Woodby v. INS*, 385 U.S. 276, 286 (1966). Any removal order is subject to administrative and judicial review. *See* 8 C.F.R. § 1003.1(b); 8 U.S.C. § 1252. The Executive Branch cannot short-circuit this statutory regime through requests for injunctions or simply by badgering States.

43. The upshot of the foregoing is that the Executive Branch possesses specific *congressionally granted* powers when it comes to voting. It may exercise those powers pursuant to constitutional and statutory limits, as well as the ordinary standards of both civil and criminal judicial review. What it cannot do is simply invent additional powers from whole cloth where Congress has never chosen to grant them. *Any* executive action in the voting realm "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Defendants otherwise have "literally . . . no power to act . . . unless and until Congress authorizes [them] to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

## III. The Trump administration launches an across-the-board effort to unlawfully federalize elections.

44. Following his return to office in 2025, President Trump has continued his decade-long campaign of lies about voter fraud, pairing them with a call to radically reshape American elections. In particular, President Trump has continued to falsely contend that noncitizens are "brought to our country to vote, and they vote illegally," urging the Republican Party to "take over" and "nationalize the voting."[5]

45. At President Trump's urging, Congress has repeatedly considered bills to restrict voting, including the "SAVE America Act," which contains provisions that would make it significantly more difficult to register to vote and cast a ballot.[6] President Trump has openly

[5] Miles Parks, *Trump Says He Wants Republicans to 'Nationalize' Elections*, NPR (Feb. 3, 2026), https://www.npr.org/2026/02/03/nx-s1-5698095/trump-says-he-wants-republicans-to-nationalize-elections.

[6] Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 24, 2026), https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html.

admitted that the goal of adding these barriers to the voting process is to ensure that, for the next "50 years," Republicans will "never lose a race."[7]

46. Despite President Trump's pressure, Congress has refused to pass legislation that would impose barriers on voting or authorize greater Executive Branch involvement in the electoral process. Unable to achieve his ends through legislative means, President Trump has sought to accomplish this goal through Executive Orders, a national campaign of litigation against the States, and widespread intimidation and intrusion from DOJ, DHS, and U.S. Citizenship and Immigration Services ("USCIS").

47. In March 2025, President Trump signed Executive Order 14,248, which attempted to require voters to present proof of citizenship when registering to vote, change mail voting deadlines, provide federal agencies with access to state voter list data, and coerce States into complying with DOJ instructions at risk of withheld federal funding. Courts swiftly enjoined broad swathes of the Executive Order as overstepping the power of the Executive Branch and the federal government. *See LULAC I*, 780 F. Supp. 3d 135; *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC II*), 808 F. Supp. 3d 29 (D.D.C. 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC III*), 818 F. Supp. 3d 34 (D.D.C. 2026); *see also California v. Trump*, 840 F. Supp. 3d 37 (D. Mass. 2026); *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026).

48. A year later, in March 2026, President Trump tried again with Executive Order 14,399. This time, he commanded the U.S. Postal Service to issue a rule seizing federal control over mail voting from the States through "Mail-In and Absentee Participation Lists" that controlled

---

[7] Maddie Ganon, *Trump Stops in Battleground Georgia to Talk Economy, Voter ID Ahead of Midterms*, Spectrum News (updated Feb. 19, 2026), https://perma.cc/TZC6-RH6W.

whether the Postal Service would transmit a voter's mail ballot. The "Ballot Mail Rule" was issued just weeks before the start of mail voting in the 2026 elections and imposed logistically impossible ballot verification requirements that would have disenfranchised millions of Americans who attempted to vote by mail. But this effort, too, was enjoined as unlawful federal overreach—a conclusion the Supreme Court declined to disturb when it rejected the administration's effort to obtain a stay of that order. *See U.S. Postal Serv. v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026); *League of Women Voters of Mass. v. Trump*, Nos. 26-2029, 26-2030, 26-2031, 26-2032, 2026 WL 2662011 (1st Cir. Sep. 10, 2026); *League of Women Voters of Mass. v. Trump*, No. 1:26-cv-11549, 2026 WL 2620871 (D. Mass. Sep. 4, 2026); *DSCC v. Trump*, No. 26-cv-01114 (CJN), 2026 WL 2681471 (D.D.C. Sep. 13, 2026).

49. Nevertheless, other components of Executive Order 14,399 continue to loom over the 2026 elections. It directs DHS to compile and send all 50 States a "State Citizenship List" that would name every adult U.S. citizen resident of each State. But these lists would be grossly inaccurate because the federal government does not have accurate citizenship or residency information for most Americans. Although Executive Order 14,399's self-imposed deadline for delivering these lists to each State has passed, DHS has indicated that an online "Portal" containing this information remains imminent. The Order also instructs the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." Exec. Order No. 14,399 § 2(b), 91 Fed. Reg. 17,125, 17,126 (Mar. 31, 2026).

