**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, et al.,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 1:26-CV-3674 |

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND AND PROCEDURAL HISTORY ........ 3

I. The Constitution vests the power to administer elections in the States, except where Congress purposefully chooses to preempt state procedures. ........ 3

II. Congress afforded federal agencies narrow, carefully circumscribed roles concerning state voter registration and ballot counting processes. ........ 5

III. The Trump administration launches a comprehensive effort to unlawfully federalize elections. ........ 8

IV. Defendants pursue President Trump's initiatives by directly interfering in state voter registration and ballot counting procedures. ........ 11

A. DOJ and DHS threaten States based on unsupported and quickly disproven claims of finding noncitizens on the rolls. ........ 12

B. DOJ seeks to commandeer state administration of voter registration and ballot counting. ........ 17

C. DOJ expands its efforts beyond California. ........ 20

V. Plaintiffs filed this lawsuit to protect their interests and defend voting rights. ........ 23

STANDARD OF REVIEW ........ 23

ARGUMENT ........ 24

I. Plaintiffs are likely to succeed on the merits of their claims. ........ 24

A. Defendants' interference with the issuance, casting, and counting of ballots is unsanctioned by any federal law and therefore *ultra vires* ........ 24

B. Defendants' effort to federalize elections violates the Tenth Amendment ........ 28

1. Defendants' efforts to dictate how States issue and count ballots violate vertical separation of powers. ........ 29

2. Threatening state election officials with civil and criminal liability to coerce compliance with federal policy violates the anticommandeering principle. ........ 30

II. Plaintiffs have standing and face imminent irreparable harm. ........ 32

A. Plaintiffs satisfy Article III standing on numerous grounds. ............................... 32

B. The harm Plaintiffs are suffering is irreparable. .................................................. 36

III. The equities and public interest favor relief. ................................................................ 38

CONCLUSION ......................................................................................................................... 40

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) .......... 24

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 27

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .......... 7

*Am. Fed'n of Lab. & Cong. of Indus. Orgsv. Dep't of Lab.*,
836 F. Supp. 3d 137 (D.D.C. 2026) .......... 24

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) .......... 27

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......... 27

**Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 4, 25, 29

**Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) .......... 3, 32, 33, 37

*Cal. Nurses Ass'n v. Mullin*,
No. 26-cv-10680-AMO, 2026 WL 3166149 (N.D. Cal. Oct. 21, 2026) .......... 16

*Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*,
511 U.S. 164 (1994) .......... 8

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 24

*City & County of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) .......... 30

*City & County of San Francisco v. Trump*,
816 F. Supp. 3d 1040 (N.D. Cal. 2026) .......... 30, 31

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 29

*Common Cause v. DOJ*,
No. CV 26-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ................................ 10

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ........................................................................... 34

*Cort v. Ash*,
422 U.S. 66 (1975) ........................................................................................... 28

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ............................................................................... 34

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026) .................................. 35, 37, 38

*Dep't of Homeland Sec. v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) ........................................ 13, 34, 35

*DSCC v. Trump*,
No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) ............................................ 25

**DSCC v. Trump*,
No. 26-cv-1114 (CJN), 2026 WL 2681471 (D.D.C. Sept. 13, 2026) ............ 23, 33, 34, 38

*FEC v. Cruz*,
596 U.S. 289 (2022) ........................................................................................ 8, 25

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ............................................................................... 7

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) ........................................................................... 34

**Foster v. Love*,
522 U.S. 67 (1997) ................................................................................... 2, 4, 25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ......................................................................................... 30

*FTC v. PPG Indus., Inc.*,
798 F.2d 1500 (D.C. Cir. 1986) ........................................................................... 37

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ............................................................................... 30

*Georgia v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .......................................................................... 4, 26

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)............................................................................................. 28

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)............................................................................ 38

*Hubbard v. U.S. EPA Adm'r*,
809 F.2d 1 (D.C. Cir. 1986) ................................................................................ 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)............................................................................................. 32

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018)............................................................................................... 6

*In re Grand Jury Subpoenas*,
835 F. Supp. 3d 947 (D. Minn. 2026) ................................................................. 30

*In re Winship*,
397 U.S. 358 (1970)............................................................................................... 8

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)............................................................................................. 39

**League of United Latin Am. Citizens v. Exec. Off. of the Pres.*,
818 F. Supp. 3d 34 (D.D.C. 2026) ............................................................ 24, 28, 29, 33

**League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................... *passim*

**League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................................................ *passim*

*League of Women Voters v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ............................................................................... 38

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
835 F. Supp. 3d 79 (D.D.C. 2026) ....................................................................... 13

*League of Women Voters v. United States Dep't of Homeland Sec.*,
No. 26-5243, 2026 WL 2643439 (D.C. Cir. Sep. 4, 2026)............................................. 35

*Lee v. U.S. Agency for Int'l Dev.*,
859 F.3d 74 (D.C. Cir. 2017) ........ 28

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 36

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ........ 36

*Moore v. Harper*,
600 U.S. 1 (2023) ........ 25

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ........ 30

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ........ 30

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 24, 39

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........ 40

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ........ 24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
793 F. Supp. 3d 19 (D.C. Cir. 2026) ........ 39

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ........ 32

*SAS Inst. Inc. v. Iancu*,
584 U.S. 357 ........ 27

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) ........ 33, 37

*Smiley v. Holm*,
285 U.S. 355 (1932) ........ 4

*Sterling Comm. Credit — Mich., LLC v. Phx. Indus. I, LLC*,
762 F. Supp. 2d 8 (D.D.C. 2011) ........ 24

*Thomas More L. Ctr. v. Obama*,
651 F.3d 529 (6th Cir. 2011) ........................................................................... 29

*Trainor v. Hernandez*,
431 U.S. 434 (1977)........................................................................................ 28

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020)................................................................. 32

*U.S. Postal Serv. v. California,*
No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026)........................................ 9

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ................................................................. 26

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........................................................................... 31

*United States v. Evans*,
No. CV 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026)............................. 10

*Washington v. Trump*,
814 F. Supp. 3d 1173 (W.D. Wash. 2026)........................................................... 25

*Watson v. Republican Nat'l Comm.*,
609 U.S. 672 (2026)..................................................................................... 4, 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)........................................................................................ 25

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. amend. X ........................................................................................ 29

U.S. Const. art. I, § 4.............................................................................. 4, 25, 29

U.S. Const. art. II, § 1 ........................................................................................ 29

18 U.S.C. § 241 ..................................................................................................... 5

18 U.S.C. § 242 ..................................................................................................... 5

18 U.S.C. § 611 ................................................................................................ 8, 27

18 U.S.C. § 1015 ................................................................................................... 8

42 U.S.C. § 1983 ........ 5

42 U.S.C. § 1985 ........ 5

42 U.S.C. § 1986 ........ 5

52 U.S.C. § 10101 ........ 5

52 U.S.C. § 10301 ........ 6

52 U.S.C. § 10307 ........ 6

52 U.S.C. § 10308 ........ 6

52 U.S.C. § 20501 ........ 6

52 U.S.C. § 20505 ........ 7

52 U.S.C. § 20507 ........ 6, 27

52 U.S.C. § 20508 ........ 7

52 U.S.C. § 20510 ........ 6, 26

52 U.S.C. § 20511 ........ 8

52 U.S.C. § 21082 ........ 7, 27

52 U.S.C. § 21083 ........ 7

52 U.S.C. § 21111 ........ 26

Nev. Rev. Stat. 293.269911 ........ 20

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 103-66 (1993) (Conf. Rep.) ........ 7

S. 3752, 119th Cong. (2026) ........ 9

**OTHER AUTHORITIES**

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ........ 10

*The Federalist No. 51* (James Madison) (Clinton Rossiter ed., 1961) ........ 29

## INTRODUCTION

With election day just eight days away, President Trump is doubling down on what he has done for the past decade: promoting lies and misinformation about American elections as a pretext to, in his own words, "take over the voting" and "nationalize" our purposefully decentralized electoral system. Ex. 1, Nkwonta Decl., Ex. A ("Nkwonta Decl."). This motion concerns the President's most recent overreach into election administration, which comes in the wake of Congress, dozens of States, and the federal courts broadly rejecting his other efforts to centralize federal elections under his authority. At President Trump's direction, the Department of Justice (DOJ) and Department of Homeland Security (DHS) have asserted the right to dictate how States administer their elections, including on matters long assigned to the States under the Constitution and federal law. This includes with respect to the most elemental aspects of election administration, including assessing who is a registered voter; determining who may appear on statewide voter registration lists; issuing ballots to registered voters; and counting and tabulating such ballots under state law procedures.

In just the few days since Plaintiffs filed this lawsuit, Defendants have confirmed they intend to expand their unlawful efforts. While Defendants have thus far targeted a few specific States, the Attorney General stated just days ago that DOJ is "looking at" a "number of States" as additional targets, both in the run-up to election day and in the certification process that follows. Nkwonta Decl., Ex. B. And shortly before Plaintiffs filed this motion, DOJ sent a letter to Washington's Secretary of State ordering that his office—within just *twenty-four hours*—review a list of supposed noncitizens on the State's rolls and "instruct the appropriate election officials to not verify the signature and/or tabulate the ballot" of such voters. Nkwonta Decl., Ex. AM. If that were not bad enough, DOJ indicated that a "second list" of supposed noncitizens would be forthcoming prior to the "November 2 [sic]" general election. *Id.* Simply put, DOJ has laid bare

its intent to dictate, State by State, which ballots should count and which should not. Such escalating misconduct underscores the need for emergency relief to staunch DOJ's lawless campaign.

