# Exhibit 5

Case No. 1:26-cv-03674-JEB

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>Plaintiffs,<br><br>*v.*<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-03674 |

**DECLARATION OF JILLIAN EDELMAN**

I, Jillian Edelman, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I oversee DGA's day-to-day operations and handle DGA's operational planning, which includes making strategic decisions about staffing, budgeting, contracts with vendors, expenditures, and more.

3. DGA is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate, communicate with, and mobilize Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices

and policies, including on managing, administering, and budgeting for federal, state, and local elections.

4. DGA's membership includes incumbent Democratic governors representing 24 States, the Democratic governors of Guam and the U.S. Virgin Islands, and the Mayor of the District of Columbia. All of DGA's members are also voters in their respective jurisdictions.

5. Nine of DGA's incumbent Democratic governor members are candidates for office in their respective States in 2026. These include Governor Hobbs of Arizona, Governor Lamont of Connecticut, Governor Green of Hawaii, Governor Pritzker of Illinois, Governor Moore of Maryland, Governor Healey of Massachusetts, Governor Hochul of New York, Governor Kotek of Oregon, and Governor Shapiro of Pennsylvania. In all, DGA is actively planning, preparing, budgeting, and strategizing for 36 gubernatorial races in the 2026 election.

6. DGA's candidate members rely on DGA's resources to help win their campaigns. These resources include direct financial support from DGA, insight from DGA on strategy, and coordination with DGA communications and political teams, and voter mobilization programs. In other words, DGA's interests and resources are deeply intertwined with those of its candidate members.

7. DGA and its candidate members have an interest in a fair and lawful electoral process for members' campaigns. Even if DGA's candidate members win their elections, unlawful election interference deprives DGA and its candidate members of a fair process and an accurate result.

8. As explained in greater detail in the Complaint, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") have demanded that election officials review lists of purported noncitizens, use those lists to remove voters from their voter rolls, and recently, deny

those voters access to mail ballots—or segregate and refrain from counting mail ballots submitted by these voters. Moreover, officials from both DHS and DOJ have supported these efforts to interfere in state election administration by making threats against state and local election officials throughout the country, including threats of criminal prosecution for election officials who refuse to comply with unlawful demands to remove voters from state voter rolls and deny ballots to lawfully registered voters.

9. These unlawful efforts directly harm the interests of DGA and its candidate members in a fair electoral process. Any election in which state and local election officials must choose between facing potential criminal prosecution or complying with unlawful demands to prevent lawfully registered voters from casting their ballots is necessarily unfair and unlawful. This interference undermines public confidence in the electoral process, thereby damaging the reputational interests of DGA and its candidate members by throwing the results of the elections in which they compete into question.

10. The administration's campaign of intimidation and election interference also harms DGA and its candidate members' competitive prospects. The ultimate aim of this campaign is the disenfranchisement of large numbers of Democratic and Democratic-leaning voters. The disenfranchisement of voters who support DGA's candidate members necessarily harms the electoral prospects of those members and puts DGA and those candidate members at a competitive disadvantage.

11. Even voters who are not disenfranchised will nonetheless likely be discouraged from voting based on a belief that their votes will not be counted, confusion about the status of their voter registration, or fear of reprisals from DHS and DOJ. In particular, many naturalized

citizens—who appear to be disproportionately targeted by DHS's efforts to identify purported noncitizen voters—will likely be intimidated into staying home on election day.

12. DGA will also be forced to take remedial measures to address the impact of the administration's campaign of intimidation and election interference. In recent years, DGA has invested resources to support voter registration and outreach programs conducted by campaigns and partnership organizations. These investments and programs have been based on DGA's and its candidate members' expectation that lawfully registered voters will be able to cast a ballot according to their respective States' procedures, rather than facing a risk of last-minute disenfranchisement. Now, DGA must revise its budget allocations as these programs adjust to aid voters and candidates who are injured by the threat of wrongful disenfranchisement created by the administration's campaign of intimidation and interference in state election procedures, diverting resources from DGA's other mission-critical activities. The resources DGA can deploy to elect its candidate members are finite in any given election cycle. Resources that must be diverted to responding to voter suppression and the threat of mass disenfranchisement necessarily come at the cost of DGA's other critical programs and expenditures.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 10/26/2026

Jillian Edelman

**Jillian Edelman**
**Chief Operating Officer, DGA**