**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants.

Civil Action No. 1:26-cv-3674-JEB

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Factual Background .......... 2

B. United States v. California .......... 4

C. Procedural History .......... 5

III. LEGAL STANDARD .......... 6

IV. ARGUMENT .......... 7

A. Plaintiffs Cannot Establish Standing Under Any Theory They Assert .......... 7

1. Legal Standard for Standing .......... 7

2. Plaintiffs lack an injury-in-fact. .......... 8

3. Neither Bost nor a competitor-standing theory confer Plaintiffs standing. .......... 12

4. The organization Plaintiffs cannot establish associational standing. .......... 15

5. The organization Plaintiffs cannot establish organizational standing. .......... 17

B. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits .......... 19

1. Defendants' Challenged Actions Are Not Ultra Vires .......... 20

2. Defendants' Challenged Actions Do Not Violate the Elections Clause or the NVRA .......... 22

a. Election Clause .......... 22

b. States' Election Powers .......... 26

b. NVRA .......... 27

3. Defendants' Challenged Actions Do Not Violate the Separation of Powers .......... 29

4. Defendants' Challenged Actions Do Not Violate the Tenth Amendment ........ 31

C. Plaintiffs Cannot Establish a Risk of Irreparable Harm ........ 34

D. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief ........ 37

E. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers. ........ 39

CONCLUSION ........ 42

## TABLE OF AUTHORITIES

### Cases

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) .......... 7

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*,
878 F. Supp. 2d 42 (D.D.C. 2012) .......... 36

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 29

*Almaklani v. Trump*,
No. 18-398, 444 F. Supp. 3d 425 (E.D.N.Y. 2020) .......... 21

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) .......... 15

*Anderson v. United States*,
417 U.S. 211 (1974) .......... 27, 37, 38

*Apotex Inc. v. U.S. Food & Drug Admin.*,
508 F. Supp. 2d 78 (D.D.C. 2007) .......... 42

*Arcia v. Florida Secretary of State,*
772 F.3d 1335 (11th Cir. 2014) .......... 28

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) .......... 18

*Arizona v. Inter Tribal Council of Ariz.*,
570 U.S. 1 (2013) .......... 28, 30

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 23, 24, 25

*Bd. of Governors of the FRS v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .......... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 21

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012) .......... 23

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) .......... 20

*Boone v. Illinois Dep't of Corr.*,
No. 23-2630, 2024 WL 4750494 (7th Cir. Nov. 12, 2024) .................................................... 10

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026)........................................................................................................ 12, 13

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021)............................................................................................................ 38

*Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Emps. v. Assoc. for Benefit of Noncontract Emps.*,
380 U.S. 650 (1965)............................................................................................................ 20

*Burroughs v. United States*,
290 U.S. 534 (1934)............................................................................................................ 23

*Buzas Baseball, Inc. v. Bd. of Regents of Univ. Sys. of Georgia*,
189 F.3d 477 (10th Cir.1999) ............................................................................................. 42

*Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*,
511 U.S. 164 (1994)............................................................................................................ 30

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026)......................................................................................... 17

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)............................................................................................. 22

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)...................................................................................... 35, 36

*Chavez-Perez v. Ashcroft*,
386 F.3d 1284 (9th Cir. 2004) ............................................................................................ 22

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*,
527 F. Supp. 2d 101 (D.D.C. 2007).................................................................................... 12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).............................................................................................................. 16

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)............................................................................................................ 26

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013)...................................................................................................... 10, 37

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025).................................................................................... 7, 35

*Common Cause v. Nuclear Regul. Comm'n*,
605 U.S. 665 (2025) ........ 20, 21

*Common Cause v. Nuclear Regul. Comm'n*,
674 F.2d 921 (D.C. Cir. 1982) ........ 40

*Cort v. Ash*,
422 U.S. 66 (1975) ........ 25

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ........ 38

*Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, __--- F.4th __----, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026) ........ 19, 20

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) ........ 6, 8, 35

*Dep't of Homeland Sec. v. League of Women Voters*,
2026 WL 2879700 (U.S. Sept. 25, 2026) ........ 28, 38

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) ........ 6

*Doe v. Off. of Pers. Mgmt.*,
No. 25-cv-234, 2025 WL 513268 (D.D.C. Feb. 17, 2025) ........ 36

*DSCC v. Trump*,
834 F. Supp. 3d 19 (D.D.C. 2026) ........ 36, 37

*Elend v. Basham*,
471 F.3d 1199 (11th Cir. 2006) ........ 40

*Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ........ 14

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 16, 17, 18, 19

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........ 22

*Fernandez v. Wiener*,
326 U.S. 340 (1945) ........ 35

*Food & Water Watch, Inc. v. Vilsak*,
808 F.3d 905 (D.C. Cir. 2015) ........ 7, 8, 9, 20

*Foster v. Love*,
522 U.S. 67 (1997) ........ 30

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 7

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) ........ 22

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........ 6

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........ 24

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021) ........ 17

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........ 24

*Hodel v. Va.irginia Surface Mining & Reclamation Assn., Inc.*,
452 U.S. 264 (1981) ........ 32

*Indep. Mkt. Monitor for PJM v. FERC*,
162 F.4th 1167 (D.C. Cir. 2025) ........ 20

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ........ 41

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ........ 31

*League of Women Voters of the U.S. v. Harrington*,
560 F. Supp. 3d 177 (D.D.C. 2021) ........ 21

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 39

*Leatt Corp. v. Innovative Safety Tech., LLC*,
No. 09-CV-1301, 2010 WL 1526382 (S.D. Cal. Apr. 15, 2010) ........ 12

*Lee v. United States Agency for Int'l Dev.*,
859 F.3d 74 (D.C. Cir. 2017) ........ 25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 8

*Mich. Canners and Freezers Ass'n, Inc. v. Agric. Marketing and Bargaining Bd.*,
467 U.S. 461 (1984) ........................................................................................ 26

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ........................................................................... 7

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ................................................................................... 32, 33

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........................................................................................ *passim*

*N.Y. Times Co. v. Def. Health Agency*,
2021 WL 1614817 n.5 (D.D.C. Apr. 15, 2021) .................................................... 7

*Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*,
No. 26-5257, 2026 WL 2168004 (D.C. Cir. July 17, 2026) ................................ 39

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ................................................................................... 32, 33

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004) ........................................................................... 11

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002) ........................................................................... 14

*New York v. United States*,
505 U.S. 144 (1992) ............................................................................... 32, 33, 35

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 37

*North Carolina v. Covington*,
581 U.S. 486 (2017) ........................................................................................ 39

*Norwood v. Harrison*,
413 U.S. 455 (1973) ................................................................................... 25, 26

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ........................................................................... 22

*Obama v. Klayman*,
800 F.3d 559 (D.C. Cir. 2015) ............................................................................. 8

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
930 F.3d 519 (D.C. Cir. 2019) ........................................................................... 37

*Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) ........ 8

*Printz v. United States*,
521 U.S. 898 (1997) ........ 33

*Privacy Info. Ctr. v. U.S. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019) ........ 8

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ........ 8, 9

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) ........ 37

*Reno v. Condon*,
528 U.S. 141 (2000) ........ 32, 34

*Save Jobs USA v. Dep't of Homeland Sec.*,
942 F.3d 504 (D.C. Cir. 2019) ........ 13

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ........ 39, 40

*Shays v. Federal Election Commission*,
414 F.3d 76 (D.C. Cir. 2005) ........ 13, 14

*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010) ........ 13, 14

*Sibley v. Alexander*,
916 F. Supp. 2d 58 (D.D.C. 2013) ........ 36

*Sibley v. U.S. Supreme Ct.*,
786 F. Supp. 2d 338 (D.D.C. 2011) ........ 11, 13

*Smiley v. Holm*,
285 U.S. 355 (1932) ........ 23

*Smith v. Sec. Exch. Comm'n*,
129 F.3d 356 (6th Cir.1997) ........ 42

*South Carolina v. United States*,
898 F. Supp. 2d 30 (D.D.C. 2012) ........ 37

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 41

*Sutter Corp. v. P & P Indus., Inc.*,
125 F.3d 914 (5th Cir.1997) .......................... 42

*Taylor v. Trump*,
788 F. Supp. 3d 1 (D.D.C. 2025) .......................... 35

*Texas Children's Hosp. v. Azar*,
315 F. Supp. 3d 322 (D.D.C. 2018) .......................... 10

*Trainor v. Hernandez*,
431 U.S. 434 (1977) .......................... 25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................... 9

*Trump v. California*,
No. 26A124, 609 U.S. __----, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......................... 9, 10, 38, 39

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......................... 38, 40, 41, 42

*TVA v. Hill*,
437 U.S. 153 (1978) .......................... 38

*United States v. California*,
No. 26-7070, __--- F.4th __----, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) .......................... *passim*

*United States v. City of Jackson*,
318 F.2d 1 (5th Cir. 1963) .......................... 26

*United States v. Comstock*,
560 U.S. 126 (2010) .......................... 34

*United States v. Hatch*,
722 F.3d 1193 (10th Cir. 2013) .......................... 34

