**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, et al.,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 1:26-CV-3674 |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ........................................ 1

ARGUMENT ........................................ 4

I. Plaintiffs are presently suffering injuries from Defendants' conduct and face the imminent and foreseeable prospect of additional harm. ........................................ 4

A. *Bost* supplies a clearcut basis for standing for Plaintiffs' candidates. ........................................ 4

1. Candidates have unique and concrete interests in the electoral process, including its fairness, accuracy, and legitimacy. ........................................ 4

2. Defendants' actions are presently injuring Plaintiffs' concrete interests in a fair process and maintaining public confidence in electoral results. ........................................ 6

3. Plaintiffs also face a substantial risk that Defendants' actions will force changes in ballot canvassing on the eve of the election. ........................................ 9

B. Defendants' ongoing intimidation and pressure campaign harms Plaintiffs' competitive interests and electoral prospects across the country........................................ 11

C. Plaintiffs' core activities are burdened by Defendants' conduct. ........................................ 14

II. Each harm that Plaintiffs face is traceable to Defendants' conduct and redressable by injunctive relief. ........................................ 16

III. While the Court should enter nationwide relief, the record reflects a particularly strong basis for enjoining Defendants from continuing to make demands of and threats to election officials in California, Washington, and Nevada. ........................................ 17

CONCLUSION ........................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ........ 8

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........ 8

**Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) ........ *passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 4, 15

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ........ 19

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
190 F.4th 990 (D.C. Cir. 2026) ........ 15

**Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 11, 16

*Dep't of Homeland Sec. v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) ........ 16

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ........ 4, 17

*DNC v. Trump*,
No. 26-CV-3506 (LLA), 2026 WL 3228366 (D.D.C. Oct. 28, 2026) ........ 5

*DNC v. Wis. State Legislature*,
592 U.S. 1039 (2020) ........ 7, 8

**DSCC v. Trump*,
No. 26-CV-01114 (CJN), 2026 WL 2681471 (D.D.C. Sep. 13, 2026) ........ 5, 6, 17

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 4, 15

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ........ 9

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 19

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 15, 16

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) .......... 5

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. 26-5243, 2026 WL 2643439 (D.C. Cir. Sep. 4, 2026) .......... 17

*Meese v. Keene*,
481 U.S. 465 (1987) .......... 3, 16

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
No. 25-5209, 2026 WL 3132807 (D.C. Cir. Oct. 20, 2026) .......... 17

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 16

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 9, 11

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. 2026) .......... 9

**Shays v. Fed. Election Comm'n*,
414 F.3d 76 (D.C. Cir. 2005) .......... 3, 4, 12, 13

*Tex. Democratic Party v. Benkiser*,
459 F.3d 582 (5th Cir. 2006) .......... 14

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 18

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571 (2017) .......... 18

*United States v. California*,
No. 2:26-cv-12025 (DOC), 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026) .......... 7

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) .......... 17

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) .......... 18

**STATUTES**

Cal. Elec. Code § 3000.5(a) .......... 19

Nev. Rev. Stat. § 293.269911 .......... 19

Wash. Rev. Code § 29A.40.010 .......... 19

**OTHER AUTHORITIES**

*AG Todd Blanche Transcript*, Pod Force One (Oct. 21, 2026), https://podcastrex.com/shows/pod-force-one/democrats-gaslight-the-american-people-ag-todd-blanche/transcript .......... 12

Devlin Barrett & Shawn Hubler, *Justice Dept. Pressures California with Expanded Election Investigation*, N.Y. Times (Oct. 29, 2026), https://www.nytimes.com/2026/10/29/us/trump-doj-california-voter-rolls-midterms.html .......... 10

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 26, 2026, at 5:15 p.m.), https://truthsocial.com/@realDonaldTrump/posts/117509280703799414 .......... 12

Gary Grumbach & Kyla Guilfoil, *Justice Department Requests Separating Alaska Ballots that Rank Dan J. Sullivan in Senate Race*, NBC News (Oct. 30, 2026), https://www.nbcnews.com/politics/2026-election/doj-requests-separating-alaska-ballots-rank-dan-j-sullivan-senate-race-rcna606646 .......... 13

Letter from R. Trent McCotter, U.S. Dep't of Just., to Meagan Wolfe, Wis. Elections Comm'n (Oct. 29, 2026), https://www.documentcloud.org/documents/28859818-us-ag-letter-to-wec/ .......... 1

## INTRODUCTION

With election day approaching, there is little question that the Executive Branch is engaged in an unlawful course of conduct that targets registered voters and intrudes upon state election machinery. The harm such conduct imposes on Plaintiffs—an array of Democratic Party organizations, their candidates, elected officeholders, and a registered voter—is neither contingent nor hypothetical: it is occurring now, and will only compound as Defendants press forward through election day and into the weeks-long certification process that follows. Indeed, since this suit was filed last week, Defendants have only amplified their efforts, including by expanding their demands to a new State, serving criminal subpoenas on election officials who have not relented to their demands, and issuing a fresh round of warning letters—this time to preserve voting related records—accompanied by the threat of criminal penalties.[1]