50. Indeed, the Trump administration, often through the Attorney General and DOJ, has consistently targeted state and local election officials—and endeavored to usurp their

responsibility over voter registration. In the summer of 2025, DOJ launched a campaign to seize control of voter list maintenance efforts, with a stated goal of purging "hundreds of thousands of people" from the rolls.[8]

51. To achieve those ends, DOJ has sought to run unredacted statewide voter registration lists through DHS and USCIS's Systematic Alien Verification for Entitlements ("SAVE") tool. SAVE purports to allow verification of an individual's citizenship. But SAVE was never intended for use in election administration, and it is beset by well-documented inaccuracies that remain the subject of ongoing litigation.[9]

52. Most States refused to acquiesce to DOJ's demand to turn over their unredacted lists, citing state privacy protections and DOJ's lack of authority for the demand. DOJ therefore launched more than *30* lawsuits against the States to compel disclosure of such lists. That litigation campaign has been unsuccessful, and every single court—now *27*—to resolve DOJ's claims has dismissed them. *See, e.g.*, *United States v. Evans*, No. 25-4403 (RDM), 2026 WL 2267774, at *5 (D.D.C. Aug. 6, 2026) (collecting cases); *see also United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) (dismissing DOJ's demand as to California), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Aguilar*, No. 3:25-cv-728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026) (dismissing DOJ's demand as to Nevada), *appeal docketed*, No. 26-5375 (9th Cir. Aug. 20, 2026). One court within this district has vacated DOJ's nationwide policy of seeking to aggregate statewide voter registration lists altogether. *See Common Cause v. U.S. Dep't of Just.*, No. CV 26-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026).

---

[8] Video posted by AAG Harmeet Dhillon (@AAGDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

[9] *See* Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Counsel for Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

53. A minority of States nevertheless acquiesced to DOJ pressure to run their voter rolls through SAVE, with the predictable result that many eligible voters were inaccurately flagged as noncitizens and sent demands to verify their citizenship.[10]

54. Because most States have rightfully refused to run their entire voter rolls through SAVE, or to otherwise surrender their voter rolls to DOJ, the Trump administration has resorted to even more desperate and unlawful tactics that form the crux of this lawsuit.

## IV. Defendants are pursuing President Trump's initiatives by directly interfering in state voter registration and ballot counting procedures.

55. The Trump administration's onslaught against voting and the States has escalated into yet new attempts to unlawfully insert the federal government into state voter list maintenance and state election administration. Two aspects of this program are at issue in this lawsuit.

56. First, since this past summer, Defendants have adopted a disturbing policy of haranguing and threatening state and local election officials with prosecution for permitting registered voters to cast ballots, based on ham-handed efforts at identifying noncitizens on state rolls.

57. Second, DHS and USCIS began efforts parallel to DOJ to federalize voter list maintenance. They have done so by peddling spurious and ever-changing lists of noncitizens purportedly on state voter rolls, while browbeating States with demands to remove those voters. Worse still, DOJ has now stepped directly into the realm of real-time election interference, by

---

[10] *See, e.g.*, Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, The Tex. Trib. (Feb. 13, 2026), https://perma.cc/PCQ4-PG5E; Judd Legum & Rebecca Crosby, *The Federal Database that Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026), https://www.motherjones.com/politics/2026/04/save-database-errors-faulty-state-voter-rolls-lists-trump-administration-doj-ice-2026-midterm-elections/.

demanding that States withhold ballots from these registered voters or, alternatively, segregate and not count ballots that have already been issued.

### A. DOJ, DHS, and USCIS threaten States based on unsupported and quickly disproven claims of finding noncitizens on the rolls.

58. On July 7, 2026, Assistant Attorney General Harmeet Dhillon sent letters to every State purportedly to provide "notice of the federal laws applicable to State and local election officials to ensure free, fair, and transparent elections."[11] These letters served to threaten election officials with "criminal" prosecution if they "knowingly retain" noncitizens on their statewide voter registration lists or otherwise "facilitate[] noncitizens in receiving and casting ballots." Assistant Attorney General Dhillon urged state election officials to "contact [DOJ] to discuss what steps your state should take to maintain clean voter lists as required by law" and demanded a response within five days as to how each State "intends to ensure it is complying with these federal laws both at the state and local level and how [DOJ] can assist in those efforts."[12]

59. Assistant Attorney General Dhillon's threat to state election officials was merely the start. On July 16, 2026, DHS sent letters to several States claiming it had conducted a "preliminary review" of their voter lists.[13] These States did not solicit DHS's assistance in maintaining their voter rolls, and DHS's letter cited no statutory authority for this unasked-for intrusion into a canonical state-law domain. Indeed, DHS appeared to target these States

---

[11] Nick Corasaniti, *Justice Department Threatens Top Election Officials Over Noncitizen Voting*, N.Y. Times (July 7, 2026), https://www.nytimes.com/2026/07/07/us/politics/justice-department-elections-noncitizen-voting.html.

[12] *See, e.g.*, Letter from Harmeet Dhillon to Sec'y Simon (July 7, 2026), https://www.sos.mn.gov/media/h34ox5rq/772026-minnesota-letter-and-memo.pdf.

[13] *See* Letter from Sec'y Mullin to Sec'y Weber (July 16, 2026), https://perma.cc/RT38-GCFZ; Letter from Sec'y Mullin to Sec'y Aguilar (July 16, 2026), https://perma.cc/CQY9-YK3U; Letter from Sec'y Mullin to Sec'y Schmidt (July 16, 2026), https://www.documentcloud.org/documents/28524325-public-file-letter-pa/.

specifically because they were among the more than 30 jurisdictions that *refused* to turn over their unredacted statewide voter registration lists to DOJ. Unwilling to take "no" for an answer, DHS began a brute-force comparison of publicly available voter list data with DHS and USCIS records in order to compile its own list of *possible* noncitizens. It then brandished these lists as purported proof that noncitizens were on their rolls.