Such executive overreach would be unlawful in any scenario, but Defendants' efforts are made far worse by the fact that they are underpinned by DHS target lists—supposedly of noncitizens—that have proven almost cartoonishly unreliable. Simply put, Defendants are premising their unlawful demands against States and election officials on fundamentally flawed lists that pose an unacceptably high risk of disenfranchising U.S. citizens.

None of this is lawful. The Executive Branch enjoys *zero* authority to superintend state voter list maintenance, to supplant state determinations of who is qualified to vote, or to dictate who gets a ballot or whose ballot gets tossed aside. Congress has kept that duty with the States, subject only to modest federal voter list maintenance requirements, which the administration has declined to invoke as the basis for its actions. Because Congress has not authorized the federal intrusion being executed by Defendants, the Constitution leaves "States with responsibility for" supervising these "mechanics of congressional elections." *Foster v. Love*, 522 U.S. 67, 69 (1997). Plaintiffs therefore seek a temporary restraining order and a preliminary injunction to halt the further expansion of Defendants' efforts. Specifically, the requested order would bar DOJ from further commanding state and local election officials—on the basis of DHS's shoddily compiled target lists—to remove specific voters from the rolls prior to the November 3 election; to withhold ballots from those individuals where they appear as active registered voters on state rolls; or to set aside their ballots rather than count them in the ordinary course.

The relevant factors for relief are satisfied. On the merits, Defendants' conduct is straightforwardly *ultra vires*: *Nothing* in the Constitution affords the President or federal agencies

authority to superintend state election administration via unlawful demands, threats, and coercion. While Congress can exercise its Elections Clause authority to grant additional powers to the Executive Branch in this realm, it clearly has not done so here—Defendants do not even pretend otherwise. Plaintiffs are therefore likely to prevail on their claim that Defendants' conduct is *ultra vires* and in violation of the Constitution. Further still, by intruding upon traditional state matters—and deploying coercive tactics to bully state and local officials into compliance—Defendants have violated the Tenth Amendment and its anticommandeering doctrine.

Absent prompt relief, Plaintiffs—a coalition of Democratic Party organizations, legislative leaders, and a registered California voter—will all suffer irreparable harm. As the Supreme Court recently held, "candidates suffer when the [electoral] process departs from the law." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026). Defendants' eleventh-hour effort to disrupt the November 3 general election imposes just such an injury on Plaintiffs, who represent Democratic candidates across the country. That injury is quintessentially irreparable: Once the election occurs, "there can be no do over and no redress." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The remaining equitable factors are satisfied for similar reasons. The public interest weighs starkly in favor of ensuring orderly elections and permitting registered voters to cast ballots. In contrast, Defendants have no legitimate interest in either exercising ungranted authority or injecting widespread chaos into the ongoing election. The Court should promptly enter the requested relief, before DOJ reaches the next State on its target list.

## BACKGROUND AND PROCEDURAL HISTORY

### I. The Constitution vests the power to administer elections in the States, except where Congress purposefully chooses to preempt state procedures.

The Constitution's Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject only to Congress's power to "preempt state

legislative choices." *Foster*, 522 U.S. at 69; *see* U.S. Const. art. I, § 4, cl. 1. Absent intervention by Congress, the States are charged with establishing "a complete code for congressional elections," including as to "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Where Congress has not chosen to act, States are responsible for "enact[ing] the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right" to vote. *Id.*

Congress may displace these requirements under the Elections Clause, which governs the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. That authority, however, is limited to "regulat[ing] how federal elections are held, but not who may vote in them," *Arizona v. Inter Tribal Council of Ariz., Inc. (ITCA)*, 570 U.S. 1, 16 (2013) (emphases omitted), consistent with "the Framers' aversion to concentrated power," *id.* at 17. Even when Congress exercises its Elections Clause authority, that power extends "so far as it is exercised, and no farther." *Id.* at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)); *see Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026) (similar).

The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024). This "allocation of authority over federal elections between Congress and the States . . . is no accident. Instead, this design was the product of carefully considered compromises among our Constitution's Framers." *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d

135, 158 (D.D.C. 2025). Under that framework, "[t]he States have initial authority to regulate elections," "Congress has supervisory authority over those regulations," and the Executive Branch "does not feature at all." *Id.* at 159.

## II. Congress afforded federal agencies narrow, carefully circumscribed roles concerning state voter registration and ballot counting processes.

Exercising its authority under the Elections Clause and the Reconstruction Amendments, Congress has enacted federal laws governing specific aspects of the electoral process; these laws establish the outer bounds of the federal government's role in election administration. For example, in the wake of the Civil War, Congress enacted the Enforcement Act of 1870 and the Ku Klux Klan Act of 1871. The former grants the Executive Branch certain powers to suppress criminal conspiracies to prevent the exercise of voting rights, *see* 18 U.S.C. §§ 241, 242, while the latter creates various civil causes of action to enforce federal rights, including voting rights, *see* 42 U.S.C. §§ 1983, 1985, 1986. Each of these laws operates through criminal or civil actions; none grant the Executive the power or authority to intrude upon state election procedures.

Congress later enacted the Civil Rights Acts of 1957, 1960, and 1964, which codified certain enforcement powers for the federal government to protect individual rights—including the guarantee that qualified citizens may vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. § 10101(a)(1). These statutes also constrain what election officials can demand of voters, *id.* § 10101(a)(2)(A); prevent individuals from being denied the right to vote because of an error or omission on a record or paper that "is not material in determining whether such individual is qualified under State law to vote," *id.* § 10101(a)(2)(B); and prohibit all persons—including federal officials—from intimidating, threatening, or coercing voters, *id.* § 10101(b). No provision authorizes the federal government to set voter qualifications or control ballot casting or counting.

In the same era, Congress enacted the Voting Rights Act of 1965 ("VRA"), which addresses specific forms of unlawful vote dilution and denial of the right to vote. *See id.* §§ 10301, 10308. Building upon the Civil Rights Acts, the law also prohibits anyone—including federal officials—from intimidating, threatening, or coercing voters or those who urge or aid a person seeking to vote. *See id.* § 10307(b). Nothing in the VRA affords the Executive Branch power to superintend the state voter registration process or the process of counting and tabulating ballots.

In the modern era, Congress enacted the National Voter Registration Act ("NVRA") in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501. While the NVRA concerns the maintenance of state voter rolls, it charges *States*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.* § 20507(c)–(g). It similarly makes States the custodians of voter lists. *See id.* § 20507(a) (requiring that "each State" take certain steps as to list maintenance). The Executive Branch is empowered to bring a civil action to enforce the terms of the NVRA, *see* 52 U.S.C. § 20510(a), but doing so requires it to plausibly allege a substantive violation of federal law, such as a failure to make "a reasonable effort to remove the names of ineligible voters" who have become ineligible due to death or change in residence. *Id.* § 20507(a)(4). Nothing in the NVRA grants the Executive Branch freestanding authority to superintend how States administer their voter rolls, never mind how they administer their elections more generally.

The NVRA also imposes specific requirements for voter registration forms used to register individuals for federal elections. For instance, it requires that any federally created voter registration form include "an attestation that the applicant meets each . . . requirement" for

registration, "including citizenship." *Id.* § 20508(b)(2). It places the same requirement on any state-created voter registration form used for federal elections. *See id.* § 20505(a)(2). This attestation reflects the "presumptive minimum amount of information necessary for state election officials to carry out their eligibility-assessment and registration duties." *Fish v. Kobach*, 840 F.3d 710, 717 (10th Cir. 2016).[1] States are therefore well within their authority to rely on a voter's attestation that they meet all eligibility requirements, including citizenship, when it comes to registering voters for federal elections. Indeed, such attestations are sufficient for registration in most nearly all State jurisdictions for State elections, as well. Nkwonta Decl., Ex. C (explaining "in most cases, citizenship is addressed by asking for a voter's attestation, not documentary proof"). The Executive Branch has no authority to quarrel with the information States demand on their own voter registration forms, unless States transgress specific limitations within the NVRA itself.

Following the NVRA, Congress enacted the Help America Vote Act ("HAVA") in the wake of the 2000 elections to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017). HAVA requires States to create and maintain a "computerized statewide voter registration list" but again leaves the administration and oversight of that list to the States. 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A). HAVA also established a right to cast a provisional ballot when an otherwise qualified and registered voter's name "does not appear on the official list of eligible voters." *Id.* § 21082(a). But nothing in HAVA grants the Executive

[1] Notably, the Conference Committee that finalized the NVRA specifically rejected a provision adopted by the Senate that would have allowed States to "requir[e] presentation of documentation relating to citizenship of an applicant for voter registration." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.). The Committee concluded that such a requirement was "not necessary or consistent with the purposes of this Act" and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.*

Branch authority to declare that registered voters whose names appear on a State's voter rolls may cast *only* a provisional ballot, much less to dictate that the State refuse to even issue that voter a ballot in the first place.