*United States v. Knight*,
490 F.3d 1268 (11th Cir. 2007) .......................... 23

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024), cert. denied, 146 S. Ct. 90 (2025) .......................... 24, 25

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) .......................... 38

*United States v. Raines*,
362 U.S. 17 (1960) .......................... 24

*United Transp. Union v. I.C.C.*,
891 F.2d 908 (D.C. Cir. 1989) ........ 11, 12

*Urb. Sustainability Dirs. Network v. Dep't of Agric.*,
2025 WL 2374528 (D.D.C. Aug. 14, 2025) ........ 7

*Virginia v. Ferriero*,
525 F. Supp. 3d 36 (D.D.C. 2021) ........ 10

*Winter v. Nat.ural Res. Def. Council*,
555 U.S. 7 (2008) ........ 6, 7, 8

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 35, 36, 37

**U.S. Constitution**

U.S. Const. art. I, § 2, cl. 1 ........ 30

U.S. Const. art. I, § 4, cl. 1 ........ 29

U.S. Const. art. VI, cl. 2 ........ 22

**Statutes**

5 U.S.C. § 704 ........ 21

18 U.S.C. § 611 ........ *passim*

28 U.S.C. § 533 ........ 23

52 U.S.C. § 20507(c)(2) ........ 27

**Rules**

Fed. R. Civ. P. 65(d)(1) ........ 39

**Regulations**

Cal. Code Regs. tit. 2, § 20363 ........ 28

**Other Authorities**

Mila Sohoni, *Equity and the Sovereign,*
97 Notre Dame L. Rev. 2019 (2022). ........ 24

## I. INTRODUCTION

This is an extraordinary lawsuit. Defendants have identified evidence that non-citizens may have cast, or may be imminently casting, votes in the upcoming federal election in violation of an explicit federal law that prohibits such votes. In certain instances, Defendants have issued letters informing states and localities of such imminent injuries, and asked that those jurisdictions take actions to segregate those ballots pending further review. The letters are not self-executing; rather, Defendants would need to seek an order from an Article III court to compel any state or locality to do anything at all. And indeed, those letters are the subject of parallel litigation, as this Court is aware. This lawsuit, though, is not about any of those letters, much less *any* compelled action that the federal government has (or could) undertake. Rather, Plaintiffs seek to enjoin the Defendants from ever informing states or localities of evidence of imminent violation of critical federal law and asking those jurisdictions to take appropriate action under their own laws. Plaintiffs frame their motion as seeking to enjoin Defendants from "unconstitutionally impos[ing] themselves" on "election administration procedures." Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 19, at 1; *see also* Plaintiffs' Mem. In Supp. of Their Mot., ECF No. 19-1 ("Pls.' Mot."). But by contrast, it is Plaintiffs' overbroad and vague request that violates the separation of powers because it seeks to prevent Defendants from enforcing or even taking any actions to enforce federal law. This Court should decline to grant Plaintiffs' requested relief. If Defendants send future letters or seek future affirmative injunctions, they will likely be the subject of future litigation regarding actual requests before any state election official will be "forced" to do anything. There is no basis for this Court to pretermit that litigation process.

Plaintiffs have not demonstrated standing to bring this suit. Rather, any injury depends on a speculative chain of hypotheticals: that Defendants will send a future letter; that a locality or

state will comply (as opposed to declining to do so), that a court will order relief, and that that relief will somehow injure Plaintiffs' electoral prospects. Putting aside Plaintiffs' lack of standing, they fail to meet their high burden of demonstrating a substantial likelihood of standing to warrant a preliminary injunction. Since that is required to issue an extraordinary remedy of an injunction, this Court should deny Plaintiffs' emergency application.

On the merits, Plaintiffs have not demonstrated the requisite likelihood of success. To start, Plaintiffs' ultra vires claim for those challenged actions does not rise above the Supreme Court's strict scope of review for ultra vires claims, which requires a successful "Hail Mary" pass in a case where error is virtually jurisdictional. A non-binding letter identifying potential ongoing violations of federal law is not that. And despite states' traditional authority in managing elections, Congress has made noncitizen voting in federal elections unlawful. 18 U.S.C. § 611. (Section 611 makes it unlawful for an alien to vote in a covered election and provides criminal penalties). The Executive Branch may investigate and prosecute alleged violations of that federal prohibition within the limits of its lawful authority. That statute is not challenged here. Thus, Defendants' challenged actions are supported by the double font of constitutional and statutory authority, making *Defendants'* likelihood of success on the merits strong.

Finally, the balance of equities and public interest tips decisively in favor of the government. The government's compelling interest in combating voter fraud significantly outweighs Plaintiffs' speculative and non-existent injuries. Further, Plaintiffs' proposed injunction is legally unsound, practically unworkable, violates fundamental prohibitions against universal relief, and fails to specify the conduct that would be restrained.

For those reasons, as further explained below, this Court should deny Plaintiffs' defective emergency application for a temporary restraining order and preliminary injunction.

## II. BACKGROUND

### A. Factual Background

On July 16, 2026, the Secretary of Homeland Security Mullin issued letters to the States of California, Nevada, and Pennsylvania, indicating that a "[p]reliminary review" of state records revealed that there may be several thousand noncitizens registered to vote in each of the states. *See* Declaration of Uzoma N. Nkwonta in Supp. of Pls.' Mot., ECF No. 19-2 ("Nkwonta Decl."), ¶¶ 15–17, Exs. L-M. The Secretary requested collaboration with each of the states "to ensure the accuracy of [the] findings." *See id.* On July 23, 2026, California Secretary of State Shirley N. Weber declined to take the requested actions in Secretary Mullin's letter and requested additional information from DHS. Nkwonta Decl. ¶ 18, Ex. N. On July 29, 2026, the Nevada Secretary of State and the Pennsylvania Secretary of the Commonwealth likewise declined to take the requested actions in Secretary Mullin's letter and requested additional information from DHS. Nkwonta Decl. ¶¶ 19 & 22, Exs. R & O.

On October 13, 2026, Acting Deputy Attorney General Trent McCotter sent letters to Secretary Weber and the Los Angeles County Clerk requesting that they confirm within 48 hours the eligibility of a list of over 20,000 individuals the Federal Government believes are highly likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election, and segregate the ballots until their citizenship was confirmed by the locality (consistent with state law that allowed for such segregation). Nkwonta Decl. ¶ 30, Ex. Z.

Additionally, the Department of Justice ("DOJ") sent letters to California counties' election officials, notifying them of a list of likely noncitizens on each counties' voter rolls, and requesting that county election officials commit to working with DOJ and DHS to identify the citizenship of the listed individuals. *See Trujillo v. DHS*, 1:26-cv-3072 (D.D.C. 2025), at ECF No. 37-3.

### *B.* *United States v. California*

On October 15, 2026, the Department of Justice brought suit against California and the election officials of the state and Los Angeles County requesting that the court "order California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status (beyond relying on unverified statements of citizenship necessary to registering) before tabulating their vote-by-mail ballot." *United States of America v. California*, No. 2:26-cv-12025 (C.D. Cal.), Complaint ECF No. 1 ¶ 6. On October 19, the United States moved for an emergency TRO and order for why a preliminary injunction should not issue. *Id.*, ECF No. 22. The district court has set a hearing for the following Tuesday, October 27. *Id.*, ECF No. 64. Because harm was ongoing and irreversible with highly likely non-citizen mail-in ballots being tabulated, the United States requested an expedited ruling on the emergency TRO by the following day, October 22. *Id.*, ECF No. 67. The district court did not rule on the TRO. The United States appealed shortly thereafter, interpreting the district court's failure to rule on the emergency TRO as a constructive denial under *A.A.R.P. v. Trump*, 605 U.S.___ (2025). *Id.*, ECF No. 74. The United States then moved for an injunction pending appeal in the Ninth Circuit on October 23. *United States v. California*, No. 26-7070 (9th Cir.), Dkt. 5.1. The Ninth Circuit then held remote oral argument on the government's motion on Sunday afternoon, October 25. On October 26, 2026, the Ninth Circuit panel concluded that it lacked jurisdiction over the Government's appeal and denied as moot the United States' emergency motion for relief. *United States v. California,* No. 26-7070 (9th Cir. October 26, 2026) (per curiam), Dkt. 63.1.

Judge Bumatay dissented, finding that the Ninth Circuit had appellate jurisdiction, that the Federal Government had standing to sue, and that California's state action is likely preempted because the state frustrates federal law by commingling citizen and noncitizen ballots alike. *United*

*States v. California*, No. 26-7070 (9th Cir.) (Bumatay, J., dissenting), Dkt. 63.1. Judges Bennett and Sanchez each filed their own concurrences with the judgment.

Following the Ninth Circuit's denial, on October 27, 2026, the district court held an evidentiary hearing on the United States's request. *See United States of America v. California*, No. 2:26-cv-12025 (C.D. Cal.), ECF No. 64. As of 2 P.M. E.T. on October 28, 2026, the day of this filing, the *California* district court had not yet ruled on the United States's request for a TRO.