While Defendants' limited discovery response confirmed the States that have already received formal demands to segregate or withhold ballots, they have otherwise refused to disclose which States are next on their list and pointedly declined this Court's invitation to "moot this process at any time" by confirming they do not intend to continue their campaign of interference. *See* October 29 Minute Order. Nonetheless, Defendants' ongoing behavior works a host of here-and-now injuries on Plaintiffs, while also creating a substantial risk of further imminent harm. To start, Defendants' meddling in the electoral process impacts Plaintiffs' candidate-members as they endeavor to earn support from voters. As the Supreme Court stressed last term, political candidates "have an obvious personal stake" in the electoral process. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77–79 (2026). This stake is not limited to state election procedures as written in the law

---

[1] *See, e.g.*, Letter from R. Trent McCotter, U.S. Dep't of Just., to Meagan Wolfe, Wis. Elections Comm'n (Oct. 29, 2026), https://www.documentcloud.org/documents/28859818-us-ag-letter-to-wec/.

books—it extends to government misconduct that undercuts a "fair process," "undermine[s] the winner's political legitimacy," or "erodes public confidence that the election results reflect the people's will." *Id.* The Supreme Court made clear that these candidate interests are not mere niceties; rather "loss of legitimacy—or its diminution—is a concrete harm." *Id.*

And Defendants are imposing just such harms on Plaintiffs *now*. In the ordinary course, state and local election officials do not carry out their duties under explicit threat of criminal prosecution. As federal prosecutors in Washington State admitted, the very purpose of these threats is to put election officials in a "pickle," requiring that they ask themselves: "Do we comply with" federal demands "or do we comply with state law?" *See* Compl. ¶ 77, *OneAmerica Votes v. Trump*, No. 2:26-cv-04223 (W.D. Wash. Oct. 30, 2026), ECF No. 1 (quoting Ex. E at 2–3). Defendants, through their unlawful self-aggrandizement, have made themselves active participants in the electoral process, even where States resist their threats. Defendants cannot stand over the shoulder of every election official—a criminal subpoena in one hand and a civil complaint in the other—and then claim to be a mere spectator. And they have already made clear their willingness to deploy the federal government's vast resources as a cudgel. All of this reflects a monumental "[d]eparture[]" from the ordinary, lawful operation of our electoral system. *Bost*, 607 U.S. at 79. And no one has a greater stake in remedying that departure than "[t]hose who spend untold time and resources seeking to claim the right to voice the will of the people." *Id.* at 78.

Even beyond *Bost*, Plaintiffs are suffering a well-recognized competitive harm. Defendants' behavior has already tilted the playing field by actively discouraging voters—and particularly naturalized citizen voters who support Plaintiffs—from casting ballots. Indeed, Defendants have made no secret of the fact that their efforts are meant to prop up the President's party. And by making clear that they intend to contest the legitimacy of ballots cast by registered

voters across the country, Defendants have "fundamentally alter[ed] the environment in which rival parties defend their concrete interests." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 86 (D.C. Cir. 2005). While these harms ensue whether or not state and local officials ultimately bow to Defendants, the foreseeable prospect that election officials will soon do so compounds that injury.

Finally, Plaintiffs are also suffering a range of organizational injuries. The Plaintiff organizations exist for one overriding purpose: to elect Democratic candidates. In pursuit of this mission, the Plaintiff organizations marshal limited resources in order to most effectively turn out Democratic voters. Defendants' actions directly interfere with those efforts and require Plaintiffs to divert crucial resources to staunch the harm. Moreover, the substantial risk of changes to state election procedures requires Plaintiffs to undertake mitigation efforts *now*—expenditures that themselves constitute an Article III injury. "[T]he need to take such affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury[.]" *Meese v. Keene*, 481 U.S. 465, 475 (1987). Indeed, it would be remarkable if Plaintiffs—the leading campaign committees for the Democratic Party—were *not* undertaking significant mitigation efforts in the face of an unprecedented federal assault upon the nation's electoral machinery.

Any one of these various categories of injuries suffices for the relief requested by Plaintiffs, which is simply that Defendants be ordered to cease asserting authority that no law has ever granted them. Granting such relief will provide meaningful redress to Plaintiffs by lifting the cloud of illegitimacy Defendants have placed over certain ballots, removing the chill lawful voters are presently suffering, and restoring the proper functioning of the electoral process through election day and in its aftermath. The Court should therefore grant Plaintiffs' motion.

## ARGUMENT

### I. Plaintiffs are presently suffering injuries from Defendants' conduct and face the imminent and foreseeable prospect of additional harm.