60. For example, DHS's July 16, 2026, letter to California purported to identify 190,832 noncitizens on California's voter list, of which 81,336 were "California registrants for whom the name, date of birth, address and Social Security number match a non-citizen in our files." *Supra* ¶ 59 n.13. But the letter did not explain DHS's methodology, nor did it acknowledge that DHS's files often contain outdated information and are incomplete. *Id.*; *see also League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 102 (D.D.C. 2026) (noting that because "[t]here is no obligation for an individual to report to SSA a change in their citizenship or immigration status until they request a replacement card or file a claim for a Social Security benefit," DHS's files often fail to contain accurate information for recently naturalized citizens (alteration in original) (citation omitted)), *stay granted*, No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026). And it provided no explanation for why DHS had flagged the other 109,496 voters as potential noncitizens. Amid these vagaries, the letter gave Secretary Shirley Weber two weeks to commit to a collaboration where DHS is engaged in "the process" of identifying purported noncitizen registrants.

61. In a July 23, 2026, response, Secretary Weber once more rejected DHS's intrusion into California's voter list maintenance program. Secretary Weber highlighted that "California's election officials work every day to maintain accurate voter rolls and ensure that only eligible voters are registered." She noted that DHS's letter "provide[d] no detail whatsoever" for evaluating

"the veracity" of DHS's "allegations" or the methodology used to identify purportedly ineligible voters. She also sought information on how DHS obtained the purported list of registered voters.[14]

62. Secretary Weber further explained that the NVRA's quiet period, which prohibits the systematic cancellation of voter registrations during the 90 days before a federal election, would begin on August 5, 2026. She reiterated her commitment to "ensur[ing] that no eligible voter is erroneously removed from our State's voter rolls, and that no eligible voter is deterred from casting a ballot due to intimidation or coercion." *Supra* ¶ 61 n.14.

63. Secretary Weber asked for a response by August 3, 2026; she did not receive one.

64. Nevada's experience began with a nearly identical July 16 letter from DHS that claimed to find 15,903 potential noncitizens on the Nevada voter rolls, including 8,576 "for whom the name, date of birth, address and Social Security number match a non-citizen in our files."[15]

65. Nevada's Secretary Francisco Aguilar answered DHS on July 29, 2026. He described his office's commitment to "ensuring that *only* eligible U.S. citizens vote in our elections," as well as federal and Nevada protocols for achieving that goal. More pointedly, Secretary Aguilar sought to "better understand" DHS's claims that thousands of unidentified voters appeared on Nevada's voter rolls, noting that, among other omissions, DHS failed to explain what data it consulted, what methodology it used, and how it accounted for common names and naturalized citizens.[16]

66. Nevada agreed to an August 13 meeting. There, DHS officials acknowledged that the 15,903 number was not based on a "full manual review of each one" by DHS investigators.

---

[14] Letter from Sec'y Weber to Sec'y Mullin (July 23, 2026), https://perma.cc/6VWD-APH9.

[15] Letter from Sec'y Mullin to Sec'y Aguilar, *supra* note 13.

[16] Letter from Sec'y Aguilar to Sec'y Mullin (July 29, 2026), https://perma.cc/F7HN-Z597.

DHS insisted that it had, however, identified a subset of 185 registrants who DHS had *confirmed* were not U.S. citizens. DHS sent Nevada a spreadsheet containing these 185 individuals and associated "voter case numbers" for each, as well as approximately 6,000 more individuals and voter case numbers that DHS had flagged but not yet manually reviewed.[17]

67. In a September 9 email, DHS reiterated its claim that Nevada should investigate the 15,903 individuals it had named. Nevada responded that DHS never bothered to provide a list of 15,903 individuals, only smaller lists of individuals purportedly identified by voter case numbers. Nevada further explained that these voter case numbers were a poor fit for identifying specific individuals because Nevada had recently switched from county-run voter registration to a statewide system, and individuals may have been assigned different numbers before and after the change.[18]

68. As for the 185 registrants who were purportedly "confirmed" by DHS as noncitizens, Nevada informed DHS that its records indicated *all 185* were citizens, with DHS having provided "nothing of substance to suggest otherwise." *Supra* ¶ 67 n.18.

69. Pennsylvania's story is similar. After receiving DHS's letter on July 16, which flagged 14,576 purported noncitizens and 8,594 whose name, date of birth, address and Social Security numbers matched DHS files, Secretary Al Schmidt replied on July 29, explaining Pennsylvania's "robust efforts" "to ensure that all eligible voters—and only eligible voters—have the opportunity to make their voices heard." Like other recipients, Secretary Schmidt noted that DHS "ha[s] not identified its methodology or what data it relied on in reaching [its] conclusion,"

---

[17] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

[18] E-mail from Greg Ott to DHS Off. of Intergovernmental Affs. (Sep. 23, 2026, at 2:54 PM), https://perma.cc/UY3B-LCGT.

and that past analyses of voter lists had relied on "faulty methodologies" that led to inaccurate results.[19]

70. In a follow-up letter on August 25, Secretary Schmidt recounted an August 13 meeting where DHS representatives "explained that they did not have high confidence" that the 14,576 registrants were in fact noncitizens. Secretary Schmidt said he was awaiting further information on DHS's methodology.[20]

71. On September 9, DHS asserted in a new letter that Secretary Schmidt had mischaracterized the August 13 meeting, as well as DHS's level of confidence that the 14,576 individuals were not citizens. But DHS was nonetheless forced to acknowledge that the number represented only "potential[]" noncitizens and still failed to provide Secretary Schmidt with a confidence determination for even *one* of those individuals.[21]

72. President Trump amplified DHS's half-baked findings, falsely presenting them as definitive proof that his administration found noncitizens on the rolls—even as DHS backed away from that same claim. On the same day that DHS sent the initial letters, July 16, President Trump delivered a primetime address repeating the claim that DHS had uncovered "approximately 278,000 non-citizens who are registered to vote." President Trump said that this was a "limited analysis" and expressed his view that "[s]ince Democrat[ic] states refuse to share their voter files the real number is actually much higher than that."[22] But as subsequent events illustrated, DHS

---

[19] Letter from Sec'y Schmidt to Sec'y Mullin (July 29, 2026), https://perma.cc/369K-NBQG.