Finally, the Attorney General possesses criminal enforcement tools to address noncitizen voting, *see* 18 U.S.C. § 611, and false claims of citizenship, *id.* § 1015(f); *see also* 52 U.S.C. § 20511. But such statutes are enforced through the criminal process, with its corresponding constitutional protections and legal standards—including establishing proof beyond a reasonable doubt. *See, e.g.*, *In re Winship*, 397 U.S. 358, 368 (1970). A "criminal prohibition alone" does not grant the government any broader regulatory or enforcement power beyond charging and prosecuting offenders. *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 190–91 (1994). In other words, while the Executive Branch can lawfully prosecute criminal offenses, it cannot convert criminal laws into freestanding authority to manage elections.

The upshot of all this is that the Executive Branch possesses limited, congressionally granted powers when it comes to voting. It may exercise those powers within constitutional and statutory limits. Beyond that, Defendants have "literally . . . no power to act . . . unless and until Congress authorizes [them] to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

## III. The Trump administration launches a comprehensive effort to unlawfully federalize elections.

Following his return to office in 2025, President Trump has continued his decadelong campaign of lies about voter fraud, pairing them with a call to radically reshape American elections. In particular, President Trump has continued to falsely contend that noncitizens are "brought to our country to vote, and they vote illegally," urging the Republican Party to "take over" and "nationalize the voting." Nkwonta Decl., Ex. A. The principal goal of this campaign,

according to President Trump, is to ensure that for the next "50 years," Republicans will "never lose a race." Nkwonta Decl., Ex. D. Despite President Trump's pressure, Congress has refused to pass legislation that would authorize greater federal involvement in establishing procedures for determining a voter's qualifications under state law. *E.g.*, S. 3752, 119th Cong. (2026).

Unable to persuade Congress, President Trump has sought to accomplish this goal through Executive Orders, a national campaign of litigation against the States, and widespread intimidation and intrusion from DOJ and DHS. In March 2025, President Trump signed Executive Order 14,248, which purported to require certain voters to present proof of citizenship when registering to vote, change state deadlines for voting by mail, provide federal agencies with access to state voter list data, and coerce States into complying with DOJ demands at risk of withheld federal funding. Courts swiftly enjoined broad swathes of the order as unlawful. *See* Compl. ¶ 47 (collecting authority). A year later, in March 2026, President Trump tried again with Executive Order 14,399. This time, he commanded the U.S. Postal Service to issue a rule seizing federal control over mail voting from the States through "Mail-In and Absentee Participation Lists" that controlled whether the Postal Service would transmit a voter's mail ballot. The "Ballot Mail Rule" was issued just weeks before the start of mail voting in the 2026 elections and imposed logistically impossible ballot verification requirements that would have disenfranchised millions of Americans who attempted to vote by mail. But this effort, too, was enjoined as unlawful federal overreach—a conclusion the Supreme Court declined to disturb when it rejected the administration's effort to obtain a stay of that order. *See U.S. Postal Serv. v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026); *see also* Compl. ¶ 48 (collecting additional authority).

Nevertheless, other components of Executive Order 14,399 continue to loom over the 2026 elections. It directs DHS to compile and send all 50 States a "State Citizenship List" that would

name every adult U.S. citizen resident of each State. But these lists would be grossly inaccurate because the federal government does not have accurate citizenship or up-to-the-minute residency information for many Americans. *See* Expert Decl. of Dr. Kenneth Mayer, *DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Apr. 17, 2026), ECF No. 55-12. Although Executive Order 14,399's self-imposed deadline for delivering these lists to each State has passed, DHS has indicated that an online "Portal" containing this information remains imminent. *See, e.g.*, Mot. for Material Updates at 4, 8, *DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Sep. 2, 2026), ECF No. 179 (describing a "coming soon" webpage for the Portal that was taken down, and a statement from defendants' counsel that, before the Portal goes live, they will provide "48 hours' notice"). The Order also instructs the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." Exec. Order No. 14,399 § 2(b), 91 Fed. Reg. 17,125, 17,126 (Mar. 31, 2026).

In parallel with these Executive Orders, the Trump administration—acting through the Attorney General and DOJ—has attempted to usurp the voter list maintenance responsibilities of State officials. In the summer of 2025, DOJ launched a campaign to seize *every* State's unredacted voter registration list to facilitate the purging of "hundreds of thousands of . . . people" from the rolls. Nkwonta Decl., Ex. E. Dozens of states resisted, prompting DOJ to file more than 30 lawsuits nationwide to compel States to produce their unredacted lists. As a peer court within this District observed, however, these efforts have universally failed thus far. *See United States v. Evans*, No. CV 25-4403 (RDM), 2026 WL 2267774, at *5 & n.4 (D.D.C. Aug. 6, 2026) (collecting authority); *see also Common Cause v. DOJ*, No. CV 26-1352 (SLS), 2026 WL 3033772, at *5 & n.3 (D.D.C. Oct. 9, 2026) (noting "every court to rule on motions to dismiss . . . have dismissed DOJ's

enforcement actions"). To date, a remarkable *twenty-seven* district courts have dismissed DOJ's suits, and not one court has found that DOJ has stated a valid claim to compel the States to turn over their unredacted voter lists.

DOJ pursued these lists in order to run them through DHS and USCIS's Systematic Alien Verification for Entitlements ("SAVE") tool, purportedly to double-check the citizenship of tens of millions of registered voters. But SAVE was never intended for use in election administration, and it has been beset by well-documented inaccuracies. *See* Nkwonta Decl., Ex. F. A minority of States nevertheless acquiesced to DOJ pressure to run their voter rolls through SAVE, with the predictable result that many eligible voters were inaccurately flagged as noncitizens and sent demands to verify their citizenship. *See, e.g.*, Nkwonta Decl., Exs. G–H. Because most States have exercised their sovereign prerogative to not run their voter rolls through SAVE, or to surrender their voter rolls to DOJ, the Trump administration has resorted to even more desperate and unlawful tactics to hijack state voter rolls. These efforts form the crux of this lawsuit.

## IV. Defendants pursue President Trump's initiatives by directly interfering in state voter registration and ballot counting procedures.

The Trump administration's onslaught against voting, voters, and the States has escalated into yet new attempts to unlawfully insert the federal government into state election administration. Defendants have adopted a disturbing policy of haranguing and threatening state and local election officials with prosecution for permitting registered voters to cast ballots, based on ham-handed efforts at identifying noncitizens on state rolls. Worse still, DOJ has now stepped directly into the realm of real-time election interference by demanding that States withhold ballots from these registered voters or, alternatively, segregate and not count ballots that have already been issued.

**A. DOJ and DHS threaten States based on unsupported and quickly disproven claims of finding noncitizens on the rolls.**

On July 7, 2026, Assistant Attorney General Harmeet Dhillon sent letters to every State, purportedly to provide "notice of the federal laws applicable to State and local election officials to ensure free, fair, and transparent elections." Nkwonta Decl., Exs. I–J. These letters served to threaten election officials with "criminal" prosecution if they "knowingly retain" noncitizens on their statewide voter registration lists or otherwise "facilitate[] noncitizens in receiving and casting ballots." Nkwonta Decl., Ex. I. AAG Dhillon demanded a response within five days as to how each State "intends to ensure it is complying with these federal laws both at the state and local level and how [DOJ] can assist in those efforts." Nkwonta Decl., Ex. J at 3.

AAG Dhillon's threat to state election officials was merely the start. On July 16, 2026, DHS sent letters to several States claiming it had conducted a "[p]reliminary review" of their voter lists. *See* Nkwonta Decl., Exs. K–M. These States did not solicit DHS's assistance in maintaining their voter rolls, and DHS's letter cited no statutory authority for this unsolicited intrusion into a canonical state-law domain. Indeed, DHS appeared to target these States specifically because they were among the more than 30 States that refused to turn over their unredacted statewide voter registration lists to DOJ for processing through SAVE. Unwilling to take "no" for an answer, DHS began a brute-force comparison of publicly available voter list data with DHS and USCIS records to compile its own list of possible noncitizens. Nkwonta Decl., Exs. K–M. It then brandished these lists as definitive proof that noncitizens were on state voter rolls. *Id.*

For example, DHS's July 16, 2026 letter to California Secretary of State Shirley Weber purported to identify 190,832 noncitizens on California's voter list, of which 81,336 were "California registrants for whom the name, date of birth, address and Social Security number match a non-citizen in our files." Nkwonta Decl., Ex. K. But the letter did not explain DHS's

methodology or sources, nor did it acknowledge—as the federal government has admitted elsewhere—that DHS's files often contain outdated information and are incomplete. Nkwonta Decl., Exs. K–M; *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 102 (D.D.C. 2026) (noting that because "[t]here is no obligation for an individual to report to SSA a change in their citizenship or immigration status until they request a replacement card or file a claim for a Social Security benefit," DHS's files often contain inaccurate information for recently naturalized citizens (alteration in original) (citation omitted)), *stay granted*, No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026). And it provided no explanation for why DHS had flagged the other 109,496 voters as potential noncitizens. Amid these vagaries, the letter gave Secretary Weber two weeks to commit to a collaboration with DHS to identify purported noncitizen registrants.