### C. Procedural History

On October 20, 2026, Plaintiffs filed this lawsuit bringing various causes of action against the Defendants premised on DHS's action in identifying potentially ineligible voters and sending letters to state officials in Nevada, Pennsylvania, and California. *See* Compl. ¶¶ 2, 55–74. Despite the clear time sensitivity of this matter, Plaintiffs never filed any motion for emergency relief.

On October 23, 2026, Plaintiffs filed a motion for expedited discovery. ECF No. 16. Defendants filed their brief in opposition to that request on October 27, 2026. *See* ECF No. 23.

Around 11 P.M. on October 26, 2026—a week after filing suit, and just one week before the midterm election—Plaintiffs filed a motion for a temporary restraining order and preliminary injunction, alleging that they face an immediate threat of harm stemming from the letters sent to state election officials. *See* Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 19, at 1. Plaintiffs moved for emergency relief on the likelihood of success on their ultra vires "Elections Clause" claims, separation of powers claims, and anticommandeering claims. *Id.* Plaintiffs did not move for emergency relief based on Count IV of their Complaint, alleging Voting Rights Act ("VRA") violations. *See id.*

Plaintiffs ask the Court for "a temporary restraining order and preliminary injunction enjoining Defendants from continuing to unconstitutionally impose themselves upon election administration procedures that the Constitution and federal law assign to the States, including as

to: (1) removal of registered voters from statewide voter registration lists; (ii) issuance of ballots to registered voters; and (iii) the counting and tabulation of ballots." *Id.*; *see also* Plaintiffs' Proposed TRO, ECF No. 19-9.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), *cert. denied*, 145 S. Ct. 2778 (2025); *see also, e.g., D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020) ("A TRO is an extraordinary remedy and should be granted sparingly.") (citation omitted). A plaintiff seeking a preliminary injunction bears the burden of establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026) (quoting *Winter*, 555 U.S. at 20). "The same standard applies to both temporary restraining orders and to preliminary injunctions." *D.A.M.*, 474 F. Supp. 3d at 55-56 (citation omitted).

*Winter* strongly indicates that all four preliminary injunction factors must be independently shown to obtain preliminary relief. *See* 555 U.S. at 20. Nonetheless, the D.C. Circuit has not yet expressly repudiated its preexisting "sliding scale" approach to the preliminary injunction factors, under which "a strong showing on one factor could make up for a weaker showing on another" in certain circumstances. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) (explaining it is "questionable that the sliding scale approach remains good law" after *Winter*). Even under the sliding scale approach, however, a failure to show irreparable harm is fatal to a request for preliminary relief. *Id.* at 1236. At most, preliminary relief may issue under this approach where a plaintiff "raise[s] a serious legal question on the merits" and "the other three

factors strongly favor issuing an injunction." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)).

In any event, whether the Court applies the questionable sliding scale approach or not, Plaintiffs bear the burden of persuasion on all four factors. *See N.Y. Times Co. v. Def. Health Agency*, 2021 WL 1614817 at * 3 n.5 (D.D.C. Apr. 15, 2021); *Urb. Sustainability Dirs. Network v. Dep't of Agric.*, 2025 WL 2374528 at *11 (D.D.C. Aug. 14, 2025).

## IV. ARGUMENT

### A. Plaintiffs Cannot Establish Standing Under Any Theory They Assert.

Plaintiffs here cannot establish standing because their alleged injuries are not imminent and the possibility that they will ever suffer any qualifying harm is too attenuated and speculative.

#### 1. Legal Standard for Standing

"In order to obtain a preliminary injunction, a party must show, among other things, 'a substantial likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Id.* (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)). Because standing is an essential element of jurisdiction, "a party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'" *Id.* (quoting *Klayman*, 800 F.3d at 568); *see also, e.g., D.A.M.*, 474 F. Supp. 3d 56 ("[A] party who fails to show a substantial likelihood of standing is not entitled to a temporary restraining order.") (citation omitted).

The burden of "substantial likelihood of standing" at this stage is meaningfully heavier than the burden on a motion to dismiss. When a plaintiff moves for preliminary relief, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v.*

*Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S.at 22). Plaintiffs "cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see Elec. Privacy Info. Ctr. v. U.S. Dep't of Com. ("EPIC")*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("[Standing] must be evaluated 'under the heightened standard for evaluating a motion for summary judgment' in 'determining whether or not to grant the motion for preliminary injunction.'" (quoting *Food & Water Watch*, 808 F.3d at 912)).

To establish standing, plaintiffs "must show (i) they have 'suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.'" *Food & Water Watch*, 808 F.3d at 914 (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015)). An injury in fact must be "(1) concrete, (2) particularized, and (3) actual or imminent." *Id.* (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)). "An actual or imminent injury is 'certainly impending and immediate – not remote, speculative, conjectural, or hypothetical.'" *Id.* (quoting *Public Citizen*, 489 F.3d at 1293). Importantly, "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)) (explaining that the lower court "erred by treating the defendants, plaintiffs, and platforms each as a unified whole").

<u>2. Plaintiffs lack an injury-in-fact.</u>

Plaintiffs lack a concrete and particularized injury-in-fact, and thus, this Court lacks jurisdiction.

Plaintiffs frame their lawsuit as challenging a broad federal-government effort to interfere with the 2026 General Election. *See* Pls.' Memorandum of Points And Authorities In Supp. of

Mot. for TRO, ECF No. 19-1 ("Pls.' Mot.") at 8-11; Compl. ¶¶ 44-54. Homing in on their allegations, however, Plaintiffs primarily, if not only, challenge letters from the Federal Government identifying suspected ineligible voters (*i.e.*, those voters who are not U.S. citizens, as federal law requires), and asking that any votes from those suspected ineligible voters be temporarily segregated so that the state and localities may ultimately determine if the suspected ineligible voters are in fact eligible. *See* Pls.' Proposed TRO at 2; Compl. ¶¶ 95-125; Compl. at 43 (Prayer for Relief).

To begin, these letters have no independent legal effect. States or localities will decide whether to comply. If they do not, Defendants will need a court order from an independent Article III judge to require those jurisdictions to segregate ballots. And even if the ballots are segregated, it will be states and localities that will determine whether any votes would be invalid under federal law. Plaintiffs have not shown that the letters themselves inflict the concrete, particularized injury necessary to support the sweeping prospective relief they seek. The letters do not themselves change any voter's registration status, withhold a ballot, or alter ballot tabulation. *See Trump v. California*, Nos. 26A124 & 26A139, 609 U.S. __, 2026 WL 2473573, at *3 (U.S. Aug. 24, 2026) (holding that the plaintiffs lacked standing to challenge President Trump's Executive Order directing the Attorney General to "prioritize" investigating and prosecuting violators of existing federal voting laws because the Executive Order "d[id] nothing to them"); *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 46 (D.D.C. 2021) (holding that the plaintiffs lacked standing to challenge the Archivist's refusal to publish a ratified amendment as part of the Constitution because the publication of the amendment is a formality with "no legal effect"), *aff'd on other grounds,* 60 F.4th 704 (D.C. Cir. 2023); *Boone v. Illinois Dep't of Corr.*, Nos. 23-2630 & 23-2727 , 2024 WL 4750494, at *2 (7th Cir. Nov. 12, 2024) ("Because, as a matter of Illinois state law, [the statute at

issue] has no independent legal effect, the statute could not have caused the plaintiffs an injury in fact that is capable of redress."), *cert. denied*, 145 S. Ct. 2819 (2025); *cf. Tex. Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 335-36 (D.D.C. 2018) (concluding that the plaintiffs had standing, in part, because the government website FAQ that was at issue had independent legal effect). Thus, to extent that Plaintiffs claim that the letters *themselves* injure them, they lack any injury. Indeed, all they point to on that front is a fear that voters more likely to vote for them may be less likely to vote in the future—based on a letter from the Federal Government to states and localities informing those jurisdictions about potential violations of the law. *See* Pls.' Mot. at 34; Snyder Decl. ¶ 10, ECF No. 19-4; Remmel Decl. ¶ 11, ECF No. 19-5; Edelman Decl. ¶ 11, ECF No. 19-6; Monroe-Moreno Decl. ¶ 9, ECF No. 19-7. But this is speculation that cannot give rise to standing. *See infra* pp.12-15.

Furthermore, any concrete and particularized injury to Plaintiffs in this case requires a "speculative chain of possibilities." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013). Even if Defendants send similar letters to new jurisdictions, those third-party jurisdictions would have to independently decide (or be compelled by a federal court) to take action based on those letters—*i.e.*, actually segregate votes—and the segregated votes would have to be those of eligible voters. After all, the letter itself does not segregate ballots (or effectuate any other action Plaintiffs want the Court to enjoin). But "[w]hen a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (citation omitted). Yet Plaintiffs have not plausibly alleged—and they certainly haven't made a strong showing—that third parties will behave in this manner. Rather, these jurisdictions have contested these letters—as proceedings in the Ninth Circuit and Central District of California

illustrate. Even there, because these letters are the subject of collateral litigation, a court would likely need to order the states to segregate the ballots, thus providing a double-layer of third-party interactions that breaks the chain of causation. This Court cannot enjoin sibling (or parent) federal courts, *Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338, 345 (D.D.C. 2011), and yet, that is ultimately the act that Plaintiffs complain about, since that seems to be the only act that will require third-party jurisdictions to enforce the letters. Relatedly, to the extent that Plaintiffs seek to enjoin a *future lawsuit to enforce the letters*, *see* Pls.' Mot. at 14, that effort is premature and unripe, and it is prudentially improper because it would forbid a district judge from ruling on their own case.