Plaintiffs' ongoing injuries establish standing under three doctrines. First, Defendants' interference distorts the election process, depriving Plaintiffs of a fair race and damaging public confidence in the outcome. *Bost*, 607 U.S. at 78–79, 82. And there is a substantial risk that Defendants' escalating pressure campaign will change ballot procedures. Second, Defendants' conduct intimidates voters and harms Plaintiffs' electoral competitiveness—as intended. *Shays*, 414 F.3d at 86. Third, Defendants' actions directly affect and interfere with Plaintiffs' core organizational activities, *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), forcing them to divert resources to mitigate the harm, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

#### A. *Bost* supplies a clearcut basis for standing for Plaintiffs' candidates.

##### 1. Candidates have unique and concrete interests in the electoral process, including its fairness, accuracy, and legitimacy.

Undergirding the Supreme Court's recent decision in *Bost* is the recognition that candidates "are not 'mere bystanders' in their own elections," 607 U.S. at 78–79 (quoting *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025)), and that they therefore have a uniquely "obvious personal stake" in how their electoral contests are conducted, *id.* at 79, that "differs in kind" from other actors, *id.* at 78. This personal stake "extends to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent." *Id.* at 82. *Bost* therefore recognized that candidates hold a broad array of interests in the electoral process, and can suffer concrete harms related to: (1) the loss of a "fair process," *id.* at 77 ("Win or lose, candidates suffer when the process departs from the law."); (2) an "unfair and inaccurate election" that fails to reflect an "accurate vote tally," *id.*; *see also id.* at

78 (noting the "discarding of lawful" votes injures candidates); and (3) a "loss of legitimacy" as an elected official due to "erode[d] public confidence" in election results, which constitutes the sort of "reputational harm" that is a "classic Article III injur[y]," *id.* at 78 (citations modified). Each of these injuries is "particularly concrete for those whose very jobs depend on the support of the people." *Id.*

As these broad categories of injury make clear, *Bost* endorsed an "expansive theory of candidate standing." *DNC v. Trump*, No. 26-CV-3506 (LLA), 2026 WL 3228366, at *9 n.9 (D.D.C. Oct. 28, 2026); *cf. League of United Latin Am. Citizens v. Exec. Off. of the President (LULAC III)*, 818 F. Supp. 3d 34, 77 n.41 (D.D.C. 2026) ("The Supreme Court's recent decision in *Bost* may lead courts in this Circuit to take a more expansive view of political-competitor standing in the future."). Such standing does not depend on a literal change to the formal rules of an election contest for a candidate to suffer harm. Because a candidate's stake "extends to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent," *Bost*, 607 U.S. at 82, conduct that corrupts how an election is administered can injure a candidate even when the rules on paper nominally stay the same. As another court in this District explained, "*Bost*'s reasoning was not limited" to the "rules governing the counting of votes in a particular election." *DSCC v. Trump*, No. 26-CV-01114 (CJN), 2026 WL 2681471, at *5 (D.D.C. Sep. 13, 2026). Instead, the "[Supreme] Court recognized that candidates can suffer different injuries related to their interest in 'a fair [electoral] process'—such as by losing an election, requiring the expenditure of additional resources, or decreasing the vote

share and damaging the candidate's reputation." *Id.* The inquiry, thus, is whether Plaintiffs have presented "the types of candidate-specific injuries recognized in *Bost*." *Id.*[2]

**2. Defendants' actions are presently injuring Plaintiffs' concrete interests in a fair process and maintaining public confidence in electoral results.**

Defendants' ongoing campaign of unlawful election interference inflicts *each* of the injuries-in-fact recognized in *Bost* upon Plaintiffs and their candidate-members. So long as the federal government unlawfully imposes itself as an actor within active state electoral machinery, it results in a "process [that] departs from the law," diminishes a "fair process," and "erodes public confidence" in the results—including victories by Plaintiffs' candidates. *Bost*, 607 U.S. at 77–78 (citation omitted). These "concrete harm[s]," *id.*, are occurring *now*, forcing Plaintiffs' members to compete in a warped electoral process that has already departed from established procedures and clouds the legitimacy of the outcome. They will continue to do so until Defendants' campaign of interference is enjoined.

Defendants do not dispute that *Bost* recognizes an expansive set of candidate harms, so they instead appear to argue that Plaintiffs cannot incur such harms until a State surrenders its constitutional authority to DOJ. But *Bost* dispels that notion by emphasizing the harm that candidates suffer when the "electoral process" itself is distorted unlawfully. *Id.* And the "electoral process" is not just a series of written rules. As Justice Kavanaugh has explained, "running a

[2] That said, Defendants' conduct does effectively attempt to alter the rules governing the counting of voters in this election by seeking to displace established procedures for distributing and tabulating mail ballots in order to advance the federal government's policy preferences. In California and Washington, they have demanded that election officials refrain from issuing ballots to, or processing ballots from, registered voters that appear on Defendants' list of purported noncitizens. *See* Nkwonta Decl., Ex. Z, ECF No. 19-2; *id.*, Ex. AB; *id.*, Ex. AG; *id.*, Ex. AM. That is an extraordinary departure from the existing "rules governing the counting of votes," *DSCC*, 2026 WL 2681471, at *5, and it would require the States to adopt entirely new processes for tabulating ballots on the eve of an election. For DSCC's and DCCC's candidate members, the stakes could not be higher.

statewide election is a complicated endeavor," *DNC v. Wis. State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring), involving "a host of difficult decisions about how best to structure and conduct the election," carried out by "thousands of state and local officials" engaged in "a massive coordinated effort to implement the [state] lawmakers' policy choices on the ground before and during the election." *Id.* The sudden intrusion of the federal government—and the Department of Justice, no less—into this "massive coordinated effort" is an alteration of ordinary election procedures as much as any change to the written rules themselves.