[20] Letter from Sec'y Schmidt to Sec'y Mullin (Aug. 25, 2026), https://perma.cc/4CGS-49N9.

[21] Letter from DHS Off. of Intergovernmental Affs. to Sec'y Schmidt (Sep. 9, 2026), https://www.documentcloud.org/documents/28652211-9926-dhs-pennsylvania-letter/.

[22] Zachary B. Wolf & Annette Choi, *Trump's Speech Claiming US Election Vulnerabilities, Annotated*, CNN (July 17, 2026), https://www.cnn.com/interactive/2026/07/politics/annotated-transcript-trump-speech-us-election-vis/.

was in fact *downsizing* its claim, even as the President baselessly insisted the true number was far greater.

73. President Trump also explained that he had ordered DHS to "notify every state about noncitizens on their voter rolls and direct them to remove all ineligible voters from the lists immediately." *Supra* ¶ 72 n.22. And he reiterated his view that "mail-in ballots are inherently corrupt." *Id.*

74. DHS Secretary Mullin echoed the President in a press conference the following day, repeating unsubstantiated numbers of purported noncitizens and threatening criminal prosecution for election officials who refused to follow the federal government's commands. For example, he emphasized that election officials who failed to act on DHS's lists could "be held accountable by fines, by penalties, and even, depending on how far it goes, prison time."[23]

### B. DOJ seeks to commandeer state administration of voter registration and ballot counting.

75. On October 13, 2026, DOJ picked up where DHS had left off. With DHS's prior threats so far unsuccessful in achieving its goal, DOJ pressed yet further by making express demands that California—mere weeks before election day—refuse to send ballots, or segregate and not count the ballots, of more than 20,000 registered voters.[24]

76. According to DOJ's October 13 letter, it sent Los Angeles County a "password protected thumb drive with a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot." *Supra* ¶ 75 n.24. DOJ demanded that Secretary

---

[23] Doina Chiacu & A.J. Vicens, *DHS Threatens States with Fines, Charges Over Election Measures*, Reuters (July 17, 2026), https://www.reuters.com/legal/government/us-dhs-chief-asks-four-states-check-voter-rolls-non-citizens-2026-07-17/.

[24] Letter from DOJ to Sec'y Weber (Oct. 13, 2026), https://perma.cc/9XH8-2Z9S; *see also* Brittany Gibson & Avery Lotz, *DOJ Gives California 48 Hours to Check Voters or Face Lawsuit*, Axios (Oct. 15, 2026), https://www.axios.com/2026/10/14/doj-california-noncitizen-voters-mail-ballots.

Weber "review the list within 48 hours," and "immediately instruct the appropriate elections officials to segregate" mail ballots cast by these individuals until their citizenship status can be determined. *Id.* It further demanded that, if an individual on the thumb drive list had not yet been provided a mail ballot, no ballot should be sent until DOJ could confirm that individual's citizenship status. DOJ's letter stated that, if a ballot for an individual on the list *had* been returned, Secretary Weber should "instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined." *Id.* The letter threatened that if the "process described above" was not implemented by "October 15 at noon EST," DOJ would seek emergency relief. *Id.*

77. DOJ sent a nearly identical October 13 letter to Dean C. Logan, the Los Angeles County Registrar-Recorder/County Clerk, likewise demanding that the purported noncitizens on the thumb drive list have their ballots segregated, withheld, not verified, and not tabulated.[25]

78. Secretary Weber rejected DOJ's "outrageous demands" made "on the eve of an election" with a 48-hour deadline. Her response emphasized that DHS still had not "provided any information about the underlying data or methodology" for its purported list of voters who "may" be noncitizens, nor had it ever provided a level of certainty for suspecting that the listed individuals were noncitizens. She further noted that DOJ's "unprecedented" demand came after ballots were already delivered to voters and voting was already underway. And she noted that DOJ's demand came *after* the similar pressure applied to Nevada failed to identify a single noncitizen registrant. DOJ's proposed "extraordinary measures," Secretary Weber explained, were "contrary to both federal and state law," including the right to vote, the Voting Rights Act, the NVRA, and several

[25] Letter from DOJ to Dean Logan, L.A. Cnty. Registrar-Recorder (Oct. 13, 2026), https://rrcc.app.box.com/s/jwladrl77dwd9ud2hexcw2yeuvm1gnic/file/2526768778856; *see also* Gibson & Lotz, *supra* note 24.