In a July 23, 2026, response, Secretary Weber once more rejected DHS's intrusion into California's voter list maintenance program. Secretary Weber highlighted that "California's election officials work every day to maintain accurate voter rolls and ensure that only eligible voters are registered." Nkwonta Decl., Ex. N at 1. She noted that DHS's letter "provide[d] no detail whatsoever" for evaluating "the veracity" of DHS's "allegations" or the methodology used to identify purportedly ineligible voters. *Id.* She also sought information on how DHS obtained the purported list of registered voters. *Id.* Secretary Weber further explained that the NVRA's quiet period, which prohibits the systematic cancellation of voter registrations during the 90 days before a federal election, would begin on August 5, 2026. *Id.* at 1–2. She reiterated her commitment to "ensur[ing] that no eligible voter is erroneously removed from our State's voter rolls, and that no eligible voter is deterred from casting a ballot due to intimidation or coercion." *Id.* at 2. Secretary Weber asked for a response by August 3, 2026; she did not receive one.

Nevada's experience began with a nearly identical July 16 letter from DHS that claimed to find 15,903 potential noncitizens on the Nevada voter rolls, including 8,576 "for whom the name, date of birth, address and Social Security number match a non-citizen in our files." Nkwonta Decl., Ex. L; *see generally* Ex. 2, Decl. of Francisco Aguilar ("Aguilar Decl.") ¶¶ 4–9. Nevada's Secretary of State Francisco Aguilar answered DHS on July 29, 2026. He described his office's commitment to "ensuring that only eligible U.S. citizens vote in our elections," as well as federal and Nevada protocols for achieving that goal. Nkwonta Decl., Ex. O at 1. More pointedly, Secretary Aguilar sought to "better understand" DHS's claims that thousands of unidentified voters appeared on Nevada's voter rolls, noting that, among other omissions, DHS failed to explain what data it consulted, what methodology it used, and how it accounted for common names and naturalized citizens. *Id.* at 1–2; *see* Aguilar Decl. ¶¶ 5–7.

DHS insisted that it had identified a subset of 185 registrants whom DHS had confirmed were not U.S. citizens. DHS sent Nevada a spreadsheet containing these 185 individuals and associated "voter case numbers" for each, as well as approximately 6,000 more individuals and voter case numbers that DHS had flagged but not yet manually reviewed. Nkwonta Decl., Ex. P. In a September 9 email, DHS reiterated its claim that Nevada should investigate the 15,903 individuals it had named. *Id.* Nevada responded that DHS never actually provided a list of 15,903, only smaller lists of individuals purportedly identified by voter case numbers. *Id.* Nevada further explained that these voter case numbers were not useful for identifying specific individuals because Nevada had recently switched from county-run voter registration to a statewide system, and individuals may have been assigned different numbers before and after the change. Nkwonta Decl., Exs. P–Q. As for the 185 registrants who were purportedly "confirmed" by DHS as

noncitizens, Nevada informed DHS that its records indicated all 185 were citizens, with DHS having provided "nothing of substance to suggest otherwise." Nkwonta Decl., Ex. Q.

Pennsylvania's story is similar. After receiving DHS's letter on July 16, which flagged 14,576 purported noncitizens and 8,594 whose name, date of birth, address and Social Security numbers matched DHS files, Secretary Al Schmidt replied on July 29, detailing Pennsylvania's "robust efforts" "to ensur[e] . . . that all eligible voters—and only eligible voters—have the opportunity to make their voices heard." Nkwonta Decl., Ex. R at 1. Like other recipients, Secretary Schmidt noted that DHS "ha[s] not identified its methodology or what data it relied on in reaching [its] conclusion," and that past analyses of voter lists DHS had relied on "faulty methodologies" that led to inaccurate results. *Id.* at 1–2. In a follow-up letter on August 25, Secretary Schmidt recounted an August 13 meeting where DHS representatives "explained that they did not have high confidence" that the 14,576 registrants were in fact noncitizens. Nkwonta Decl., Ex. S at 1. Secretary Schmidt said he was awaiting further information on DHS's methodology. *Id.* On September 9, DHS asserted in a new letter that Secretary Schmidt had mischaracterized the August 13 meeting, as well as DHS's level of confidence that the 14,576 individuals were not citizens. Nkwonta Decl., Ex. T at 1. But DHS was nonetheless forced to acknowledge that the number represented only "potential[]" noncitizens and DHS still failed to provide Secretary Schmidt with a confidence determination for even one of those individuals. *Id.*

President Trump amplified DHS's half-baked findings, falsely presenting them to the nation as definitive proof that his administration found noncitizens on the rolls—even as DHS backed away from that same claim. On the same day that DHS sent the initial letters, July 16, President Trump delivered a primetime address repeating the claim that DHS had uncovered "approximately 278,000 non-citizens who are registered to vote." Nkwonta Decl., Ex. U. President

Trump said that this was a "limited analysis" and expressed his view that, "[s]ince Democrat[ic] states refuse to share their voter files the real number is actually much higher than that." *Id.* But as subsequent events illustrated, DHS was in fact downsizing its claim, even as the President baselessly insisted the true number was far greater. President Trump also explained that he had ordered DHS to "notify every state about noncitizens on their voter rolls and direct them to remove all ineligible voters from the lists immediately." *Id.* And he reiterated his view that "mail-in ballots are inherently corrupt." *Id.* DHS Secretary Mullin echoed the President in a press conference the following day, repeating unsubstantiated numbers of purported noncitizens and threatening criminal prosecution for election officials who did not follow the federal government's commands. *See, e.g.*, Nkwonta Decl., Ex. V (emphasizing that election officials who failed to act on DHS's lists could "be held accountable by fines, by penalties, and even depending on how far it goes, prison time").

Since DHS and Secretary Mullin first began bandying these target lists this past summer, more information has emerged about their fundamental unreliability. For example, a district court in California recently found that USCIS's process for compiling these lists relies upon "unknown artificial intelligence tools" and "[c]ommercial databases" to generate names. *See Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *2 (N.D. Cal. Oct. 21, 2026) (enjoining DHS's use of these lists to conduct field operations and interviews against individuals who DHS should reasonably know to be citizens). As that court noted, "USCIS *concedes* that errors" will result from this process. *Id.* (emphasis added). The court further found that USCIS's procedures create "a high likelihood of error in review," *id.*, such that DHS and DOJ rely upon "faulty data sources that sweep in U.S. citizens," *id.* at *8.

At least one of the commercial databases relied upon by USCIS appears to be "ELLY," a platform created by right-wing activists, which has been "criticized as inaccurate by election officials" and even by the "activists" who have relied on it to challenge voter registrations. Nkwonta Decl., Ex. W. For example, the Elections Director of Cherokee County in Georgia recently stated that the "voting history data in ELLY is consistently incorrect" and that ELLY repeatedly misidentified lawful voters as either deceased or living at nonresidential addresses. Nkwonta Decl., Ex. X. Even so, conspiracy theorist Jerome Corsi recently disclosed on the *War Zone* podcast that ELLY "has already been given to the Department of Homeland Security and DOJ, and they are using the tool themselves to do their criminal investigations." Nkwonta Decl., Ex. Y.

### B. DOJ seeks to commandeer state administration of voter registration and ballot counting.

On October 13, 2026, DOJ picked up where DHS had left off, demanding that California—mere weeks before election day, and with voting already well underway—refuse to send ballots, or segregate and not count the ballots, of more than 20,000 individuals who DOJ believed to be registered to vote in California. Nkwonta Decl., Ex. Z; *see also* Nkwonta Decl., Ex. AA. According to DOJ's October 13 letter, it sent Los Angeles County a "password protected thumb drive with a list of names of people the Federal Government believes are likely noncitizens who" DOJ claimed "were sent a vote-by-mail ballot." Nkwonta Decl., Ex. Z at 1. DOJ demanded that Secretary Weber "review the list within 48 hours," and "immediately instruct the appropriate elections officials to segregate" mail ballots cast by these individuals until their citizenship status can be determined. *Id.* DOJ further demanded that, if an individual on the list had not yet been provided a mail ballot, no ballot should be sent until DOJ could confirm that individual's citizenship status. DOJ's letter further stated that, if an individual on the list had returned a ballot, Secretary Weber should

"instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined." *Id.* at 2. DOJ threatened that, if the "process described above" was not implemented by "October 15 at noon EST," it would seek emergency relief. *Id.* at 2. DOJ sent a nearly identical October 13 letter to Dean C. Logan, the Los Angeles County Registrar-Recorder/County Clerk, likewise demanding that the individuals on the list have their ballots segregated, withheld, not verified, and not tabulated. Nkwonta Decl., Ex. AB.