In sum, this chain of discretionary events that must occur to particularize the proffered harm is far too attenuated to constitute an injury-in-fact. *See Murthy*, 603 U.S. at 70 (detailing the chain of discretionary events that must occur for the plaintiff to suffer a likely future injury); *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes, [the court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions[.]"). Crediting these "predictions of *future* events or injuries" would "reduce [the redressability and traceability prongs] to mere pleading requirements." *United Transp. Union*, 891 F.2d at 913.

Moreover, any injunction must be forward-looking, as an injunction cannot remedy past harm. *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 105 (D.D.C. 2007) ("That [the plaintiff] has adequately alleged a past injury-in-fact, however, does not in of itself give [the plaintiff] standing to seek prospective relief." (citation omitted)); *see also Murthy*, 603 U.S. at 59 ("[B]ecause the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value." (citation omitted)). A previously sent

letter is a rung bell, which "[t]he grant of an injunction . . . cannot 'unring.'" *Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-CV-1301, 2010 WL 1526382, at *10 (S.D. Cal. Apr. 15, 2010).

Plaintiffs attempt to meet their burden using four vehicles: (1) candidate standing under *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71 (2026); (2) competitor standing; (3) associational standing; and (4) organizational standing. Pls.' Mot. at 32-35. No matter the theory, they cannot do so.

3. Neither *Bost* nor a competitor-standing theory confer Plaintiffs standing.

Plaintiffs DSCC, DCCC, DGA, NSDP, their candidate members, Senator Schumer, and Representative Jeffries purport to have standing under *Bost*. Pls.' Mot. at 32-33, 37. In doing so, Plaintiffs seek to extend *Bost* beyond its parameters. When presented with candidates challenging a state law dictating when votes must be counted, the Supreme Court held that "[c]andidates have a concrete and particularized interest in *the rules that govern* the counting of votes in their elections." *Bost*, 607 U.S. at 82 (emphasis added). No such rule is at issue here; rather, this case concerns determinations of voter eligibility, which are conducted by states and localities—none of which are present in this suit. While "a candidate has a personal stake in the rules that govern the counting of votes in his election," *id.* at 76, the government's letters are not voting rules, and they do not purport to implement any such rule. The letters do not require any jurisdiction to remove anyone from voter rolls, cancel qualified voters, or take any similar action. *Bost* is not a candidate-specific exception to the requirements of Article III.

Plaintiffs also assert that a competitor-standing theory confers them standing. Plaintiffs—and the district courts they cite—chiefly rely on the D.C. Circuit's decision in *Shays v. Federal Election Commission*, 414 F.3d 76 (D.C. Cir. 2005), which addressed political candidates'

challenges to FEC campaign-finance regulations as having violated their authorizing statute. Pls.' Mot. at 33. *Shays* recognized "illegal structuring of a competitive environment . . . as [a] sufficient [injury] to support Article III standing." 414 F.3d at 85; *see also Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 942 F.3d 504, 508-09 (D.C. Cir. 2019) ("The doctrine of competitor standing recognizes that when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests in that environment suffer legal harm under Article III." (citation omitted)).

While the D.C. Circuit's "cases addressing competitor standing have articulated various formulations of the standard for determining whether a plaintiff asserting competitor standing has been injured," *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010), "common to all [the] cases is that the complainant [must] show an actual or imminent increase in competition, which increase [courts] recognize will almost certainly cause an injury in fact," *id.* In other words, a plaintiff must connect the challenged government action to a personal competitive injury.

Glaringly absent from Plaintiffs' allegations is any such showing. While Plaintiffs' reference various quotes from news-clippings, *see, e.g.*, Pls.' Mot. Ex. D, they fail to explain how the letters directed at non-citizen voting target or disenfranchise lawful voters. Plaintiffs cite only general declarations that "[t]he administration's campaign of intimidation and election interference. . . threatens to disenfranchise large numbers of Democratic and Democratic-leaning voters." Snyder Decl. ¶ 9; *see also* Remmel Decl. ¶ 10; Edelman Decl. ¶ 10; Monroe-Moreno Decl. ¶ 8. Or, they declare, in a conclusory fashion, that "many voters . . . will likely be discouraged from voting based on a belief that their votes will not be counted, confusion about the status of their voter registration, or fear of reprisals from DHS and DOJ." Snyder Decl. ¶ 10; *see also* Remmel Decl. ¶ 11; Edelman Decl. ¶ 11; Monroe-Moreno Decl. ¶ 9.

These allegations starkly contrast those that the D.C. Circuit recognizes as conferring competitor standing. *See, e.g.*, *Sherley*, 610 F.3d at 72-74 (holding that adult stem cell researchers had competitor standing to challenge DHHS's guidelines increasing the range of stem cell research eligible to compete with their research for government grants); *Shays*, 414 F.3d at 86 (explaining how the challenged campaign-finance regulations created "intensified competition" requiring the plaintiffs to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow," and detailing examples of the regulations and their effects); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998) (holding that an electric-energy seller had competitor-standing to challenge a FERC decision permitting a competitor to sell energy at market-based rates).

The issue, at its core, lies in the fact that the letters themselves impose no legal effect and, thus, necessitate an attenuated chain of events to materialize the injury that Plaintiffs purport to suffer. Even under a competitor-standing theory, this is inadequate. *See, e.g.*, *New World Radio, Inc. v. FCC*, 294 F.3d 164, 171 (D.C. Cir. 2002) (rejecting a competitor-standing theory where the plaintiff's injury could occur "only if" the defendant subsequently "s[ought] *and* secure[d] the relocation of its [ ] broadcast license to the Washington, D.C. programming area").

But even if the proper states and localities did act in accordance with the requests contained in the letters, the election measures would target *unlawful* voters, which falls within the Executive Branch's purview under 18 U.S.C. § 611(a) to ensure that non-citizens do not cast votes. *See United States v. California*, No. 26-7070, __F.4th __, 2026 WL 3212945, at *24 (9th Cir. Oct. 26, 2026) (Bumatay, J., dissenting) (per curiam) (discussing the United States' interest in preventing and prosecuting fraudulent voting under section 611(a), following DHS's letter to California asking it to verify the identity of a list of voters before the 2026 General Election). And contrary

to Plaintiffs' contention that "Defendants are targeting and seeking to disenfranchise large numbers of Democratic and Democratic-leaning voters," Pls.' Mot. at 33, if states took such measures to enforce federal law's requirements about non-citizen voting, those measures would apply to Republican and Democrat voters alike.

4. The organization Plaintiffs cannot establish associational standing.

Plaintiffs DSCC, DCCC, DGA, and NSDP contend that they have associational standing because "Defendants' meddling directly harms the right of Plaintiffs' members and supporters to vote." Pls.' Mot. at 33. "An organization can assert associational standing on behalf of its members if: '(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *EPIC*, 928 F.3d at 101 (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)).

Associational standing confers standing to third-party organizations on behalf of their *members*. *Id.* Plaintiffs offer no authority for how associational standing can justify standing based on injury to the "supporters" of members (i.e., their candidate members), which layers derivative standing on top of derivative standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring) ("Associational standing . . . is simply another form of third-party standing. And, the Court has never explained or justified either doctrine's expansion of Article III standing."). This Court should decline to further expand such a doctrine. Regardless, only NSDP appears to be comprised of non-candidate members (in addition to candidate-members), *see* Monroe-Moreno Decl. ¶ 3, while the members that comprise DSCC, DCCC, and DGA appear to be exclusively candidates (who are also voters in their own right), *see* Snyder Decl. ¶ 4; Remmel Decl. ¶ 4; Edelman Decl. ¶¶ 4-5.