Defendants' interference in the electoral process is not hypothetical or abstract: it is *happening now*, and it materially changes the landscape in which Plaintiffs are "compet[ing] for the support of the people." *Bost*, 607 U.S. at 78*; see* Compl. ¶ 86, ECF No. 1 (alleging Defendants' conduct forces Plaintiffs to "compete in unlawfully structured elections"). There can be no dispute that, in the ordinary course, election officials in California, Washington, or any other State, do not receive orders from DOJ on how to transmit, collect, store, verify, and tabulate ballots, nor do they receive threats of criminal prosecution if they choose to follow state law instead of DOJ's demands. DOJ itself has pointed to no similar past conduct, which appears to reflect an unprecedented effort, "on the eve of an election, [] to coerce [States] and local government[s] to abandon their own Constitutional elections procedures and bend to the will of the Executive Branch." *United States v. California*, No. 2:26-cv-12025 (DOC), 2026 WL 3252428, at *1 (C.D. Cal. Oct. 28, 2026). That effort is therefore itself a deeply significant "[d]eparture[] from the preordained rules" of how States administer elections. *Bost*, 607 U.S. at 79.

In an effort to minimize their role, Defendants blink reality by suggesting that "[t]he[ir] letters are not self-executing," TRO Opp'n 1, and "do not require any jurisdiction to take any . . . action," *id.* at 12. But Defendants are not merely ordinary citizens penning letters to the local

newspaper, whose gripes and views "would be more likely to be discarded or filed away than to be acted on." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (Posner, J.). Defendants wield the immense enforcement authority of the federal government, and "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68–69 (1963). When Defendants tease criminal prosecution, state and local election officials are hardly free to ignore Defendants' commands and simply carry on. Indeed, prosecutors in Washington openly admit they are placing election officials in a "pickle" that forces them to choose between competing federal and state demands—an assertion that flatly contradicts DOJ's argument here that its demands are merely informational "dear colleague" letters. And Defendants' threats are not idle. As events have shown, election officials will be hauled into court, and at minimum harangued by high-ranking officials in the midst of carrying out the "massive coordinated effort" that is an election. *DNC*, 592 U.S. at 1043 (Kavanaugh, J., concurring). This looming sword of Damocles invariably bears on "the democratic process by which [Plaintiffs] earn or lose the support of the people they seek to represent," *Bost*, 607 U.S. at 82, including as to how the public perceives the results, and how Plaintiffs' candidates must structure their campaigns in response. Plaintiffs are now actively bearing the brunt of these "reputational harms." *Id*. at 78; *see also* Snyder Decl. ¶¶ 8, 11, ECF 19-4; Remmel Decl. ¶¶ 9, 12, ECF 19-5; Edelman Decl. ¶¶ 9, 12, ECF 19-6.

In the same way that Defendants have unlawfully changed the election process, their conduct leads to a "loss of legitimacy" that is also presently inflicting "concrete harm" on Plaintiffs. *Bost*, 607 U.S. at 78. Their demands and interference cast a pall over ballots being cast in the election and "erode[] public confidence that the election results reflect the people's will."

*Id.*; *see also* Tr. 16:15–20. Even assuming Plaintiffs' candidate members win their elections, Defendants' *ultra vires* conduct threatens to taint those victories in the eyes of the public, and "when public confidence in the election results falters, public confidence in the elected representative follow*s*." *Bost*, 607 U.S. at 78 (recognizing this as a "concrete harm" and "[r]eputational harm" to candidates); *see also* Tr. 17:20–25. Indeed, it is one thing for Defendants—as President Trump long has—to cast aspersions upon the existing federal and state law procedures States use to identify potential noncitizen voters. It is another entirely to formally demand that election officials target specific registered voters, backed by the real threat that—if those officials decline to adhere to DOJ's demands—the federal government will litigate the results of the election.