California provisions protecting the right to vote and have that ballot counted. She concluded by reiterating that "California's elections officials work every day to ensure that only eligible voters are registered" and "maintain accurate voter rolls" and that she would not "disenfranchise thousands of Californians" based solely on DOJ's unsupported and likely inaccurate list.[26]

79. DOJ responded to Secretary Weber's letter on October 16, 2026, doubling down on its overt threats to California's election officials, insisting that election officials who refused DOJ's directive to withhold or segregate ballots cast by individuals on the agency's list would face "significant . . . legal consequences" for "knowingly facilitating" noncitizen voting. The letter resolved with an ominous warning to "reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure."[27] In short, it echoed the same threats of legal retaliation that the Assistant Attorney General Dhillon had made months earlier. *Supra* ¶ 58.

80. President Trump himself put a finer point on the issue, reposting the letter to Truth Social with the announcement, "**They will all go to jail for a long period of time!!!**"[28]

81. DOJ's threats were not idle. On October 15, it sued the State of California, as well as Secretary Weber and the Los Angeles County Registrar-Recorder/County Clerk, bringing a novel, standalone claim under the Supremacy Clause. *See* Complaint, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1. Four days later, on October 19, 2026, DOJ moved for a temporary restraining order. DOJ requested an order commanding California "(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens

---

[26] Letter from Sec'y Weber to DOJ (Oct. 15, 2026), https://perma.cc/2RFW-AMKA; *see also* Press Release, Cal. Sec'y of State, *California Secretary of State Shirley N. Weber, Ph.D., Shares Response to U.S. Department of Justice Demands* (Oct. 15, 2026), https://perma.cc/K552-T4G6.

[27] @USAttyEssayli, X.com (Oct. 16, 2026), https://x.com/usattyessayli/status/2111235463428419898?s=46.

[28] Ward, *supra* note 2.

and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot." Ex Parte Application for TRO at 28–29, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 19, 2026), ECF No. 22-2.

82. Unsurprisingly, however, DOJ's brazen claims against California have already begun to wither under the barest scrutiny. Los Angeles County conducted a preliminary review of the more than 7,000 voters on DOJ's list with a Los Angeles address and found that *more than a quarter* of the entries concerned individuals who listed a place of birth within the United States. Nearly 40% of the sample entries concerned registrations that had already been cancelled, and the vast majority had never cast a ballot. Opp'n to Ex Parte Application for TRO at 17, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 20, 2026), ECF No. 32-1. Simply put, Defendants are premising their outrageous demands against States and election officials on fundamentally flawed lists that pose an unacceptably high risk of disenfranchising lawful voters.

83. DOJ officials in other States have eagerly latched on to the policy of threatening election officials endorsed at the highest levels of government: On October 19, the first day of early voting in Texas, U.S. Attorney for the Southern District of Texas Aaron Reitz posted a video on social media threatening to "hunt . . . down and prosecute" voters and local election officials alike. It was his job, he said, to make sure "crooked local election administrators . . . do their job."[29]

84. DOJ's recent actions confirm that Defendants have settled on a course of intimidating state election officials with threats of criminal prosecution for doing nothing more than adhering to state law and distributing ballots to registered voters. And they yet again confirm

---

[29] Jen Rice, *'I Will Hunt You Down': U.S. Attorney Baselessly Threatens Voters as Polls Open in Texas*, Democracy Docket (Oct. 19, 2026), https://perma.cc/2NN4-4YM8.

Defendants' intent to insert themselves into state election administration, including by demanding that States remove registered voters from the rolls and not count their ballots. As DOJ's suit in California illustrates, Defendants stand ready to enforce these threats. As a result, election officials across the country now must carry out their time-sensitive responsibilities under the specter of unlawful federal intrusion upon their already demanding duties.

### V. Plaintiffs are harmed by Defendants' meddling in state election administration procedures and intimidation of election officials.

85. Defendants' intimidation of election officials and meddling in state election procedures harms the Plaintiffs in numerous ways.

86. *First*, Defendants' course of conduct harms Plaintiffs—including their members who are candidates in upcoming elections in all 50 States, and Leader Schumer and Leader Jeffries (who are candidates themselves)—by forcing them to compete in unlawfully structured elections.

87. The Supreme Court has recognized that "candidates . . . have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Id.* at 78.

88. Defendants' interference with state ballot counting and tabulation processes, along with their intimidation of state election officials, unlawfully alters election rules in ways that "deprive the candidate[s] of a fair process and an accurate result." *Id.* at 77. That concrete injury is compounded by the damage to Plaintiffs' reputational interests, which depend on public confidence in election integrity. *See id.* at 82 ("[Candidates'] interest[s] extend[] to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent.").

89. *Second*, Defendants' actions harm Plaintiffs by unlawfully targeting, and seeking to disenfranchise, large numbers of Democratic and Democratic-leaning voters, including Plaintiff Jimenez, which in turn injures the Plaintiffs' electoral and competitive prospects. Courts have routinely held that any threat to the electoral prospects of a political party's candidates—or to an individual candidate—stemming from a change in election rules constitutes a concrete and particularized injury for purposes of Article III.[30] Plaintiffs thus have direct standing to challenge Defendants' conduct, which seeks to unfairly tilt the competitive playing field by coercing state election officials into disenfranchising registered voters likely to cast ballots in the forthcoming elections. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005).

90. *Third*, Plaintiffs are also harmed by being forced to mitigate the attendant voter suppression caused by Defendants' actions. Specifically, Plaintiffs are forced to revise their programming and messaging to aid injured voters and candidates, like Plaintiff Jimenez, which naturally requires resource diversion from other mission-critical activities. In particular, Leader Schumer, who is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country, closely coordinates with DSCC and its candidate members to craft messaging, prioritize party investments, and develop strategies to elect Democratic Senate candidates. Defendants' ongoing meddling in state election administration procedures directly impairs his ability to grow the Senate Democratic Caucus by intimidating voters and state election officials alike.