Secretary Weber rejected DOJ's "outrageous demands" made "on the eve of an election" with a 48-hour deadline. Nkwonta Decl., Ex. AC at 2. Her response emphasized that DHS still had not "provided any information about the underlying data or methodology" for its purported list of voters who "may" be noncitizens, nor had it ever provided a level of certainty for suspecting that the listed individuals were noncitizens. *Id.* at 2. She further noted that DOJ's "unprecedented" demand came after ballots were already delivered to voters and voting was already underway. *Id.* at 1–2. And she noted that DOJ's demand came after similar allegations made to Nevada failed to identify a single noncitizen registrant. Nkwonta *Id.* at 1. DOJ's proposed "extraordinary measures," Secretary Weber explained, were "contrary to both federal and state law," including the right to vote, the VRA, the NVRA, and several California provisions protecting the right to vote and have that ballot counted. *Id.* at 2–3. She reiterated that "California's elections officials work every day to ensure that only eligible voters are registered" and "maintain accurate voter rolls" and that she would not "disenfranchise thousands of Californians" based solely on DOJ's unsupported and likely inaccurate list. *Id.* at 3; *see also* Nkwonta Decl., Ex. AD.

DOJ responded to Secretary Weber's letter on October 16, doubling down on its overt threats to California's election officials, insisting that those officials who refused DOJ's directive to withhold or segregate ballots cast by voters on the list would face "significant" "legal

consequences" for "knowingly facilitating" noncitizen voting. Nkwonta Decl., Ex. AE. The letter closed with an ominous warning that California election officials "reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure." *Id.* In short, it echoed the same threats of retaliation that AAG Dhillon had made months earlier. Nkwonta Decl., Ex. I. President Trump himself put a finer point on the issue, reposting the letter to Truth Social with the announcement, "**They will all go to jail for a long period of time!!!**" Nkwonta Decl., Ex. AF (emphasis added).

DOJ's threats were not idle. On October 15, it sued the State of California, as well as Secretary Weber and the Los Angeles County Registrar-Recorder/County Clerk, bringing a novel, standalone claim under the Supremacy Clause. *See* Complaint, *United States v. California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1. Four days later, on October 19, DOJ moved for a temporary restraining order requiring California "(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot." Ex Parte Appl. for TRO at 28–29, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 19, 2026), ECF No. 22-2.

Almost immediately, DOJ's brazen claims against California began to wither under the barest scrutiny. Los Angeles County preliminarily reviewed a sampling of voters on DOJ's list with a Los Angeles address and found that more than a quarter of the entries concerned individuals who listed a place of birth within the United States (and are therefore extremely likely to be citizens). Nearly 40% of the sample entries concerned registrations that had already been cancelled, and the vast majority had never cast a ballot. Opp'n to Ex Parte Appl. for TRO at 17, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 20, 2026), ECF No. 32-1. Simply put, Defendants

are premising their outrageous demands against States and election officials on fundamentally flawed lists that pose an unacceptably high risk of disenfranchising lawful voters.

Yet, even as its claims fall apart, DOJ has amped up the pressure on election officials across California. On October 23—three days after the filing of this lawsuit—DOJ sent letters to election officials in *every* California county, demanding that they purge supposed noncitizens from the rolls and set aside their ballots. Nkwonta Decl., Ex. AF. The letters menacingly state that officials "risk significant federal scrutiny" if they fail to acquiesce to DOJ's demands to set aside ballots. *Id.* While Los Angeles County—the first California county to receive DOJ's demands—made clear that it would not give in to DOJ's threats, it remains to be seen whether election officials in California's other 57 counties will do likewise, where many lack the necessary resources to stand up to DOJ's extortionate demands.

**C. DOJ expands its efforts beyond California.**

While Defendants' ongoing course of misconduct continues to escalate in California, they have made clear that they are likely to make similar demands nationwide. Late on October 21, NBC News reported that DOJ is contemplating enforcement efforts "against more states in the lead-up to—or possibly after—the Nov. 3 midterm elections." Nkwonta Decl., Ex. AH. The purpose of these actions is clear: "to compel states to comb through voter rolls for noncitizens trying to vote in federal elections." *Id.* NBC News reported that DOJ is likely to focus on the growing number of States—including Nevada—that "automatically send mail-in ballots to registered voters." *Id.*; *see* Nev. Rev. Stat. § 293.269911. It noted that these forthcoming enforcement activities are part of a "broader campaign by the Trump administration" to federalize voter list maintenance based upon the President's "unfounded claims that voting is marred by widespread fraud." Nkwonta Decl., Ex. AH. It also indicated that DOJ officials intend to keep up their meddling *beyond* election day and up until state and local officials "certify their votes." *Id.*

In California, that could mean up to 30 days after election day. *Id.* By all accounts, these expanded interference efforts will rely upon the same shoddy target lists that DHS and USCIS began compiling over the summer—lists that "have largely fallen apart" and "result[ed] in just a handful of arrests and prosecutions," notwithstanding the government's hyperbolic initial claims concerning tens or hundreds of thousands of voters. *Id.*

AG Blanche quickly validated the NBC News report. On October 22, he confirmed that there were "a number of States" that DOJ is "looking at" as next targets. Nkwonta Decl., Ex. B. And he soon made good on this threat. Just hours before Plaintiffs filed this motion, DOJ sent a letter to Washington's Secretary of State demanding that his office, within twenty-four hours, review a list of supposed noncitizens on the State's rolls and "instruct the appropriate elections official to not verify the signature and/or tabulate the ballot" of those voters. Nkwonta Decl., Ex. AM. DOJ added that a "second list" would follow before the "November 2 [sic]" general election. *Id.* DOJ paired the letter with a news conference where the Acting U.S. Attorney for the Western District of Washington reiterated that DOJ is "asking the state to set aside those ballots until we can confirm they are legal voters." Nkwonta Decl., Ex. AN; Nkwonta Decl., Ex. AO. DOJ's actions confirm that Defendants have arrogated to themselves an unprecedented power to micromanage core aspects of state election administration.[2]

[2] Further still, AG Blanche has also refused to rule out having DOJ challenge, or try to delay, state certification of election results. Nkwonta Decl., Ex. AI. On the same day he made that statement, DOJ filed a lawsuit to enjoin certification of election results in Alaska *unless* the incumbent—Republican Senator Daniel Sullivan—wins. *See* Complaint, *United States v. Alaska*, No. 3:26-cv-376 (D. Alaska Oct. 22, 2026), ECF No. 1. As one legal commentator at the Cato Institute put it, the "lawsuit is abusive in its intentions and borders on frivolous in its arguments." Nkwonta Decl., Ex. AJ. While the Alaska suit is limited to state-specific considerations not directly relevant here, it further illustrates DOJ's unprecedented intrusion into state election administration.

The effects of DOJ's campaign are already emanating across the country and even into States that have not yet been specifically targeted by DOJ. A Republican election official in Pinal County, Arizona told NPR News that "election officials everywhere are watching" events in California and "making plans as though they'll be next." Nkwonta Decl., Ex. AL. Indeed, many election officials across the country now fear that DOJ's slapdash "accusations could be leveraged in some way by federal law enforcement to potentially confiscate ballots in the period after voting ends during counting." Nkwonta Decl., Ex. AK. And as Secretary Aguilar explains, his office has already had to undertake a number of unprecedented steps for this election cycle, including issuing guidance to local election officials about what to do if armed federal agents appear at polling locations or if federal officers seek to seize ballots. *See* Aguilar Decl. ¶¶ 12, 14. The result has been a predictable chill on his staff, who now face the prospect of being threatened with criminal prosecution for simply fulfilling their duties. *Id.* ¶¶ 10, 12, 14.

DOJ officials in other States have also begun to take their cue from the Attorney General. On October 19, the first day of early voting in Texas, U.S. Attorney for the Southern District of Texas Aaron Reitz posted a video on social media threatening to "hunt . . . down and prosecute" voters and election officials alike. Nkwonta Decl., Ex. AL. It was his job, he said, to make sure "crooked local election administrators . . . do their job." *Id.* DOJ's recent actions confirm that Defendants have settled on a course of intimidating election officials with threats of criminal prosecution for doing nothing more than adhering to state law and distributing ballots to registered voters. And they again reinforce Defendants' intent to insert themselves into state election administration, including by demanding that States remove registered voters from the rolls and not count their ballots. As DOJ's conduct in California—and now Washington—illustrates,

Defendants stand ready to make good on these threats, and officials across the country now must carry out their already demanding responsibilities under the specter of unlawful federal intrusion.

## V. Plaintiffs filed this lawsuit to protect their interests and defend voting rights.

Defendants' interference in the election strikes at the core interests, missions, and activities of Plaintiffs—a coalition of Democratic Party organizations, legislative leaders, and a naturalized citizen voter in California—on a nationwide scale. *See* Compl. ¶¶ 10–17, 85–94; *see also* Ex. 3, Decl. of Lillie Snyder Boss ("Snyder Decl.") ¶¶ 3–4; Ex. 4, Decl. of Caitlin Remmel ("Remmel Decl.") ¶¶ 3–4; Ex. 5, Decl. of Jillian Edelman ("Edelman Decl.") ¶¶ 3–4; Ex. 6, Decl. of Daniele Monroe-Moreno ("Monroe-Moreno Decl.") ¶¶ 3–4; Ex. 7, Decl. of Erick Jose Jimenez ("Jimenez Decl.") ¶¶ 3–4. Plaintiffs have tracked Defendants' conduct closely since this past summer, while also challenging both of President Trump's election-related Executive Orders in court. *See LULAC I*, 780 F. Supp. 3d at 166-67; *DSCC v. Trump*, No. 26-CV-1114 (CJN), 2026 WL 2681471 at *1 (D.D.C. Sep. 13, 2026). They filed this suit on October 20, once it became unmistakable that Defendants had arrogated to themselves an unprecedented—and unlawful—power to intrude into the most foundational aspects of state election administration. Plaintiffs filed the present motion for a temporary restraining order, or alternatively a preliminary injunction, on October 26, once it became clear that Defendants were likely to ramp up their interference efforts through the election and post-election certification period. Nkwonta Decl., Exs. AG–AI; *cf.* Complaint, *Alaska*, No. 3:26-cv-376. Confirming the point, DOJ expanded its unlawful operation to Washington State at at the same time Plaintiffs were gearing to file the instant motion. Nkwonta Decl., Ex. AM.