To the extent any of the organization Plaintiffs assert standing on behalf of their candidate-members based on a competitor-standing or under *Bost*, this argument fails for the reasons discussed previously. *See supra* pp. 12-15. As to NSDP's non-candidate, voting members—and to the extent the other organization Plaintiffs assert standing based on voting members—they neither identify a violation nor explain how their votes will likely be disregarded. Plaintiffs' concern that potential voters may need to spend time and resources gathering information to prove their citizenship, or may be less likely to vote, is speculative because the *effect* of those letters is speculative. *See* Pls.' Mot. at 34. What matters "is the *reality* of the threat of [future] injury," not a plaintiff's "subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Thus, the "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

Moreover, the organization Plaintiffs do not appear to identify a non-candidate, voting member, and they also do not contend that Plaintiff Jimenez is a member. *See* Pls.' Mot. at 34; Jimenez Decl. ¶¶ 1-8, ECF 19-8. When a plaintiff "claims associational standing, it is not enough to aver that unidentified members have been injured." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021) (citation omitted). The D.C. Circuit has recently held that this rule applies more strictly during the merits stage because "the question on a motion for a preliminary injunction is whether [a plaintiff] is *likely* to be able to establish standing later in the case." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1229 (D.C. Cir. 2026) (emphasis added). Even if Mr. Jimenez is a member of one of the organization Plaintiffs, he lacks standing for the same reasons as other non-candidate, voting members: the asserted harm is speculative. Moreover, Mr. Jimenez's fear that he, a naturalized citizen, "may be on the [DOJ's] list" is unfounded. Jimenez Decl. ¶ 7. Mr. Jimenez is a confirmed U.S. citizen not included on the referenced list, *see*

Declaration of Nathaniel Stiefel, ¶¶ 4-5, Defs.' Ex. A, and is therefore not at any risk of injury. And Mr. Jimenez himself does not allege that he has been contacted by federal officials, identified on a federal list, denied a ballot, or told that his ballot will not be counted. *See* Jimenez Decl.

5. The organization Plaintiffs cannot establish organizational standing.

Lastly, Plaintiffs DSCC, DCCC, DGA, and NSDP contend that they have organizational standing because Defendants' conduct "will directly interfere with their core activities." Pls.' Mot. at 35 (quotation omitted). Organizations may "sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *All. for Hippocratic Med.*, 602 U.S. at 393-94. Specifically, the organizational Plaintiffs assert that their "core business activities" include mobilizing voters to cast their ballots and "ensuring that those ballots are counted." Pls.' Mot. at 35. They allege that, as a result of Defendants' conduct, they will be "forced" to "divert[ ] resources from [ ] other mission-critical activities" to "revise [their] programs and messaging to aid voters and candidates who are injured by the threat of wrongful disenfranchisement[.]" Snyder Decl. ¶ 11; *see also* Remmel Decl. ¶ 12; Edelman Decl. ¶ 12; Monroe-Moreno Decl. ¶ 10. None of those allegations establish organizational standing.

*First*, Plaintiffs' suit is a challenge against Defendants "requesting or demanding" that a state remove suspected ineligible voters, refuse to issue ballots to such voters, or segregate or tabulate any such ballots. Pls.' Proposed TRO at 2. As explained above, no action to effectuate this request has occurred; nor can it reasonably be anticipated to occur absent judicial intervention or, at a minimum, the independent choices of third-party jurisdiction. Thus, any expenditures premised on that possibility are unjustified, self-inflicted, and not fairly traceable to the challenged conduct of the Defendants. *See Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 634 (9th Cir. 2026) (en banc) (holding that potential expenditures to mitigate the hypothetical impact of a

challenged action "cannot support standing" when the alleged impact "lacks record support and is highly speculative" (quoting *All. for Hippocratic Med.*, 602 U.S. at 390)). It is no less fatal to Plaintiffs' alleged organizational standing than to individual or associational standing that there is no imminent threat that California will take the actions requested in Defendants' challenged letters.

*Second*, Plaintiffs' asserted expenditure/diversion of resources theory has been squarely rejected by the Supreme Court. In *Alliance for Hippocratic Medicine*, four associations challenged actions by the Food and Drug Administration (FDA) relaxing "regulatory requirements for mifepristone, an abortion drug." 602 U.S. at 372-73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (citation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (citation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (citation omitted).

But the Supreme Court unanimously held that associations "cannot spend [their] way into standing[.]" *Id.* The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a

single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394–95. So too here.

Defendants' challenged actions may make Plaintiffs' core mission objectives, such as voter mobilization, less likely to succeed (though that is deeply speculative and itself inadequate), but even so, Plaintiffs have not alleged or proved—nor could they allege or prove—that Defendants' challenged actions actually interfere with Plaintiffs' ability to pursue activities like voter mobilization. "[A]n organization may not establish standing simply by spending money 'opposing those policies' that it 'dislike[s].'" *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, __ F.4th __, 2026 WL 2635380, at *5 (D.C. Cir. Sept. 8, 2026) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). It is only when "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' *to continue pursuing those activities*, [that] such concrete harm to the organization's activities supports standing to sue." *Id.* (emphasis added); *see also, e.g., Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1173-74 (D.C. Cir. 2025) (finding that the plaintiff might have demonstrated organizational standing had it alleged the defendant's actions "deprived it of the information it depends on to carry out its monitoring functions" and also showed "how it used its resources to counteract the injury" (cleaned up)).

**B. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits**

In addition to lacking standing, Plaintiffs also fail to demonstrate a substantial likelihood of success on the merits. *See Food & Water Watch*, 808 F.3d at 913 ("In order to obtain a preliminary injunction, a party *must show*, among other things, a substantial likelihood of success on the merits.") (citation omitted) (emphasis added).

1. <u>Defendants' Challenged Actions Are Not Ultra Vires</u>

Plaintiffs cannot establish that the challenged action of the Defendants is ultra vires. The Supreme Court has "strictly limited" the scope of ultra vires review, otherwise "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds" (citation omitted)). Thus, ultra vires claims must fit within "painstakingly delineated procedural boundaries"; and such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition'" in a statute. *Id.* (first quoting *Boire v. Greyhound Corp*., 376 U.S. 473, 481 (1964), then quoting *Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Emps. v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)).

To the extent that Plaintiffs allege a violation of NVRA, *see* Pls.' Mot. at 27, Plaintiffs simply "dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. While "[t]hat is a fairly common maneuver," the Supreme Court has squarely rejected it. *Id.*

Ultra vires review is also unavailable here for at least two reasons. First, ultra vires review is unavailable if "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors of the FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Plaintiffs specifically argue that Defendants' challenged actions are ultra vires because they violate a provision of the NVRA. Pls.' Mot. at 27. Although Plaintiffs fail to meet the requirements to bring such a cause of action here, it is

undisputed that challenges to final agency action allegedly in violation of the NVRA can be brought under the APA. *See, e.g., League of Women Voters of the U.S. v. Harrington*, 560 F. Supp. 3d 177, 180-81 (D.D.C. 2021) (granting summary judgment on APA claims challenging non-compliance with requirements of the NVRA). The APA provides a relevant cause of action for constitutional claims. *See, e.g.*, *Almaklani v. Trump*, 444 F. Supp. 3d 425, 432-34 (E.D.N.Y. 2020) (acknowledging argument that APA provides the relevant cause of action and collecting cases limiting constitutional claims to administrative record, with some exceptions). Plaintiffs cannot simply ignore the basic requirements that Congress has established through the final agency action requirement. *See* 5 U.S.C. § 704; *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (determining whether an agency action is final requires showing that the action marks the "consummation" of the decision-making process rather than "merely tentative or interlocutory" and that the action determines "rights or obligations"). Given that "alternative path to judicial review," an ultra vires claim is not available. *Nuclear Regul. Comm'n*, 605 U.S. at 682. And as here, "if [] plaintiff's claims [fail] under the APA, then those same claims necessarily could not succeed under ultra vires review, which has an even narrower scope."' *Fed. Express Corp. v. U.S. Dep't of Com.,* 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified).

Even if there were no alterative path to review, an ultra vires claim fails unless the agency "plainly act[ed] in excess of its delegated powers" and "its error must be 'jurisdictional or nearly so.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) (citing *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) & *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). As discussed further below, sending a non-binding letter is not an ultra vires act in violation of federal law, rather, it is an appropriate act designed to *further* federal law.

2. Defendants' Challenged Actions Do Not Violate the Elections Clause or the NVRA

**a. Elections Clause.** Plaintiffs contend that Defendants' actions are ultra vires executive actions in violation of the Elections Clause. *See* Pls.' Mot. at 24–26. Plaintiffs mistakenly contend that Congress has not provided statutory authority for the challenged actions consistent with its constitutional authorities. Again, the challenge here is not to any *actions* taken by the Federal Government. It is to letters identifying potential ongoing violations of federal law. Thus, Plaintiffs' challenge is doubly difficult: not only does it have to show that the actions they contend these letters *seek* localities and states to take is ultra vires, but that sending the non-binding letter itself is ultra vires. They cannot run the table on that exceptional request.

It is not ultra vires for the Federal Government to inform states and localities of probable ongoing violations of federal law. The Elections Clause of the Constitution grants States the authority to set the rules for the "Times, Places and Manner" of elections. U.S. Const. art. VI, cl. 2. It also lets Congress make or alter those rules. And acting under its authority over immigration law, Congress passed 18 U.S.C. § 611(a)—the law undergirding the federal government's actions in California. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) (stating that the Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens" (citation omitted)); *see also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("Federal authority in the areas of immigration and naturalization is plenary[.]") (citation modified).