**3. Plaintiffs also face a substantial risk that Defendants' actions will force changes in ballot canvassing on the eve of the election.**

In addition to these active and ongoing harms, there is also a substantial and imminent risk of even further harm because Defendants' escalating pressure campaign is likely to lead state and local officials to acquiesce, cementing a further "[d]eparture[] from the preordained rules" for the forthcoming election. *Bost*, 607 U.S. at 79. Here, Plaintiffs need only show a "substantial risk"—not certainty—of "future injury." *Murthy v. Missouri*, 603 U.S. 43, 69 (2024); *see also New Mexico v. Musk*, 824 F. Supp. 3d 80, 96 (D.D.C. 2026) ("[A]bsolute certainty is not required." (quoting *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012)). And whereas in *Murthy* the government's unlawful conduct had already "subsided," *Murthy*, 603 U.S. at 71, DOJ has left no doubt that it intends to continue making demands of state and local officials through election day and into the certification process, Nkwonta Decl., Ex. B.

For one, DOJ extended its pressure campaign to Washington State, demanding that officials set aside ballots within 24 hours, including those of voters who "were noncitizens" at one

point in time and "may have subsequently naturalized," and promising a "second list" before election day. Nkwonta Decl., Ex. AM. Prosecutors in that State have made clear that they are "going to continually demand that these [ballots] are segregated" and "make sure these ballots aren't counted." *OneAmerica Votes*, No. 2:26-cv-04223 (W.D. Wash. Oct. 30, 2026), ECF No. 1, Ex. E at 2. And in California, DOJ has responded to every judicial setback with escalation. Indeed, as courts there have rejected its state-specific enforcement effort, DOJ answered California's resistance with federal grand jury subpoenas to election officials across the State. *See* Devlin Barrett & Shawn Hubler, *Justice Dept. Pressures California with Expanded Election Investigation*, N.Y. Times (Oct. 29, 2026), https://www.nytimes.com/2026/10/29/us/trump-doj-california-voter-rolls-midterms.html.

Defendants' only response to this imminent harm is to disclaim the obvious purpose of their own letters, contending that it "seems" that targeted jurisdictions will not accede to DOJ's demands absent enforcement proceedings. ECF No. 25 at 11. But Plaintiffs cannot rely upon DOJ's mere assumption that their letters will be ignored, particularly when they are phrased as commands and backed by threats of criminal investigation for noncompliance. *See* Nkwonta Decl., Ex. Z at 1–2 (demanding that California's Secretary of State "review the list within 48 hours" and "immediately instruct the appropriate officials to segregate" mail ballots, and threatening emergency litigation if the process was not implemented by October 15); *id.*, Ex. AF (warning California officials that "noncitizen voting in a federal election is a federal crime" and threatening significant legal consequences for "knowingly facilitating" noncitizen voting); *id.*, Ex. I (warning election officials of "criminal" prosecution if they "knowingly retain" noncitizens on the rolls or "facilitate[] noncitizens in receiving and casting ballots"). Defendants have elsewhere made clear, that, in their view, if an election jurisdiction has received one of their lists of suspected noncitizen

voters and does not remove those voters from the rolls or counts one of those voters' ballots, they have "knowingly" facilitated a crime. Nkwonta Decl., Ex. AE; *see also id.*, Ex. I.

Defendants hedge throughout their brief on precisely what they expect States and officials to do in response to their demands, first framing them as merely "informing states and localities" at the top of their brief, TRO Opp'n at 1, before later admitting that the recipients "cannot unilaterally decide not to comply with federal law" as set forth in those same letters, *id.* at 30 (further suggesting that "the States' refusal to cooperate with the Executive's law enforcement authority" may amount to a separation of powers violation). Those two positions are mutually untenable. And Defendants' counsel muddied the matter further by refusing to squarely answer the Court's question about whether States could simply choose to ignore the letters. Tr. 19:24–20:3. If anything, counsel suggested Defendants' view is that it "is not perfectly appropriate" for States to forgo DOJ's demands. *Id.* Ultimately, it is simply not credible for Defendants to claim anything other than that their demands are issued with the expectation of State compliance, and this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted).

Plaintiffs are therefore staring down the "substantial risk," *Murthy*, 603 U.S. at 69, that States and localities will imminently yield to DOJ's demands—setting aside lawfully cast ballots on the eve of an election, in departure from the procedures state and federal law prescribe. That is a concrete injury, whatever the electoral results: "Win or lose, candidates suffer when the process departs from the law." *Bost*, 607 U.S. at 77.

### B. Defendants' ongoing intimidation and pressure campaign harms Plaintiffs' competitive interests and electoral prospects across the country.