---

[30] *E.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (regulations that "make[] the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation[s] were declared unlawful" inflict cognizable harm); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (similar, collecting "[v]oluminous persuasive authority"); *Nelson v. Warner*, 472 F. Supp. 3d 297, 304–07 (S.D. W. Va. 2020) (collecting cases from "[s]everal circuits" finding individual candidate and party committee standing).

91. Plaintiff Leader Jeffries likewise suffers those injuries as a candidate for reelection this cycle, and in his role as Leader of the House Democratic Caucus. Leader Jeffries works to elect Democratic Party candidates in U.S. House elections across the country, including through coordination with DCCC. Defendants' intimidation campaign, as well as their efforts to affirmatively meddle in state election administration procedures, make Leader Jeffries' efforts to grow the House Democratic Caucus more difficult by intimidating voters and state election officials, interfering with planning and programming for Democratic House campaigns, and harming those campaigns' ultimate likelihood of success.

92. Additionally, Plaintiffs DSCC, DCCC, DGA, and the NSDP's core business activities include persuading and mobilizing voters to support their candidate members. DSCC, DCCC, DGA, and the NSDP have invested heavily in encouraging their supporters to vote, including significant sums already spent on turnout efforts for the 2026 election. DSCC, DCCC, DGA, and the NSDP, however, have crafted their get-out-the-vote strategies and messaging with the expectation that state election administration procedures would not be undermined by Defendants' actions, as well as the reasonable expectation that registered voters would be permitted to cast ballots. Because of Defendants' ongoing misconduct, DSCC, DCCC, DGA, and the NSDP are forced to revise their communications and voter engagement efforts at the last minute to support and protect voters who are concerned about exercising their right to vote.

93. DSCC, DCCC, DGA, and the NSDP have also invested heavily in voter protection initiatives to ensure that voters can successfully cast their ballots. DCCC, for instance, has devoted considerable financial resources and staff time to on-the-ground voter protection, including through coordination with candidate members' campaigns across the country. DSCC and DGA have provided financial support to many similar programs. But although obstacles to voting are

nothing new, Defendants' campaign of intimidation and threats to seize and segregate lawfully cast ballots certainly is. With such unprecedented threats looming over the 2026 elections, DSCC, DCCC, DGA, and the NSDP's existing efforts are compromised and undermined. DSCC, DCCC, DGA, and the NSDP must spend additional resources to support their candidates and voters during the post-election period if Defendants' threats materialize.

94. *Fourth*, Plaintiffs' associational interests are impaired by Defendants' misconduct, which directly harms members and supporters of DSCC, DCCC, DGA, and the NSDP, like Plaintiff Jimenez, by coercing States to disenfranchise or impose additional unlawful burdens on voters shortly before an election. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44 (1977). This harm is of greatest magnitude for the NSDP, as naturalized citizens are a core constituency of the Party. That is because naturalized citizens, like Plaintiff Jimenez and other similarly situated voters, are no doubt aware of Defendants' attempts to coerce state and local officials to purge voters or to prevent such voters from having their ballots counted. Accordingly, these voters fear being unlawfully targeted for voting and potentially disenfranchised.

## CLAIMS FOR RELIEF

### COUNT I: *ULTRA VIRES* EXECUTIVE ACTION
### U.S. CONST. art. I, § 4, cl. 1 (Elections Clause)

95. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

96. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 588 (2012). A federal agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301. And where Congress authorizes a "lawful means" for an agency to pursue its "policy aims," the tools it provides are exhaustive: Agencies may not "'improvise on the powers granted by Congress' by devising an extralegal path"

to their chosen ends. *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 368 n.* (2018) (quoting *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 330 (1961)).

97. It has been axiomatic since the Founding that the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations." The Federalist No. 59 (Alexander Hamilton). To that end, the Constitution "invests the States with responsibility for the mechanics of congressional elections," *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. II, § 1, cl. 2. States thus have expansive authority to regulate "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quoting *Smiley*, 285 U.S. at 366).

98. The Constitution makes clear that it only "empowers *Congress* to pre-empt state regulations governing" federal elections, not the Executive Branch. *ITCA*, 570 U.S. at 8 (emphasis added). It is only "the action of *Congress*," not the executive, that may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. at 384 (emphasis added). Even then, "Congress's power to regulate elections 'supersede[s]' state law 'so far as it is exercised, and no farther.'" *Watson v. RNC*, 609 U.S. 672, 697 (2026) (quoting *Ex parte Siebold*, 100 U.S. at 392).

99. The Executive Branch's constitutional and statutory authority over elections is purposefully limited. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington*, 814 F. Supp. 3d at 1214 n.57. The "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. The Executive Branch lacks any "direct control" over "the

individuals—members of Congress and state officials—who conduct federal elections," and it thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.* at 1347. Instead, executive officers may only act "in relation to another branch's constitutionally authorized act." *Id.*

100. "Constitutional *ultra vires* claims" are available where "the executive exceed[s] its powers under the Constitution." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 836 F. Supp. 3d 137, 173 (D.D.C. 2026). As distinguished from statutory *ultra vires* claims, arguing that agency action "exceeded specific statutory authority," constitutional *ultra vires* claims arise where the Executive Branch "disclaims reliance on any statute, ostensibly in favor of inherent constitutional authority." *Id.* (citing *Dalton v. Specter*, 511 U.S. 462, 472 (1994)). And in such circumstances, "courts are normally available to reestablish the limits on [its] authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied*, 144 S. Ct. 1110 (2024).