## STANDARD OF REVIEW

To obtain a temporary restraining order or a preliminary injunction, Plaintiffs must show that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with

the public interest." *Newby*, 838 F.3d at 6 (D.C. Cir. 2016) (citation omitted); *see also Sterling Comm. Credit — Mich., LLC v. Phx. Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (explaining that the "same substantive standard [for a preliminary injunction] . . . applies" to a temporary restraining order). The "first and most important factor" is whether the movants "have established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). When a temporary restraining order is sought against the government, the final two factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits of their claims.

#### A. Defendants' interference with the issuance, casting, and counting of ballots is unsanctioned by any federal law and therefore *ultra vires*.

Defendants' bid to seize control of election administration far exceeds the outer bounds of executive power. The Executive Branch has no colorable authority—under the Constitution or federal statutes—to dictate how States manage their voter rolls, issue ballots, or count and tabulate those ballots. Defendants' escalating campaign to coerce States into altering their voter registration and ballot rules on the cusp of the November 3 election therefore "exceed[s] [their] powers under the Constitution" and is straightforwardly *ultra vires*. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 836 F. Supp. 3d 137, 173 (D.D.C. 2026). Injunctive relief is necessary to "reestablish the limits on [the executive's] authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also LULAC I*, 780 F. Supp. 3d at 194–200 (issuing preliminary injunction to enjoin executive action with respect to elections); *League of United Latin Am. Citizens v. Exec. Off. of the Pres.* (*LULAC III*), 818 F. Supp. 3d 34, 80–81 (D.D.C. 2026)

(collecting authority and describing the availability of a cause of action to enjoin executive action that is *ultra vires* under the Constitution).

Start from first principles. *Any* action that Defendants take "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). DOJ and DHS, in particular, as executive agencies have "literally . . . no power to act . . . unless and until Congress authorizes [them] to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted). Such authority is obviously lacking here. The Constitution "invests the States with responsibility for the mechanics of congressional elections," while allowing *Congress* "to preempt state legislative choices." *Foster*, 522 U.S. at 69; *see also* U.S. Const. art. I, § 4, cl. 1. "The President does not feature at all" in this constitutional allocation of power, *LULAC I*, 780 F. Supp. 3d at 159, consistent with "the Framers' aversion to concentrated power," *ITCA*, 570 U.S. at 17; *see also Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 n.57 (W.D. Wash. 2026) ("Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections."). Indeed, granting the Executive Branch "regulatory authority over federal elections does not appear to have [even] crossed the Framers' minds." *LULAC I*, 780 F. Supp. 3d at 159 (citing *The Federalist No. 59* (Alexander Hamilton)).

Defendants therefore indisputably have no *constitutional* power to draw on for their actions, which intrude upon matters the Constitution assigns to the States and Congress—"registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quoting *Smiley*, 285 U.S. at 366); *see also DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026) ("[T]he Constitution

vests [the President] with no express authority over the conduct of elections . . . ."); *Meadows*, 88 F.4th at 1346 (noting the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections").

That leaves Defendants with only lawfully designated authority from Congress. Yet Defendants do not even pretend to premise their actions on any statutory tool that Congress has authorized under the Elections Clause—confirming that their actions are ultra vires. As set forth above, *supra* Background § II, Congress has endowed the Executive Branch with a set of *specific* tools to enforce federal law governing voter registration and elections. These enforcement tools are exhaustive—federal authority under the Elections Clause extends only so far as *Congress* has exercised it, and "no farther." *Watson*, 609 U.S. at 697 (citation omitted). But tellingly, Defendants have not even bothered to invoke those tools to justify their recent efforts to coerce States into purging voters from the rolls, withholding their ballots, or segregating them upon receipt. For example, the two federal statutes most relevant to the mechanics of voter registration—the NVRA and HAVA—"create a comprehensive scheme for the creation and upkeep of states' computerized [voter lists], and for the enforcement of the list maintenance requirements imposed by those statutes." *United States v. Bellows*, 834 F. Supp. 3d 113, 125 (D. Me. 2026), *appeal docketed*, No. 26-1676 (1st Cir. May 21, 2026). "That scheme gives the Attorney General the power to 'bring a civil action' against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, but it does not contemplate" the intimidation tactics Defendants employ here. *Id.* Indeed, DOJ has not invoked either of these enforcement tools in its correspondence demanding that States remove voters from the rolls, never mind attempted to assert a claim under them. Nkwonta Decl., Exs. K, Z; *see generally* Complaint, *California*, No. 2:26-cv-12025. DOJ also cannot point to any federal statute that permits it to superintend how States issue, collect, and count ballots. While HAVA

*entitles* registered voters to cast a provisional ballot when they would otherwise be disenfranchised, *see* 52 U.S.C. § 21082(a), nothing in federal law empowers Defendants to proclaim that regular ballots cast by registered voters be sequestered or treated as provisional. Defendants have simply invented that authority whole cloth.

This is no mere failure of omission. The NVRA itself *prohibits* the very relief DOJ seeks—a last minute purging of voter rolls across the country. *See id.* § 20507(c)(2)(A) (precluding state list-maintenance programs within 90-days of a general election); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014) (holding this provision prohibits last minute voter purges based on citizenship status). Agencies cannot "'improvise on the powers granted by Congress' by devising an extralegal path" to their chosen ends. *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 368 n.* (2018) (quoting *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 330 (1961)); *see also AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77–78 (2021) (explaining Congress's provision of *express* enforcement tools prohibits implicitly finding broader tools under the same statute); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

Rather than ground their actions in any of Congress's laws governing the mechanics of the voter registration process, Defendants have indicated elsewhere that they are likely to rely upon 18 U.S.C. § 611, which criminalizes voting by noncitizens. *See* Nkwonta Decl., Ex. Z; Complaint, *California*, No. 2:26-cv-12025. But the proper channel for enforcing such a law is *through the criminal process itself*, which affords defendants procedural rights and requires that the government establish guilt beyond a reasonable doubt before a jury. *Nothing* in § 611 or any other criminal provision authorizes Defendants, on the eve of an election, to displace state voter registration or ballot counting procedures—whether by demand, threat, or even civil enforcement

actions. That is because it is axiomatic that "a bare criminal statute" does not confer any broader regulatory or civil enforcement power. *Cort v. Ash*, 422 U.S. 66, 80 (1975); *see also Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017) (per curiam); *cf. Trainor v. Hernandez*, 431 U.S. 434, 441 (1977) (recognizing the "accepted rule" that courts of equity cannot grant relief under criminal statutes). A criminal statute prohibiting noncitizens from voting authorizes DOJ to prosecute individuals for such offenses—nothing more. It certainly does not authorize DOJ to reach beyond "the mechanism that Congress chose to provide for enforcing" the law, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 289 (2002)—namely, criminal prosecution of individuals—to impose voter list maintenance or ballot issuance requirements upon States, backed by threats of "significant federal scrutiny." Nkwonta Decl., Ex. AG.

The upshot is straightforward: Defendants lack any constitutional or statutory authority to draw on when it comes to demanding that States undertake specific election administration procedures like removing specific lists of voters close-in-time to an election; denying ballots to such targeted voters; or segregating or not counting ballots cast by such voters. Such lawless conduct is a quintessential *ultra vires* violation that is constitutional in nature: Defendants are "wrongly exercis[ing] powers that the Constitution vests in Congress and the States alone." *LULAC III*, 818 F. Supp. 3d at 82. This Court has authority to "enjoin [such] unconstitutional acts." *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) (per curiam).

**B. Defendants' effort to federalize elections violates the Tenth Amendment.**

Defendants' conduct further violates vertical separation of powers under the Tenth Amendment by intruding upon the sovereign authority of the States. And because Defendants are pursuing their unlawful ends through threats and coercion intended to compel state officials to submit to federal policy preferences, they are also violating the anticommandeering doctrine.

**1. Defendants' efforts to dictate how States issue and count ballots violate vertical separation of powers.**

In addition to the "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's reservation "to the States" of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. This is especially true in the election context. As explained above, "the Constitution vests authority first in the States" to both determine "who is qualified to vote" and to "regulate federal election procedures." *LULAC III*, 818 F. Supp. 3d at 59; *see* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2. Thus, "considerations of federalism and the vertical separation of powers" are especially salient when executive action intrudes upon States' traditional authority to administer elections. *LULAC III*, 818 F. Supp. 3d at 100.