Since at least 1996, Congress has made it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner[.]" 18 U.S.C. § 611(a). A

noncitizen who violates the voting ban may be fined or imprisoned. *See id.*; *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007) (finding 18 U.S.C. § 611 to be a general intent crime where the government needs only to "prove that the defendant knowingly engaged in the conduct prohibited" (citation omitted)). And Congress has vested the Attorney General with broad authority "to detect and prosecute crimes against the United States." 28 U.S.C. § 533.

Section 611 falls within those broad grants of authority as it regulates the conduct of noncitizens within the sphere of federal elections and allows for the "maintenance of a republican form of government" by ensuring only citizens can vote in federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) ("In exercising [its Elections Clause] power, the Congress may supplement [the] state regulations . . . . It may impose additional penalties for the violation of the state laws."); *Burroughs v. United States*, 290 U.S. 534, 547 (1934) ("The power of Congress to protect the election of President and Vice President from corruption [is] clear[.]"); *Bluman v. FEC*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (upholding federal statute banning certain aliens from engaging in election-related expenditures, on the ground that "[t]he Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States").

Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *accord Arizona*, 567 U.S. at 395 (recognizing that it is "fundamental that foreign countries" confer with "one national sovereign" on immigration issues). That naturally includes authority over the statuses of noncitizens and "regulation of the conduct of an alien before naturalization." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Thus, "the regulation of aliens is so

intimately blended and intertwined with responsibilities of the national government that where it acts, and where the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Id*. That is all true even if there are some unconstitutional applications of the law. *See United States v. Raines*, 362 U.S. 17 (1960). In this case, however, Section 611(a) constitutionally applies to situations where noncitizens are voting in a federal election. 18 U.S.C. § 611(a). In sum, the challenged actions here are supported by both the Constitution and statute. Pls.' Mot. at 24.

Plaintiffs contend that because Section 611 is a criminal statute, Defendants are precluded from issuing letters or bringing a lawsuit seeking to enforce the law prohibiting noncitizen voting. *Id.* at 28. That is misplaced. "Courts have long accepted that the United States may invoke equitable jurisdiction to vindicate the supremacy of federal law." *California*, 2026 WL 3212945, at *26 (Bumatay, J., dissenting) (citing *Arizona*, 567 U.S.at 393–94 and *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (collecting cases)). Such an equitable cause of action "follows from the general principle that 'the United States may sue to protect its interests.'" *Id.* (citations omitted). Indeed, such equitable jurisdiction is "longstanding" and based on "[t]he sovereign's special treatment in equity." *Id.* (citing Mila Sohoni, *Equity and the Sovereign*, 97 Notre Dame L. Rev. 2019, 2027 (2022)).

The cases Plaintiffs cite for the proposition that the government lacks a cause of action to sue to enforce federal law are inapposite. *See* Pls.' Mot. at 28. They simply stand for the uncontroversial principle that federal criminal statutes can only be enforced by the government. *See Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017) (per curiam) (holding that a federal contractor lacked a private cause of action under a criminal lawsuit); *Cort v. Ash*, 422 U.S. 66, 80 (1975) (same, as to a corporate stockholder seeking damages against

corporate directors). And Plaintiffs' cherry-picked quote from *Trainor v. Hernandez* states only the "accepted rule that equity will ordinarily not enjoin the prosecution of a crime." 431 U.S. 434, 441 (1977). That does not support Plaintiffs' contention that Defendants, who are ultimately charged with enforcing federal law, lack a cause of action.

Furthermore, since 18 U.S.C. § 611 represents Congress' constitutional prerogative to regulate federal elections, "a state may [therefore] not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citation omitted). State action—such as California's refusal to verify whether the identified 20,000+ voters are U.S. citizens (the subject of separate litigation)—must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405. When a State "authorizes [persons] to engage in conduct that the federal [law] forbids, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mich. Canners and Freezers Ass'n, Inc. v. Agric. Marketing and Bargaining Bd.*, 467 U.S. 461, 478 (1984) (citation modified).

Just as preemption applied when state officials acted to "encourage racial segregation" in violation of the Equal Protection Clause, *United States v. City of Jackson*, *Miss.*, 318 F.2d 1, 3-4 (5th Cir. 1963), so too is it likely to apply to California's actions as to likely noncitizen voters identified by the Federal Government. Preemption also applies when local authorities are merely "passive participant[s]" in unlawful behavior. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (applying *Norwood*'s "induce, encourage or promote" principle, 413 U.S. at 465, to scenario where a local government "had essentially become a 'passive participant' in a system of racial exclusion" (citation omitted)).

Further, while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes unlawfully hampers such efforts. It is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. That necessarily, and unlawfully, frustrates federal objectives in enforcing the law. *See id.*;.*California*, 2026 WL 3212945, at *28 (Bumatay, J., dissenting) (explaining how California's interpretation of both "federal and state election law to preclude separating illegal voters' ballots from legal ones" "frustrates § 611(a)").

Ultimately, while Plaintiffs' complaint inaccurately labels the Federal Government's request to California as an unlawful voter "purge," *see* Pls.' Mot. at 34; the Government's request is simply to set aside ballots momentarily to allow for confirmation of citizenship and compliance with federal (and even state) law.

**b. States' Election Powers.** Moreover, the challenged actions do not impinge on states' Article I authority to prescribe the "Times, Places and Manner" of holding federal elections. The federal government seeks only to temporarily segregate unsolicited vote-by-mail ballots where there is credible evidence showing that the ballots may be tied to noncitizens; and such segregation is only to ensure an accurate vote count pending citizenship verification. The relief sought in the *California* case does not require California to systematically remove anyone from voter rolls. Instead, Defendants' narrowly requested relief seeks only to root out the fundamental unfairness of a vote cast by a noncitizen canceling a vote by a citizen. *See Anderson v. United States*, 417 U.S. 211, 227 (1974) ("Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). And again, the letters themselves—the things actually challenged here—do not impinge

on anything. They simply request that jurisdictions take action to comply with federal law. That does not infringe on the states' rights, just as a federal law enforcement agency would not violate state election powers if it notified a jurisdiction of an imminent terrorist attack targeting an election facility.

**c.** **NVRA.** Finally, the challenged actions do not violate federal law prohibiting the effectuation of a "program" with a purpose "to systematically remove the names of ineligible voters from the official lists of eligible voters'" within 90 days of an election, as Plaintiffs allege. 52 U.S.C. § 20507(c)(2)(A) ("NVRA"); *see* Pls.' Mot. at 27. The Federal Government is not seeking systematic or programmatic changes to any registration list, nor does it allege that states violated the law by initially registering voters. *See California*, 2026 WL 3212945, at *33 (Bumatay, J., dissenting) ("[T]he government is not asking the State to carry out a voter roll program."). Rather, any future letters would concern tabulating votes that a state now knows likely come from noncitizens. The Federal Government seeks only standard (and temporary) ballot-handling procedures to ensure an accurate vote count pending citizenship verification. The letters do not require any jurisdiction to remove anyone from voter rolls, cancel qualified voters, or take any similar action. *See id.* ("[N]o one would be removed from the voter rolls, and no one would be prevented from casting their ballot.").

And "while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, *it does not preclude States from deny[ing] registration based on information in their possession establishing the applicant's ineligibility*." *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 15 (2013) (emphasis added & citation omitted)); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014) (The NVRA "does not in any way handcuff a state from using its resources to ensure that noncitizens are not

listed in the voter rolls." "As a result, the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information[.]").

In fact, the Supreme Court has expressly—and recently—held that "*individualized* inquiries" into citizenship "are permitted under federal law during [the 90-day] period." *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, ---609 U.S. ---, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026). That is what the Federal Government did in the context of the *California* litigation. To prevent the Federal Government from conducting such individualized inquiries would "inhibit[its] efforts to assist state and local agencies in the proper administration of the midterm elections." *Id.*

Defendants also note that *League of Women Voters* concerned the use of the Systematic Alien Verification for Entitlements (SAVE) program, but that process is not at issue here. Pls.' Mot. at 12; *see* Compl. at 9, n.1, ECF No. 1, *United States v. California*, No. 2:26-cv-12025-DOC (C.D. Cal. October 15, 2026) ("To the best of the government's knowledge, California has not submitted any voter rolls through the Systematic Alien Verification for Entitlements (SAVE) program. Thus, USCIS' process performed here was done independent of SAVE.").

Put differently, the United States in the California lawsuit does not seek to enjoin "election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (citation omitted). Far from it. The United States seeks only to force California to *conform* to federal and state election rules concerning noncitizen voting. *See* 18 U.S.C. § 611. Such relief would not cause confusion among voters or otherwise because it concerns how to handle certain ballots once cast. And California has laws and systems in place to accommodate the requested relief. *See*, *e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

But, again, all of this is premature. Nothing has happened yet, and the letters themselves-in contrast to any potential lawsuits—do not force anyone to do anything. They certainly do not remove any voter from the rolls, and Plaintiffs attempt to opine on the legality of that potential exercise in the abstract is improper.

Consequently, Plaintiffs' claims that the Federal Government has exceeded its authority in the challenged actions fall flat and are likely to fail.