Plaintiffs are suffering electoral competitiveness harms for similar reasons. The strategic assistance Plaintiffs have offered their candidate members has assumed a process where state law

is followed in the ordinary course, without an intrusive federal hand. *See* Remmel Decl. ¶ 12; Snyder Decl. ¶ 11; Edelman Decl. ¶ 12. Defendants' actions—threatening state election officials with federal criminal charges if they do not cede to federal override of state election procedures—have "fundamentally alter[ed]" that assumption. *Shays*, 414 F.3d at 86. The results are tangible: Plaintiffs and their candidates now "must anticipate and respond to a broader range of" possible canvassing practices, risks of disruption to ballot counting, and widespread voter confusion and disenfranchisement "than federal law would otherwise allow." *Id.*

Plaintiffs bear a unique burden to adapt their campaign strategies to account for Defendants' illegal actions because they are *intended* to harm Plaintiffs' electoral prospects. Defendants hand-wave "quotes from news-clippings," TRO Opp'n at 13, that lay plain their desire to use the coercive power of the federal government to undermine Plaintiffs' candidates, yet they never disavow those plans. Nor could they: the President has expressly linked his administration's election-interference initiatives to his goal that Republicans "never lose a race" for the next "50 years." Nkwonta Decl., Ex. D. And he has leveraged baseless allegations that "Democrat[ic] states" that oppose his agenda on election administration—like California, Washington, and Nevada—do so because they "want to cheat." Nkwonta Decl., Ex. U. Indeed, the President frequently remarks that if Plaintiffs' candidates succeed, it will only be because "they cheat by playing games with the Ballots." Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 26, 2026, at 5:15 p.m.), https://truthsocial.com/@realDonaldTrump/posts/117509280703799414.

These remarks cannot be divorced from Defendants' actions. Defendant Blanche has disclaimed any "separation and independence between the Department of Justice and the White House," making clear he "work[s] for President Trump." *AG Todd Blanche Transcript*, Pod Force One (Oct. 21, 2026), https://podcastrex.com/shows/pod-force-one/democrats-gaslight-the-

american-people-ag-todd-blanche/transcript. In fact, DOJ has already filed one lawsuit, at the President's specific direction, to prevent Alaska's certification of its election for U.S. Senator—but *only if* the Republican incumbent candidate loses. *See* Gary Grumbach & Kyla Guilfoil, *Justice Department Requests Separating Alaska Ballots that Rank Dan J. Sullivan in Senate Race*, NBC News (Oct. 30, 2026), https://www.nbcnews.com/politics/2026-election/doj-requests-separating-alaska-ballots-rank-dan-j-sullivan-senate-race-rcna606646.

In other words, Defendants are not hiding the fact that their directives seek to advance the President's goals, and their initiatives are meant to harm Democrats. Their focus thus far on Democratic-led States whose election officials have resisted Defendants' demands to purge their voter rolls with the SAVE database, or to review target lists compiled by DHS, underscores their focus on *Democrats'* electoral prospects. Plaintiffs would be grossly negligent in their duties to Democratic Senate, House, and Governor candidates if they failed to "anticipate and respond to" the novel, illegal tools the federal government is wielding to prevent States from counting ballots in races Plaintiffs' candidates are well positioned to win. *Shays*, 414 F.3d at 86. And because DOJ has demonstrated that it intends to continue these tactics through the certification process, Plaintiffs must pair their final-stretch efforts to win elections with preparation for post-election disputes premised upon Defendants' demands.

Plaintiffs' electoral prospects are also *presently* suffering from Defendants' threats to segregate ballots cast by voters they have classified as suspect, which have predictably chilled many eligible voters who support Democrats from engaging with the electoral process. *See* Snyder Decl. ¶¶ 9–10; Remmel Decl. ¶¶ 10–11; Edelman Decl. ¶¶ 10–11; Monroe-Moreno Decl. ¶¶ 8–9, ECF 19-7. The risk is not speculative: Plaintiff Jimenez testified that voters in Latino communities in California "have expressed serious apprehension about voting in the upcoming election" due to

fear of federal prosecution for casting a ballot under state law. Jimenez Decl. ¶ 8. Many voters have been "hesitant to go to the polls" despite assurances there is no lawful basis for retaliation. *Id.* Naturalized citizens—a "core constituenc[y]" for Democrats in many States, Monroe-Moreno Decl. ¶ 9—are particularly at risk for misidentification under Defendants' shoddy procedures for identifying purportedly ineligible voters. *See* Jimenez Decl. ¶¶ 5–8; Decl. of Carl Bergquist ¶ 6, *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, No. 1:26-cv-03072 (D.D.C. Oct. 15, 2026), ECF No. 21-3 ("[M]any members fear they will be unable to confirm their citizenship in time for the election.").[3]

It is no answer for Defendants to insist that their efforts merely "target *unlawful* voters." TRO Opp'n at 14. The record is replete with evidence that Defendants' half-baked efforts have threatened *lawful* voters with disenfranchisement. Pls.' TRO Br. 19–20; Pls' Suppl. Authority, Ex. B (response from Washington Secretary of State Hobbs to DOJ). The "fear of reprisals from DHS and DOJ," Snyder Decl. ¶ 10, that Defendants' actions have instilled in Plaintiffs' supporters further harms their electoral prospects, *cf. Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (holding political party had competitor standing based on challenged conduct's "effect on voter turnout"). The only way to staunch such harm to voters—and thus Plaintiffs' electoral prospects—is to enjoin Defendants from casting a nationwide shadow of doubt over the legitimacy of ballots lawfully cast under state and federal law.