101. Defendants' effort to federalize certain aspects of state election administration falls outside any colorable boundary of Defendants' lawfully delegated authority when it comes to conducting federal elections.

102. Defendants have targeted States that refused to purge their voter rolls using the SAVE database. *Supra* ¶¶ 51–54. In such States, Defendants have generated lists comprising *thousands* of voters whom they believe, based on shoddy data-matching techniques, *may* not be citizens. Defendants have, in turn, launched a campaign to coerce States—through the threat or initiation of civil or criminal action—to remove these registered voters from the rolls, and to

withhold, segregate, and refuse to tally potentially thousands of lawful ballots cast by these individuals.

103. No source of legal authority exists for the Executive Branch to compel or coerce States into removing voters from the rolls, withholding ballots from registered voters, or segregating or refusing to tally ballots cast by registered voters. While Defendants have grounded their efforts in their inherent authority under the "Supremacy Clause" to prevent the casting of any ballot in violation of 18 U.S.C. § 611, *supra* ¶ 39, no such authority exists: 18 U.S.C. § 611 simply makes it "unlawful for any alien to vote in any [federal] election." *Nothing* in Section 611 authorizes Defendants to seek injunctive relief against, or otherwise compel or coerce, States to withhold, segregate, or refuse to tally ballots cast by registered voters. Defendants appear to recognize as much, which is why they have thus far disclaimed reliance on any clear statutory authority and instead have relied upon vague invocation of the Supremacy Clause to support their *ultra vires* conduct.

104. Accordingly, Defendants' actions are straightforwardly *ultra vires* and this Court must "reestablish the limits on [the executive's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)), by issuing injunctive and declaratory relief against Defendants' attempts to prevent States from issuing and canvassing ballots of lawfully registered voters, *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

**COUNT II: VIOLATION OF VERTICAL SEPARATION OF POWERS**
**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend. X**

105. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

106. In addition to the "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th

Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's reservation "to the States" of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. It is further reflected in the Constitution's express reservation of certain rights to the States, at least where Congress has not acted in a contrary manner. *See id.* art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

107. This is especially true in the election context. "The Constitution addresses two types of power over federal elections: first, the power to determine who is qualified to vote, and second, the power to regulate federal election procedures. In both spheres, the Constitution vests authority first in the States." *LULAC III*, 818 F. Supp. 3d at 59. Thus, "considerations of federalism and the vertical separation of powers" are especially salient where an executive order intrudes on a traditional domain of state authority. *Id.* at 100.

108. Defendants' conduct violates the vertical separation of powers between the federal government and the States by intruding upon matters that both the Constitution and Congress have left to the States, namely the maintenance of voter rolls, and the issuance and canvassing of ballots to voters who have lawfully registered under state law.

109. Such conduct is inconsistent with the Constitution and Congress's longstanding assignment of most election administration responsibilities to the States, and is at odds with the States' reserved authority to "determine who is qualified to vote" and "regulate federal election procedures." *Id.* at 59; *accord Moore*, 600 U.S. at 29.

110. While Defendants have nominally identified supposed sources of authority for their actions, such as the Supremacy Clause and 18 U.S.C. § 611, those sources do not grant Defendants the freewheeling election administration powers they claim. Indeed, they merely emphasize that Defendants enjoy only *specific* powers when it comes to elections that are derived from *express*

congressional enactments. Defendants may not transgress such grants of authority, *Foster*, 522 U.S. at 69, yet they have done just that, trampling upon matters reserved to the States in the process.

111. Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

**COUNT III: VIOLATION OF THE ANTICOMMANDEERING DOCTRINE**
**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend. X**

112. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

113. As noted, the Tenth Amendment reserves any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, . . . to the States respectively, or to the people." U.S. Const. amend. X. Based on the Founders' "fundamental structural decision" in that regard, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018), the anticommandeering doctrine prohibits the federal government from "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," *New York v. United States*, 505 U.S. 144, 176 (1992) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). The rule applies "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578.

114. The anticommandeering doctrine is not limited exclusively to instances where the federal government hijacks state *legislative* processes. It also applies when the federal government

seeks to conscript state officials into enforcing federal priorities, *see New York*, 505 U.S. at 161–62, 188; *Printz v. United States*, 521 U.S. 898, 935 (1997), or to punish States and state officials for refusing to acquiesce to federal demands, *see, e.g.*, *In re Grand Jury Subpoenas*, 835 F. Supp. 3d 947, 955 (D. Minn. 2026) ("Nor may the federal government coerce or retaliate against states or political subdivisions who decline to help the federal government enforce federal laws."); *City & Cnty. of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1040–41 (N.D. Cal. 2026).

115. Defendants' efforts to federalize voter list maintenance, and to control how States issue and count ballots, therefore reflect a textbook violation of the anticommandeering doctrine, in keeping with the President's insistence that his political party should "nationalize" voting. *Supra* ¶ 44. Specifically, Defendants have repeatedly pressured and coerced States that have declined to run their voter rolls through SAVE into purging their voter rolls of individuals who appear on USCIS-generated lists of supposed noncitizens and have now demanded that the State of California refuse to count ballots from such individuals.