Defendants' campaign to superintend state election administration tramples upon this division of authority, which was motivated by "the Framers' aversion to concentrated power." *ITCA*, 570 U.S. at 17. The Tenth Amendment therefore reflects a "double security" embodied throughout the Constitution, and in the Elections and Qualifications Clauses specifically, to secure "the rights of the people." *The Federalist No. 51*, at 323 (James Madison) (Clinton Rossiter ed., 1961). Simply put, this reservation of authority to the States prohibits the Executive Branch from second-guessing election-administration choices that the Constitution assigns to the States, including as to determining voter eligibility; maintaining voter registration lists; and setting rules for the issuance, return, collection, and tabulation of ballots. This Court possesses the equitable jurisdiction to enjoin this ongoing violation of the separation of powers. *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved

party with standing may file a constitutional challenge."); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

**2. Threatening state election officials with civil and criminal liability to coerce compliance with federal policy violates the anticommandeering principle.**

Similarly, the Tenth Amendment's anticommandeering doctrine embodies the "fundamental structural decision incorporated into the Constitution" to "withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). The doctrine "prohibits the federal government from commandeering state and local officials to help enforce federal law." *City & County of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1040 (N.D. Cal. 2026) (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)). And while typically framed as a restriction on *Congress's* authority, it naturally extends to the Executive Branch, which enjoys no greater constitutional authority to issue edicts to the States. *See Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014). That is particularly so since, in the elections context, the Executive can only exercise authority granted by Congress to begin with.

The anticommandeering doctrine is practical in effect and does not turn upon whether the federal government issues orders, demands, or thinly veiled threats posing as voluntary requests. Rather, it applies when the federal government "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012); *see also In re Grand Jury Subpoenas*, 835 F. Supp. 3d 947, 955 (D. Minn. 2026) ("Nor may the federal government coerce or retaliate against states or political subdivisions who decline to help the federal government enforce federal laws."); *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1184 (N.D. Cal. 2025) (explaining the

anticommandeering doctrine applies "regardless of whether that compulsion is direct (through command) or indirect (through coercion)"). At heart, under the Constitution's division of powers, States "ha[ve] the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

Defendants' recent campaign to attempt to federalize election administration seeks to deprive States of that choice, using the threat of federal investigation, retaliation, and lawsuits as a cudgel to compel State and local election officials to bend the knee to the current administration's policy preferences. Indeed, Defendants do not even attempt to mask their "commandeering" of state election administration. The President has called for his own party in Congress to "nationalize" elections and to "take over the voting." Nkwonta Decl., Ex. A. And he recently announced that election officials who refuse to implement his policy preferences should "go to jail for a long time!!!" Nkwonta Decl., Ex. AF. Defendants' demands to the States can only reasonably be understood as coercive ultimatums. And as Defendants escalate their efforts in California, in Washington, and across the country more broadly, "States and local municipalities may feel compelled to adhere" to Defendants' demands. *City & County of San Francisco v. Trump*, 816 F. Supp. 3d at 1041. Such "weaponiz[ation]" of the federal government's resources and investigative authority—to displace state choices over state matters—violates the Tenth Amendment. *Id.*[3]

[3] While Plaintiffs are not presently moving for preliminary relief under Count IV of their Complaint, which asserts a claim under Section 11(b) of the Voting Rights Act, they reserve the right to do so. Moreover, the factual allegations undergirding that claim—that Defendants are engaged in a persistent course of threatening election officials—further support finding that Plaintiffs are likely to prevail on their other claims. *See, e.g.*, *City & County of San Francisco v. Trump*, 816 F. Supp. 3d at 1040–41.

## II. Plaintiffs have standing and face imminent irreparable harm.

### A. Plaintiffs satisfy Article III standing on numerous grounds.

Plaintiffs are likely to show they have an "injury-in-fact" that is "traceable to the challenged conduct of the" Defendants and "likely to be redressed" by an injunction against Defendants. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 356–57 (D.D.C. 2020) (citing *Elec. Priv. Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). Although "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006), each Plaintiff has standing under several different standing doctrines. And because Plaintiffs operate nationwide and represent candidates and voters participating in elections in every State, they possess standing to obtain nationwide relief. *See DSCC*, 2026 WL 2681471, at *11 (finding nationwide relief appropriate for the same plaintiff organizations here because they "together have members who are candidates in all fifty states").

***Harm to candidates based on unlawful election interference.*** Plaintiffs—including DCCC, DSCC, DGA, NSDP, their candidate members, and two individual candidates—have standing under the Supreme Court's recent decision in *Bost* to challenge Defendants' unlawful interference and federalization of state procedures for elections and ballot counting. 607 U.S. at 77; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (explaining that groups may bring suit on behalf of their members); Snyder Decl. ¶¶ 3–6, 8; Remmel Decl. ¶¶ 4–7, 9; Edelman Decl. ¶¶ 4–7, 9; Monroe-Moreno Decl. ¶¶ 3–4, 7. *Bost* establishes that candidates "have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." 607 U.S. at 77. This harm exists whether the challenged procedures "help, hurt, or have no effect on a candidate's electoral prospects." *Id.* By exceeding federal authority and improperly intruding into state election administration, Defendants have deprived Plaintiffs "of the

opportunity to compete for election under the Constitution and laws of the United States." *Id.* at 79; *see also DSCC*, 2026 WL 2681471, at *5 (holding that many of the same Plaintiffs had standing under *Bost* to challenge a USPS rule that attempted to regulate mail voting).

***Electoral competitiveness harm.*** Plaintiffs also have standing because Defendants are targeting and seeking to disenfranchise large numbers of Democratic and Democratic-leaning voters—thus harming Plaintiffs' electoral prospects. Snyder Decl. ¶¶ 9–10; Remmel Decl. ¶¶ 10–11; Edelman Decl. ¶¶ 10–11; Monroe-Moreno Decl. ¶¶ 8–9. Courts consistently recognize this basis for standing. *See, e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . [in] winning reelection"); *DSCC*, 2026 WL 2681471, at *5 (holding that "candidates currently running for office likely have competitor standing"); *LULAC III*, 818 F. Supp. 3d at 86 (citing *Nat. L. Party of U.S. v. FEC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000)) (same for party committees).

Here, there is little question that the very purpose of Defendants' misconduct is to aid the President's party and to harm his party's competitors, effectively all of whom are members of the Plaintiff organizations. President Trump himself has declared that his administration's electoral interference will ensure that for the next "50 years," Republicans will "never lose a race." Nkwonta Decl., Ex. D. And he has expressly blamed "Democrat[ic] states" for refusing to turn over unredacted voter rolls that—in the President's baseless view—would reveal greater numbers of unlawfully registered noncitizens. Nkwonta Decl., Ex. U. In sum, the President's own words confirm the partisan and electoral motivations behind the conduct at issue.

***Harm to the right to vote.*** Plaintiffs further have standing because Defendants' meddling directly harms the right of Plaintiffs' members and supporters to vote. *See, e.g.*, *Crawford v.*

*Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (Posner, J.) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law."), *aff'd*, 553 U.S. 181 (2008) (plurality opinion); *LULAC I*, 780 F. Supp. 3d at 191, 207 (recognizing associational standing to sue based on anticipated harm to Democratic voters). A voter has standing to challenge voter restrictions even if they are ultimately able to overcome the restriction—and so do Plaintiffs on behalf of their supporters. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding, even if voters "possessed an acceptable form of photo ID, they would still have standing to challenge the statute that required them to produce" ID to vote); *Fish v. Schwab*, 957 F.3d 1105, 1119–20 (10th Cir. 2020) (holding even a voter who could comply with proof of citizenship law had standing to challenge it).

Many naturalized citizens—like Plaintiff Jimenez and other supporters of Democratic candidates—are aware of Defendants' attempts to coerce state and local officials to purge voters or to prevent such voters from having their ballots counted. *See* Snyder Decl. ¶ 10; Remmel Decl. ¶ 11; Edelman Decl. ¶ 11; Monroe-Moreno Decl. ¶ 9; Jimenez Decl. ¶¶ 5–8. Because these voters are at extra risk of misidentification from outdated DHS and SSA data, *see supra* at Background § III, they are especially likely to need to respond to Defendants' errant accusations by collecting proof of their citizenship. As the Supreme Court recently held, "such a 'need to take . . . affirmative steps to avoid risk of harm . . . constitutes a cognizable injury' supporting standing." *Dep't of Homeland Sec.*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026) (per curiam). Likewise, "an increased risk of disenfranchisement in an upcoming election can make that injury 'sufficiently imminent for standing purposes.'" *DSCC*, 2026 WL 2681471, at *6 (D.D.C. Sept. 13, 2026) (citation omitted). Here, the organizational plaintiffs collectively represent voters—

including millions of naturalized citizen voters—in every State in the country. *See* Snyder Decl. ¶ 4; Remmel Decl. ¶ 4; Edelman Decl. ¶ 4; Monroe-Moreno Decl. ¶ 3.