3. Defendants' Challenged Actions Do Not Violate the Separation of Powers

Plaintiffs' separation of powers argument ignores the vital, constitutionally mandated role the Executive Branch plays in carrying out the will of the people through enforcing the laws enacted by Congress. This includes laws related to elections. "Congress may at any time by Law make or alter such Regulations" set by the States in prescribing the "Times, Places and Manner of holding [congressional] Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause functions as "a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" *Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 9.

Congress has exercised that power by passing the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in 1996, which, as codified in 18 U.S.C. § 611, prohibited noncitizens from voting in federal elections. The Executive is charged with enforcing IIRIRA and related laws pertaining to noncitizen voting, and contrary to Plaintiffs' argument, that enforcement

authority is not limited only to "charging and prosecuting offenders." Pls.' Mot. at 8. Enforcement is not just punishment, it includes investigation into whether a crime has been committed and includes actions designed to prevent criminal activity. Contrary to Plaintiffs' assertions, *see id.* at 8; *Cent. Bank of Denv.*, *N.A. v. First Interstate Bank of Denv.*, *N.A.*, 511 U.S. 164 (1994) does not say otherwise. That case involved an attempt by bond purchasers to impose civil liability on certain defendants for aiding and abetting the alleged criminal fraud of other defendants. *Id.* The Court held only that a *private* plaintiff may not maintain an aiding and abetting suit under the criminal statute because "a criminal prohibition alone" does not create a *private* right of action. *Id.* at 190-191. It does not circumscribe the role of the federal government in enforcing the law.

Moreover, the separation of powers is not just top-down. The Elections Clause does not give the States the power to preempt Congress or the Executive's law enforcement role. "Congress's Elections Clause power to establish federal election rules is supreme over, but coextensive with, the States' own regulatory power." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 60 (D.D.C. 2026) (citation omitted). It follows then that while States are authorized to determine who is qualified to vote, *see* U.S. Const. art. I, § 2, cl. 1, where Congress has spoken on those qualifications through statutes or constitutional amendments, State qualifications cannot conflict with those set forth by Congress or the Constitution. States, for example, cannot decide that noncitizens are qualified to vote in federal elections, because Congress has expressly prohibited it. States similarly cannot unilaterally decide not to comply with federal law regarding noncitizen voting. If there has been any separation of powers violation here, it comes from the States' refusal to cooperate with the Executive's law enforcement authority.

But this is all a dispute over potential future enforcement actions. Those are not at issue here. Rather, the actions Plaintiffs describe in their Complaint and the instant motion do not

constitute interference with the States' duties to administer the upcoming election. Defendants have sent letters and provided elections officials with lists of individuals Defendants have reason to believe are noncitizens who are statutorily ineligible to vote in federal elections. *See* Pls.' Mem. at 12-13, 17-18. These actions are designed to ensure that the law is followed, and votes of eligible citizens are not diluted—a far cry from interfering with the role and function of the States under the Elections Clause. The Executive's actions do not violate the vertical separation of powers.

4. <u>Defendants' Challenged Actions Do Not Violate the Tenth Amendment</u>

Plaintiffs argue that Defendants have violated the Tenth Amendment through a violation of the anticommandeering doctrine by allegedly "[t]hreatening state election officials with civil and criminal liability to coerce compliance with federal policy." Pls.' Mot. at 30. Plaintiffs are incorrect. Even if Plaintiffs' allegations were true, no violation of the anticommandeering doctrine can exist for alleged mere threats to coerce compliance with a federal policy; instead, a plaintiff must demonstrate, at a minimum, that the federal government is requiring a State "to enact . . . laws or regulations" or that the federal government is requiring a State "to assist in the enforcement of federal statutes regulating private individuals." *See Reno v. Condon*, 528 U.S. 141, 151 (2000).

The Tenth Amendment "is essentially a tautology" that "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156-57 (1992). And the anticommandeering doctrine is narrow and "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). A violation of the anticommandeering doctrine must be a proverbial "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). The Supreme Court has endorsed it in a few instances, but the

facts from those cases only magnify that Plaintiffs cannot demonstrate an anticommandeering claim here.

As the Supreme Court stated in *Murphy*, the "pioneering case," 584 U.S. at 471, for the anti-commandeering doctrine is *New York v. United States*, where the Supreme Court held that Congress may not commandeer the legislative processes of the States "by directly compelling them to enact and enforce a federal regulatory program." 505 U.S. at 161 (quoting *Hodel v. Va. Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). There, one provision of the Low-Level Radioactive Waste Policy Amendments Act of 1985 required States to make a choice: regulate the radioactive waste in accord with Congress's wishes or "tak[e] title to and possession of the low level radioactive waste generated within their borders and becom[e] liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *Id.* at 174-75. The Court concluded that both options were unconstitutionally coercive as no matter what, a State was required to "implement[] legislation enacted by Congress" by pressuring the States into involuntary "serv[ing] . . . federal regulatory purposes." *Id.* at 175-76.

Likewise, in *Printz v. United States*, the Supreme Court considered the constitutionality of a federal statute that imposed on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). The Supreme Court concluded that this legislation—which operated to "conscript[]" State officers to execute federal law—was "fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 935. In *Sebelius*, the Court held that requiring States to accept the Affordable Care Act's expansion in health care coverage or else lose all Medicaid funding similarly violated this principle by "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." 567 U.S. at 581-82. And in *Murphy*, the Supreme Court ruled that a

provision of the Professional and Amateur Sports Protection Act—which prohibited a State from "authoriz[ing]" sports gambling—ran afoul of the anticommandeering doctrine because it "dictate[d] what a state legislature may and may not do." 584 U.S. at 474.

Here, the facts alleged are nothing like those precedents. Plaintiffs argue that Defendants violate the anticommandeering doctrine through a nondescript "campaign to attempt to federalize election administration" by "threat[ening] . . . federal investigation, retaliation, and lawsuits as a cudgel to compel State and local election officials to bend the knee to the current administration's policy preferences" with their evidence primarily being public statements taken out of context. Pls.' Mot. at 31. Those allegations go far afield of the bounds of the doctrine. Plaintiffs do not allege that Defendants "require[d] [a State] to enact any laws or regulations," or that Defendants have "require[d] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151 (concluding that Driver's Privacy Protection Act of 1994 did not violate anticommandeering principle because it lacked these features). Instead, all that Plaintiffs have presented are letters reminding State officials that "federal law prohibits noncitizens from voting in federal elections" and providing evidence in those that "likely noncitizens" were provided ballots, *see* Pls.' Mot. Ex. Z (citing 18 U.S.C. § 611), *id.* Ex. AB (same); *see also id.*, Ex. AE (providing Defendants' response to California's letter). Judge Bumatay, writing in dissent, recognized the federal government's authority not only to send such letters, but to bring a lawsuit to enforce its interests, if it so chose. *See California*, 2026 WL 3212945, at *24-30 (Bumatay, J., dissenting). In doing so, Judge Bumatay dispelled the notion that the anti-commandeering doctrine prohibits the federal government's authority to do so, let alone to send mere letters. *See id.* at *31-32.

Plaintiffs characterize Defendants' letters as "threat[s]" and "coercive tactics to bully state and local officials into compliance." Pls.' Mot. at 3, 31. But so-called "threat[s]" and "bully[ing]" do not suffice to demonstrate that Plaintiffs must make an unconstitutional choice to enact the federal governments' preferred laws or regulations or that Plaintiffs must assist the federal government in regulating private third parties. *See Reno*, 528 U.S. at 151. Again, the letters themselves are not self-executing—they do not compel anyone to do anything.

Ultimately, Plaintiffs also do not argue that 18 U.S.C. § 611 or enforcement of it is somehow unconstitutional, and so long as the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see also United States v. Comstock*, 560 U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." (quoting *New York*, 505 U.S. at 156)); *Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government." (citation omitted)). And a statement that a state action is violating *federal* law and a request that that violation be remedied is not a Tenth Amendment violation. It is a basic feature of a federal system where federal law is ultimately supreme over state actions.

In short, Plaintiffs have not and cannot state a claim for relief under the anticommandeering doctrine.

### C. Plaintiffs Cannot Establish a Risk of Irreparable Harm

Plaintiffs' motion for preliminary relief must also be denied because they do not meet their burden to establish substantial likelihood of irreparable harm. "[A] 'movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236

(D.C. Cir. 2025) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also*, *e.g.*, *D.A.M.*, 474 F. Supp. 3d at 56 (The D.C. Circuit "has made clear…that an absence of irreparable injury is fatal to a plaintiff's motion" for preliminary relief. (citation omitted)); *Taylor v. Trump*, 788 F. Supp. 3d 1, 7-8 (D.D.C. 2025) ("It is clear that a failure to show a likelihood of irreparable harm is standing alone sufficient to defeat the motion" for emergency relief. (citation modified)).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. For one, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted). And of course, "the injury must be beyond remediation." *Id.* That means that even "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (citation omitted).