**C. Plaintiffs' core activities are burdened by Defendants' conduct.**

When "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'divert[s] its resources' to continue pursuing those

[3] While DOJ has indicated that neither Mr. Jimenez nor Mr. Trujillo is on DHS's target list, millions of other naturalized citizen voters do not enjoy the luxury of such confirmation provided through litigation-driven declarations.

activities, such concrete harm to the organization's activities supports standing to sue." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 190 F.4th 990, 1001 (D.C. Cir. 2026) (first and second alterations in original). "Pocketbook harm is a traditional Article III injury," including "when a plaintiff 'reasonably incur[s] costs to mitigate or avoid' the 'substantial risk' of a harm." *Bost*, 607 U.S. at 84 (Barrett, J., concurring) (citations omitted); *see also Clapper*, 568 U.S. at 414 n.5 (Article III is satisfied when a plaintiff "incur[s] costs to mitigate or avoid" a "substantial risk" of harm (alteration in original)).

Plaintiffs are further harmed in an organizational capacity because they must divert resources—on the eve of the election—to redress this loss of efficacy to their core voter engagement activities. *See* Snyder Decl. ¶ 11; Remmel Decl. ¶ 12; Edelman Decl. ¶ 12; Monroe-Moreno Decl. ¶ 10. Such diversion is not an effort by Plaintiffs to "spend [their] way into standing" through advocacy efforts, *All. for Hippocratic Med.*, 602 U.S. at 395, but rather a necessary effort "to mitigate or avoid" *already existing* harm to their core activities. *Clapper*, 568 U.S. at 414 n.5; *see also* Edelman Decl. ¶ 12 (emphasizing that "[n]ow, DGA must revise its budget allocations . . . to aid voters and candidates"). Simply put, as Defendants' actions increasingly make Plaintiffs' organizational efforts "less effective," *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC II*), 808 F. Supp. 3d 29, 58 (D.D.C. 2025), Plaintiffs must reallocate resources to shore up the efficacy of such programming, Snyder Decl. ¶ 11; Remmel Decl. ¶ 12; Edelman Decl. ¶ 12; Monroe-Moreno Decl. ¶ 10.

Plaintiffs must also "incur [additional] costs to mitigate or avoid" the "substantial risk" of States and localities altering their election procedures. *Clapper*, 568 U.S. at 414 n.5. These mitigation expenses are also a present injury because they must be expended *now*; Plaintiffs cannot afford to take a wait-and-see approach as DOJ continues to exert pressure on election officials.

The Supreme Court has recently re-confirmed that "[s]uch a 'need to take . . . affirmative steps to avoid risk of harm . . . constitutes a cognizable injury' supporting standing." *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026) (per curiam) (second and third alteration in original) (quoting *Meese*, 481 U.S. at 475). In other words, Plaintiffs suffer injury when they must undertake reasonable preparatory efforts in expectation of foreseeable harm. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010).

## II. Each harm that Plaintiffs face is traceable to Defendants' conduct and redressable by injunctive relief.

Defendants' arguments on traceability and redressability largely collapse into their arguments on injury. Specifically, Defendants contend that any causal chain of injury between their actions and Plaintiffs is broken by the independent choices of third parties (like state or local election officials), or otherwise a self-inflicted injury. *See* TRO Opp'n at 9–11. But that argument entirely ignores one of the principal injuries Plaintiffs have alleged: the reputational and legitimacy harms that Defendants are causing through their *ultra vires* intrusion into the electoral process. *Supra* Argument § I.A.2; *see also* Tr. 16:15–20. Those injuries persist *regardless* of how state and local officials respond to it, and they are directly traceable to Defendants' demands upon state and local election officials. *Supra* Argument § I.A.

Defendants' arguments also disregard the chill they are imposing on voters, which directly harms Plaintiffs' candidates' electoral prospects and interferes with their core activities. *Supra* Argument §§ I.B–C. Plaintiffs' injuries "flow[] from the 'predictable effect' that" Defendants' actions "will have on eligible voters' behavior," which "satisf[ies] the traceability requirement." *LULAC II*, 808 F. Supp. 3d at 63 (quoting *Dep't of Com.*, 588 U.S. at 767–68). And that chill on voters—and its attendant impact on Plaintiffs and their candidate-members—is likely to be substantially redressed by a court order making clear that Defendants must cease their unlawful

campaign to interfere with state election procedures based on DHS's unreliable lists of purported noncitizens. *See, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (partial redress sufficient for Article III); *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, No. 25-5209, 2026 WL 3132807, at *8, *10 (D.C. Cir. Oct. 20, 2026) (similar).

Traceability and redressability are also readily satisfied even under Defendants' overly restrictive view. "An injury remains fairly traceable to federal action when third parties 'will likely react' to it 'in predictable ways.'" *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 26-5243, 2026 WL 2643439, at *5 (D.C. Cir. Sep. 4, 2026) (quoting *Diamond Alt. Energy*, 606 U.S. at 112). That an election official will accede to DOJ's demands and threats is certainly predictable, and even more likely as DOJ issues grand jury subpoenas to election officials that refused to comply. Barrett & Hubler, *supra*.