116. And as DOJ's recent action in California shows, Defendants are willing to enforce this policy through threats of criminal prosecution and baseless civil suits against state election officials. Defendants therefore intend to continue leveraging threats of criminal and civil liability against state officials unless they withhold, segregate, and refuse to tally ballots cast by thousands of registered voters Defendants have preliminarily deemed *possibly* unqualified to vote.

117. Nothing in federal statutory or constitutional law affords Defendants such authority, which seeks to override legitimate state choices about how to engage in "supervision of voting, . . . prevention of fraud and corrupt practices, counting of votes, [and the] duties of inspectors and canvassers." *Moore*, 600 U.S. at 29 (internal quotation marks omitted). By "weaponiz[ing]" enforcement authority against States that "purportedly fail to comply with"

Defendants' preferred election administration policies, Defendants have violated the anticommandeering principle contained within the Tenth Amendment. *City & Cnty. of San Francisco*, 816 F. Supp. 3d at 1041.

**COUNT IV: VIOLATION OF THE VOTING RIGHTS ACT**
**52 U.S.C. § 10307(b)**

118. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

119. Section 11(b) of the Voting Rights Act provides that "no person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote," nor shall they "attempt to intimidate, threaten, or coerce any person" for doing the same. 52 U.S.C. § 10307(b).

120. Section 11(b) "is to be given an expansive meaning," *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979), and incorporates the comprehensive definition of "vote" and "voting" in Section 14 of the Voting Rights Act, 52 U.S.C. § 10310(c)(1).

121. Voters requesting or returning mail ballots are voting or attempting to vote as defined by the Voting Rights Act. State officials administering elections—including by mailing absentee ballots to registered voters, running polling sites for in-person voting, and tabulating ballots—"aid[]" voters in casting their vote within the meaning of Section 11(b), and similarly "urg[e]" registered voters to cast ballots as part of their duties. 52 U.S.C. § 10307(b).

122. Establishing a violation of this provision does not require either "a showing of specific intent or racial animus[.]" *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018). Furthermore, "threats, intimidation or coercion may take on many forms," *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl I*), 498 F. Supp. 3d 457, 484 (S.D.N.Y. 2020) (quoting *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (per curiam)), and whether

challenged activity is intimidating, coercive, or threatening "must be considered against the background of contemporaneous events . . . and the general climate prevailing . . . at the time." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967). "The threatened injury need not be one of violence or bodily harm," and "threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify depending on the circumstances." *Wohl I*, 498 F. Supp. 3d at 477.

123. Coercive legal actions and threats of criminal liability constitute well-established violations of Section 11(b). *See, e.g.*, *Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 725–26 (W.D. Tex. 2026) (granting preliminary injunction where attorney general stated "he [sought] to 'crush' [voter registration organization] in his quo warranto action"); *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl II*), 661 F. Supp. 3d 78, 114 (S.D.N.Y. 2023) (finding Section 11(b) violation based on "threat[s of] legal action if [voters] voted by mail").

124. As the November election draws nearer, DOJ has repeatedly, and with increasing severity, threatened state officials with legal consequences—including threatening criminal prosecution—if they refuse the agency's demands to withhold ballots from registered voters based upon Defendants' shoddy and unreliable target lists. These coercive attacks recently culminated in the President's direct threat that state officials in California "will all go to jail for a long period of time!!!" *Supra* ¶ 3.

125. Defendants' coercive threats of legal retaliation against state officials, including even potential imprisonment, for simply following state law and aiding registered voters in casting their ballots objectively intimidate voters and election officials alike, in violation of Section 11(b) of the Voting Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants have acted *ultra vires* and in violation of the separation of powers and anticommandeering doctrine by issuing demands and threats that States: (i) remove registered voters from statewide voter registration lists; (ii) refuse to issue ballots to such voters; and (iii) segregate (and ultimately not count) ballots cast by such voters;

B. Enjoin Defendants from continuing to unconstitutionally impose themselves upon election administration procedures that the Constitution and federal law assign to the States, including as to: (i) removal of registered voters from statewide voter registration lists; (ii) issuance of ballots to registered voters; and (iii) the counting and tabulation of ballots;

C. Declare that Defendants' course of threatening state election officials with criminal prosecution for aiding and urging registered voters to cast ballots pursuant to state law violates Section 11(b) of the Voting Rights Act;

D. Enjoin Defendants from continuing to issue such unlawful threats to state election officials in violation of Section 11(b);

E. Award costs and reasonable attorneys' fees incurred in this action; and

F. Grant such other relief as the Court deems just and proper.

Dated: October 20, 2026

Respectfully submitted,

*/s/ Marc E. Elias*
Marc E. Elias (DC 442007)
Uzoma N. Nkwonta (DC 975323)
Christopher D. Dodge (DC 90011587)
Nicole E. Wittstein (DC 1725217)
Kevin R. Kowalewski (DC 90045467)
Tori A. Shaw (DC 90036555)*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
eliasm@elias.law
unkwonta@elias.law
cdodge@elias.law
nwittstein@elias.law
kkowalewski@elias.law
tshaw@elias.law

**Pro hac vice* application forthcoming

*Counsel for Plaintiffs DSCC, DCCC, Democratic Governors Association, U.S. Senate Minority Leader Schumer, U.S. House Minority Leader Jeffries, the Nevada State Democratic Party, and Erick Jose Jimenez*