***Harm to core activities.*** Finally, Plaintiffs have standing because Defendants' conduct will "directly interfere with their core activities." *LULAC I*, 780 F. Supp. 3d at 180. When "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' to continue pursuing those activities, such concrete harm to the organization's activities supports standing to sue." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 26-5006, 2026 WL 2635380, at *5 (D.C. Cir. Sep. 8, 2026) (alterations in original). The core business activities of DSCC, DCCC, DGA and NSDP include mobilizing voters to cast their ballots for their candidate members and ensuring that those ballots are counted. *See* Snyder Decl. ¶¶ 3, 5; Remmel Decl. ¶¶ 3, 5; Edelman Decl. ¶¶ 3, 6; Monroe-Moreno Decl. ¶¶ 3–4. Critically, each relies on what should be an unremarkable presumption in this country—that ballots cast by registered voters will count. Now that Defendants have disrupted that basic assumption of American democracy, Plaintiffs must scramble to reallocate resources against voter suppression at the expense of other mission-critical work. Snyder Decl. ¶ 11; Remmel Decl. ¶ 12; Edelman Decl. ¶ 12; Monroe-Moreno Decl. ¶ 10.

***Traceability/Redressability.*** Each of Plaintiffs' injuries is directly traceable to Defendants. "[A]n injury remains fairly traceable to federal action when third parties 'will likely react' to it 'in predictable ways.'" *League of Women Voters v. United States Dep't of Homeland Sec.*, No. 26-5243, 2026 WL 2643439, at *5 (D.C. Cir. Sep. 4, 2026) (quoting *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025)) (holding there was standing to challenge SAVE program); *see Dep't of Homeland Sec.*, 2026 WL 2879700 (also holding there was standing). The pressure applied to state and local election officials increases the likelihood that they will acquiesce to

Defendants' demands to burden and disenfranchise registered voters. And there is no question equitable relief would redress Plaintiffs' injuries by preventing Defendants from intimidating election officials and voters and meddling in state elections altogether. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

**B. The harm Plaintiffs are suffering is irreparable.**

Early voting is already underway across the country, and election day is next week. As Justice Kavanaugh has stressed, "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring). Last minute disruptions lead "to unanticipated and unfair consequences for candidates, political parties, and voters." *Id.* Simply put, it is inherently disruptive for federal actors to "swoop in and re-do a State's election laws in the period close to an election." *Id.* That, however, is precisely what Defendants plan to do on an escalating scale, making preparations to impose half-cocked, chaos-inducing demands on States across the country. Nkwonta Decl., Ex. AH; *see supra* Background § IV.C. Without injunctive relief, Plaintiffs will suffer quintessential irreparable harm: once the election occurs—and the time to vote and compete for office passes—"there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted). Although these harms are *certain* without an injunction, as the D.C. Circuit explained, preliminary equitable relief "requires only a likelihood of irreparable injury." *Id.* at 8–9. "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Id.* at 9. Accordingly, Plaintiffs have established irreparable harm in numerous ways.

*First*, the political party Plaintiffs—DSCC, DCCC, DGA, and NSDP—represent candidates who are running for election this year in all 50 States. Defendants' election meddling forces these candidates to compete on a playing field tilted against them, an injury that cannot be remedied after the fact. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 201–02 (citing *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *accord Shays*, 414 F.3d at 90 (recognizing time-sensitive nature of electoral harms); Snyder Decl. ¶¶ 6, 8; Remmel Decl. ¶¶ 7, 9; Edelman Decl. ¶¶ 7, 9; Monroe-Moreno Decl. ¶ 7. Indeed, Plaintiffs will also suffer irreparable competitive harm to their electoral prospects. Snyder Decl. ¶¶ 9–10; Remmel Decl. ¶¶ 10–11; Edelman Decl. ¶¶ 10–11; Monroe-Moreno Decl. ¶¶ 8–9; *see FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986) (recognizing prospect of competitive harm, even outside the elections context, as irreparable harm). Plaintiffs have no choice but to act to prevent damage to their campaigns and to preserve their greatest opportunity to prevail in their races. *See Bost*, 607 U.S. at 80 (recognizing that "[o]nly [after election day] will many candidates be able to predict with any certainty that a rule will be outcome determinative"). Fundamentally, "candidates suffer when the process departs from the law," *id.* at 77, and that suffering is irreparable absent equitable relief, *Newby*, 838 F.3d at 8–9.

*Second*, Defendants are fundamentally disrupting the Party Plaintiffs' execution of their plans for the 2026 elections at the final, most crucial moment. To combat federal efforts to deprive voters of their ballots and prevent ballots from being counted, Plaintiffs must revamp their voter education and anti-suppression programs at the expense of their persuasion and mobilization efforts, making it more difficult to accomplish their purpose of turning out Democratic voters and electing Democrats. *See* Snyder Decl. ¶ 11; Remmel Decl. ¶ 12; Edelman Decl. ¶ 12; Monroe-Moreno Decl. ¶ 10. "As binding law defines it," that is irreparable harm. *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *13 ("An organization faces irreparable harm when it sues to challenge 'new obstacles [that] unquestionably make it more difficult for the [organization] to accomplish [its] primary mission' in circumstances where 'there can be no do over and no redress.'" (alterations in original) (quoting *Newby*, 838 F.3d at 9)); *see also League of Women Voters v. North Carolina*,

769 F.3d 224, 247 (4th Cir. 2014). Plaintiffs are scrambling to prevent voter disenfranchisement from Defendants' interference, and "[b]ecause each day presents an opportunity to recruit candidates, persuade voters, and galvanize supporters that cannot be restored once lost, [Defendants' efforts to meddle in elections] irreparably harm the Democratic Party Plaintiffs' interests throughout the country." *LULAC I*, 780 F. Supp. 3d at 201; *see also id.* (recognizing the court "can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns").

*Third*, Plaintiffs' members and supporters are likely to suffer irreparable harm to their voting rights when federal threats impose administrative burdens or obstacles to casting a ballot; or when demands on state and local election officials mean they either can no longer receive a ballot or cast a ballot that is not counted. *See, e.g.*, *DSCC*, 2026 WL 2681471, at *9 ("The harm of untransmitted ballots—both to voters and candidates—is irreversible . . . ."). "[T]here are no do-overs for voters entitled to participate in elections," *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *13, so courts "routinely deem" such threats of injury to "voting rights irreparable injury." *League of Women Voters*, 769 F.3d at 247; *Newby*, 838 F.3d at 8–9 (finding irreparable harm likely even where "unclear whether Alabama and Georgia are currently enforcing their proof-of-citizenship laws").

**III. The equities and public interest favor relief.**

The public interest and the equities further favor the issuance of a restraining order or preliminary injunction. For these factors, courts "weigh[] the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024). Because here "the Government is the opposing party," the assessment of the equities and the public interest "merge." *Nken*, 556 U.S. at 435.

Defendants face no harm at all from an order temporarily enjoining unlawful election interference. *See, e.g.*, *Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful" government conduct.). Indeed, Defendants cannot point to any lawful grant of constitutional or statutory authority that will be denied them if temporary relief issues. *See supra* Argument §§ I.A, I.B. I.C. The requested relief does not ask to circumscribe any *lawful* exercise of executive authority—Defendants would retain the tools allocated to them by Congress for investigating potential violations of federal criminal statutes related to voting, subject to the appropriate procedural and evidentiary requirements. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 110–11 (D.D.C. 2025) (holding that "requiring [federal agencies] to comply with the law as Congress enacted . . . would not" cause the government irreparable harm), *aff'd sub nom. Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026); *cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."). And although there is a public interest in "preserving the integrity of [the] election process," *Newby*, 838 F.3d at 13 (alteration in original) (citation omitted), there is no evidence that noncitizen voting is a widespread problem, nor any evidence that Defendants have anything helpful to offer state and local election officials. Given the well-documented inaccuracies in Defendants' lists, Defendants are *at best* sending election officials on a wild goose chase that distracts from the mission of keeping elections safe and secure. The reality, of course, is much worse. *Supra* at Background § IV.

On the other side of the scale, the equities and public interest strongly favor preliminary relief because without it, Defendants have free rein to carry out a smash-and-grab election interference crusade across the country. "[T]here is a substantial public interest 'in having

governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12. Left unchecked, Defendants will threaten the public's "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks omitted), and corresponding interest in "permitting as many qualified voters to vote as possible," *LULAC I*, 780 F. Supp. 3d at 203 (quoting *Newby*, 838 F.3d at 12). Because Plaintiffs support the same goal in encouraging and assisting their supporters, the "programmatic harm" to Plaintiffs "dovetails with the public interest." *Newby*, 838 F.3d at 13.

The balance of equities and public interest overwhelmingly support a temporary restraining order and preliminary injunction.

## CONCLUSION

The Court should grant a temporary restraining order and preliminary injunction.

Dated: October 26, 2026

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Marc E. Elias (DC 442007)
Uzoma N. Nkwonta (DC 975323)
Christopher D. Dodge (DC 90011587)
Nicole E. Wittstein (DC 1725217)
Kevin R. Kowalewski (DC 90045467)
Tori A. Shaw (DC 90036555)*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
eliasm@elias.law
unkwonta@elias.law
cdodge@elias.law
nwittstein@elias.law
kkowalewski@elias.law
tshaw@elias.law

*Admitted *pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic Governors Association, U.S. Senate Minority Leader Schumer, U.S. House Minority Leader Jeffries, the Nevada State Democratic Party, and Erick Jose Jimenez*