First, as discussed *supra*, Plaintiffs have failed to demonstrate that they have Article III standing to bring this motion. "The irreparable-harm standard requires a more significant showing than the injury-in-fact standard." *Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012). "Where plaintiff 'has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a preliminary injunction.'" *DSCC v. Trump*, 834 F. Supp. 3d 19, 40-41 (D.D.C. 2026) (quoting *Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013)). Here, Plaintiffs "'fail[] to carry their burden with respect to establishing that they have a substantial likelihood of standing,'" so "they

have also failed to show that those injuries are 'certain enough and great enough to warrant preliminary injunctive relief.'" *Id.* at 41 (quoting *Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234, 2025 WL 513268, at *4 (D.D.C. Feb. 17, 2025)).

Second, even if standing were not at issue, Plaintiffs' allegations do not establish the necessary threat of irreparable harm. Plaintiffs allege that they face irreparable harm because Defendants' challenged requests "force[ ] [Plaintiffs' member] candidates to compete on a playing filed tilted against them," frustrate the organization Plaintiffs' core mission, and impair members' and non-member supporters' voting rights, which cannot be remedied once an election has passed. Pls.' Mot. at 36-38. However, as explained in detail *supra*, there is no present possibility that state officials will act to interfere with Plaintiffs' voting rights based on Defendants' requests. *See DSCC*, 834 F. Supp. 3d at 41 ("[G]iven . . . that no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs, they have not suffered any harm at present, much less harm that is 'certain,' 'great,' and imminent." (quoting *Wis. Gas. Co.*, 758 F.2d at 674 )); *id.* at 31 ("[T]he Supreme Court has repeatedly said that 'allegations of *possible* future injury' are not sufficient to establish injury in fact." (quoting *Clapper*, 568 U.S. at 409)). The indisputable fact that state officials are not acting on DOJ's requests also breaks the necessary causal chain for the less specific harms alleged by Plaintiffs, including "voter disenfranchisement" and requiring "candidates to compete on a playing field titled against them." Pls.' Mot. at 36, 38. In the absence of any immediate threat of the allegedly irreparable harm, Plaintiffs fail to satisfy this prong of the preliminary injunction analysis. *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019).

### D. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief

The Court need not reach the remaining preliminary injunction factors, but if it does, neither factor favors Plaintiffs' request for preliminary relief.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government has a compelling interest in combating voter fraud. *See Anderson*, 417 U.S. at 227 ("Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*; *see South Carolina v. United States*, 898 F. Supp. 2d 30, 43 (D.D.C. 2012) (three-judge panel) (Kavanaugh, J.) (stating that "there 'is no question about the legitimacy or importance' of the interest in deterring voter fraud and that there is 'independent significance' in enhancing public confidence in the electoral system") (quoting *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196–97 (2008)).

As the Supreme Court has explained, "[t]he deposit of [fraudulent] ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial." *Anderson*, 417 U.S. at 227. Accordingly, the government is permitted to "take action to prevent election fraud" before it has occurred. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Congress's enactment of 18 U.S.C. § 611 reflects an express mandate to protect those interests by authorizing the Executive Branch to enforce the prohibition on noncitizens voting in

federal elections. A court deciding whether to issue an injunction is not free to disregard that legislative "order of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *United States* v. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (citation omitted).

Here, where Plaintiffs seek an injunction prohibiting the government from carrying out its responsibilities under a "statute[ ] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). The Supreme Court emphasized that point recently in staying two lower court injunctions that interfered with the federal government's ability to enhance election integrity. *See California*, 2026 WL 2473573, at *4 (holding that the government was "likely to suffer irreparable harm" from an injunction that, *inter alia*, prohibited DHS "from trying to compile Citizenship Lists" and "deal[t] 'a serious setback' to the Executive's 'goals'" (citation omitted)); *League of Women Voters*, 2026 WL 2879700, at *2-3 (holding that the government was "likely to suffer irreparable harm" from an order that "set aside and vacated" improvements to the DHS system that verifies citizenship and immigration status of noncitizens). Because Plaintiffs' requested injunction would similarly prohibit Defendants from taking appropriate action to ensure voter integrity in advance of the upcoming November 2026 election, it is the harm to the United States that is irreparable. *California*, 2026 WL 2473573, at *4; *see Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*, No. 26-5257, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026) (finding the federal government demonstrated irreparable harm because "'there can be no do over' once the election occurs") (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

Americans benefit from an electoral process that prevents tabulation of illegal votes. Plaintiffs' requested injunction would undermine that important goal and frustrate the purpose of 18 U.S.C. § 611 to prevent noncitizen voting. The public interest and equities strongly tip in Defendants' favor and outweigh Plaintiffs' speculative and presently non-existent injuries.

### E. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers.

In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs' proposed injunction is vague, unworkable, and infringes on the separation of powers.

Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically[,]" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has explained, "the specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Instead, "[t]he Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* After all, "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see, e.g.*, *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982).

Plaintiffs' proposed injunction violates the specificity requirements of Rule 65(d) by leaving Defendants guessing about what specific conduct would be enjoined. *See* Pls.' Mot. at 1. Specifically, Plaintiffs ask the Court for a "temporary restraining order and preliminary injunction enjoining Defendants from continuing to unconstitutionally impose themselves upon election

administration procedures that the Constitution and federal law assign to the States, including as to: (1) removal of registered voters from statewide voter registration lists; (ii) issuance of ballots to registered voters; and (iii) the counting and tabulation of ballots." *Id.* An injunction that simply restates existing law under penalty of contempt is prohibited. *See CASA, Inc.,* 606 U.S. at 858 ("[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law."); *see also Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (holding that a court cannot fashion an injunction that abstractly commands the Secret Service to obey the First Amendment, noting that an injunction requiring party to do nothing more specific than "'obey the law' is impermissible.").

Plaintiffs fail to explain what conduct would constitute an alleged "unconstitutional[] impos[ition]." Are government officials restricted from making public statements about non-citizens voting in federal elections? May government officials communicate with state and local governments about potential voter fraud? Must the Department of Justice stop litigating the *California* case or recently filed voter fraud criminal cases in the Central District of California? Does the injunction collaterally prohibit grand jury subpoenas for voter records? Those are just a few of the myriad questions that Plaintiffs' requested injunction leaves unanswered. And Plaintiffs' brief remarkably appears to suggest that *all* of those activities would be enjoined. *See* Pls.' Mot. at 35–36 (arguing that social media posts from the President, letters sent to state officials, and the filing of criminal charges against other people allegedly "intimidate[e] election officials" and constitute "meddling in state elections" (citation omitted)). Congress required "that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade*

*Ass'n*, 389 U.S. 64, 76 (1967) (discussing Fed. R. Civ. P. 65(d) regarding injunctions). Plaintiffs' proposed injunction falls well short of that standard.

Moreover, Plaintiffs' proposed injunction violates the Supreme Court's decision in *CASA* by seeking universal relief not tailored to any particular Plaintiff. *See CASA*, *Inc.*, 606 U.S. at 847, 851 (stating that injunctive relief must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue."). Plaintiffs cannot secure broad injunctive relief for all their unknown members, particularly those members who lack Article III standing in their own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-500 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."). Because "standing is not dispensed in gross," a preliminary injunction must be tailored only to those specific plaintiffs who have established standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citation omitted).

Finally, Plaintiffs' nationwide injunction that would indefinitely preclude the federal government from enforcing federal law and would violate the separation of powers. As the Supreme Court emphasized, "federal courts do not exercise general oversight of the Executive Branch" and may not "prevent[ ] the Government from enforcing its policies against nonparties." *CASA*, 606 U.S. at 859, 861. Plaintiffs' injunction would prohibit the government from taking future actions to enforce the law and seemingly would enjoin an ongoing federal lawsuit in California.

Such a broad request violates the principle that "federal courts 'as courts of coordinate jurisdiction and equal rank . . . must be careful to avoid interfering with each other's affairs [and must] avoid rulings which may trench upon the authority of sister courts.'" *Apotex Inc. v. U.S. Food & Drug Admin.*, 508 F. Supp. 2d 78, 88 (D.D.C. 2007) (quoting *Buzas Baseball, Inc. v. Bd.*

*of Regents of Univ. Sys. of Georgia,* 189 F.3d 477, 477 (10th Cir.1999); *Sutter Corp. v. P & P Indus., Inc.,* 125 F.3d 914, 917 (5th Cir.1997)); *see also Smith v. Sec. Exch. Comm'n,* 129 F.3d 356, 361 (6th Cir.1997)). Indeed, granting Plaintiffs' requested relief may constitute a "harm to the public interest when courts extend themselves beyond their proper jurisdiction." *Id.* In sum, Plaintiffs' requested relief is overbroad, violates the separation of powers, and should be denied.

## **CONCLUSION**

For the reasons explained above, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

Dated: October 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Kathryn Barragan*
Kathryn Barragan (DC Bar No. 90026294)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 598-7696
Email: Kathryn.e.barragan@usdoj.gov

Abigail Nusbaum (FL Bar No. 1059558)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 451-7304
Email: Abigail.S.Nusbaum@usdoj.gov

*Counsel for Defendants*