Finally, Defendants are wrong to suggest that Plaintiffs seek prospective relief for past harms. *See* TRO Opp'n at 11. As events from the past week have made clear, DOJ's efforts remain ongoing. Indeed, DOJ has now distributed new target lists to election officials in every county in California, *see* Nkwonta Decl., Ex. AG, and issued a parallel demand to Washington while promising a "second list" of purported noncitizens before election day, *id.*, Ex. AM. Far from seeking to address a "rung bell," TRO Opp'n at 12, Plaintiffs' requested emergency relief seeks to prohibit Defendants from continuing to make mischief in the belltower in the form of additional or supplemental demands and threats to States.

## III. While the Court should enter nationwide relief, the record reflects a particularly strong basis for enjoining Defendants from continuing to make demands of and threats to election officials in California, Washington, and Nevada.

The record and arguments present the Court with ample grounds for issuing nationwide relief. *See DSCC*, 2026 WL 2681471, at *11 (granting nationwide relief for many of the same Plaintiffs). The case for nationwide relief is bolstered by Defendants' ongoing refusal to disclaim

their intent to make future demands of States, or to make clear *where* such demands are likely to occur. And while their narrow discovery response to date has indicated that five States—California, Washington, Nevada, Pennsylvania, and New Jersey—have been sent some form of a demand, they have not yet been required to answer Plaintiffs' interrogatory regarding which States are next. Given the breadth of authority claimed by Defendants, and their refusal to disclose where they intend to exercise it, only a nationwide injunction "will offer complete relief to the plaintiffs before the court." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (emphasis omitted); *see also Washington v. Trump*, 145 F.4th 1013, 1039 (9th Cir. 2025) (concluding that a nationwide injunction was necessary to afford complete relief), *cert. denied*, 146 S. Ct. 2809 (2026).

Even so, if the Court has doubts about the appropriateness of a nationwide injunction at this juncture, it can still afford a narrower remedy. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."). Here, the record presents a particularly compelling basis for enjoining Defendants from engaging in future demands of election officials in three States that have been the subject of particular intrusion: California, Washington, and Nevada. The first two States have *already* received unlawful demands from DOJ that they purge voters and segregate ballots—demands that DOJ has stated it intends to build upon moving forward. Nkwonta Decl., Ex. Z; *id.*, Ex. AE; *id.*, Ex. AM. In other words, there is a particularly concrete and imminent risk that DOJ will send additional demands to election officials in those States.

Similarly, since this past summer, Nevada has been a State of particular focus for Defendants, including through the unprecedented issuance of numerous grand jury subpoenas to Secretary Aguilar's office. *See* Compl. ¶¶ 64–68; Aguilar Decl. ¶¶ 11–12, ECF 19-3. On top of

that, reports have indicated that DOJ is particularly focused on making demands of States that conduct elections largely by mail, Nkwonta Decl., Ex. AH, a pattern confirmed by its targeting of California and Washington—States where all or most ballots are cast by mail. *See* Cal. Elec. Code § 3000.5(a); Wash. Rev. Code § 29A.40.010. Under Secretary Aguilar's leadership, Nevada has likewise implemented a vote-by-mail system in which every registered voter receives a mail ballot. Aguilar Decl. ¶ 7, ECF 19-3; Nev. Rev. Stat. § 293.269911. The presence of NSDP as a plaintiff in this matter also bolsters Plaintiffs' already strong basis for standing in Nevada. *See generally* Monroe-Moreno Decl. And because NSDP's membership is comprised of Democratic voters and candidates in Nevada, *id.* ¶ 3, it may assert associational standing on behalf of those individuals. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (Posner, J.), *aff'd*, 553 U.S. 181 (2008) (plurality opinion); *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d 135, 191, 207 (D.D.C. 2025) (recognizing associational standing to sue based on anticipated harm to Democratic voters). This Court therefore has authority and discretion to fashion injunctive relief that will remedy the nationwide harm caused by Defendants' actions, or in the alternative, grant partial relief with an injunction targeting Defendants' ongoing and anticipated actions in California, Nevada, and Washington.

## CONCLUSION

The Court should grant a temporary restraining order and preliminary injunction.

Dated: October 31, 2026

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Marc E. Elias (DC 442007)
Uzoma N. Nkwonta (DC 975323)
Christopher D. Dodge (DC 90011587)
Nicole E. Wittstein (DC 1725217)
Kevin R. Kowalewski (DC 90045467)
Tori A. Shaw (DC 90036555)*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
eliasm@elias.law
unkwonta@elias.law
cdodge@elias.law
nwittstein@elias.law
kkowalewski@elias.law
tshaw@elias.law

*Admitted *pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic Governors Association, U.S. Senate Minority Leader Schumer, U.S. House Minority Leader Jeffries, the Nevada State Democratic Party, and Erick Jose Jimenez*