**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DSCC, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DONALD J. TRUMP, *et al.*,**<br><br>**Defendants.** | **Civil Action No. 26-3674 (JEB)** |

## MEMORANDUM OPINION

Even extraordinary merits questions cannot justify the extraordinary relief of a preliminary injunction or temporary restraining order if those seeking it lack standing. In recent months, the federal government has sent letters to multiple states attempting to browbeat them into removing from their voter rolls certain purported non-citizens or segregating (and ultimately not counting) the ballots of such voters — at least until their citizenship is confirmed.

Plaintiffs here — the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee, the Democratic Governors Association, the Nevada State Democratic Party, the Democratic Leaders of the U.S. Senate and House of Representatives, and one California voter who has been naturalized since 2006 — challenge that conduct, arguing that such federal interference in state election administration violates the Constitution and the Voting Rights Act. They seek a temporary restraining order and preliminary injunction that would bar the Departments of Justice and Homeland Security from sending states letters demanding that they segregate and not tabulate the ballots of purported non-citizens on lists that the federal

government has compiled, at least until their citizenship has been confirmed. Yet Plaintiffs have not established that they have standing to seek such relief. The Court will therefore deny their request for a TRO and PI.

## I. Background

### A. Legal and Factual Background

When it comes to federal elections, the states are hardly bit players. On the contrary, the Elections Clause of the U.S. Constitution vests them with "responsibility for the mechanics of congressional elections." Foster v. Love, 522 U.S. 67, 69 (1997). That clause gives states exclusive authority to determine who can vote in federal elections. See U.S. Const. art. I, § 2, cl. 1. It also gives states presumptive authority to regulate the "Times, Places and Manner of holding Elections" — authority that only Congress may override. Id., art. I, § 4; Roudebush v. Hartke, 405 U.S. 15, 24 (1972) ("Unless Congress acts, Art. I, § 4, empowers the States to regulate."). States are thus responsible for devising a "complete code for congressional elections," including rules regarding "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes." Smiley v. Holm, 285 U.S. 355, 366 (1932).

In recent months, the federal government has voiced its belief that many states' voter rolls appear to contain non-citizens. Federal law makes it a crime for non-citizens to vote in federal elections. See 18 U.S.C. § 611. In July, the Department of Homeland Security sent letters to numerous states claiming that it had conducted a preliminary review of their voter rolls based on publicly available voter data. See ECF No. 1 (Compl.), ¶ 59. DHS engaged in this exercise after trying, with limited success, to get states to hand over unredacted versions of their voter-registration lists themselves. Id., ¶¶ 49–52; see United States v. Evans, 2026 WL 2267774, at *5

(D.D.C. Aug. 6, 2026) (collecting string of unsuccessful lawsuits brought by federal government). Without explaining its methodology, the Department sent numerous states — including California, Nevada, and Pennsylvania — letters claiming that each had thousands of non-citizens on its voter rolls. See Compl., ¶¶ 60–69. The Government urged the states to collaborate with it to address the situation. See, e.g., ECF No. 19-2 (Declaration of Uzoma Nkwonta) at ECF pp. 128–29.

California rebuffed the Government's entreaties, questioning the veracity of the lists. See Compl., ¶¶ 60–63. Nevada and Pennsylvania, meanwhile, inquired about DHS's methodology and sought to confirm the accuracy of the lists. Id., ¶¶ 64–71. They did not get very far. In Nevada, for instance, the federal government initially claimed that 15,903 potential non-citizens were on the state's voter rolls, with 8,576 supposedly confirmed. Id., ¶ 64. When Nevada endeavored to verify those numbers, DHS responded that a paltry 185 of the 15,903 were "confirmed" non-citizens. Id., ¶¶ 65–68. So Nevada looked into each of the 185. It found that none was a non-citizen. Id., ¶ 68; see E-mail from Greg Ott to DHS Off. of Intergovernmental Affs. (Sep. 23, 2026, at 2:54 PM), https://perma.cc/UY3B-LCGT. As for the Pennsylvania list, DHS never identified its methodology and allegedly admitted that it lacked a high confidence level in its list. See Compl., ¶¶ 69–71.

Unhappy with the states' responses, the Department of Justice stepped in. On October 13, it sent letters to state and local election officials in California requesting that they review a list of purported non-citizens within 48 hours and segregate and refuse to tabulate the ballot of anyone on the list until citizenship could be determined. Id., ¶¶ 76–77; see Nkwonta Decl. at ECF pp. 128–29. The letter suggested that such verification was necessary to enforce the federal prohibition on non-citizen voting in federal elections. See Nkwonta Decl. at ECF p. 128 (citing

18 U.S.C. § 611). The implication appeared to be that election workers would effectively be encouraging non-citizen voting in violation of federal law if they did not. California refused to comply, contending that such demands could not be squared with state or federal law. See Compl., ¶ 78. DOJ then sued those officials in the Central District of California, requesting a TRO to enforce the letter's demands. See United States of America v. California, No. 26-12025, ECF No. 22-1 (Emergency TRO Application) (C.D. Cal. Oct. 19, 2026).

B. Procedural Background

One day after the federal government sought such relief in the California case, Plaintiffs filed this suit. Plaintiffs DSCC, DCCC, and DGA are organizations whose "core business activit[y]" is to "persuad[e] and mobiliz[e] voters to support their candidate members." Compl., ¶ 92. Those candidate members, in turn, are Democratic Senate candidates (in 44 of the states), Democratic House candidates (in all 50 states), and Democratic gubernatorial candidates (in 24 states). Id., ¶¶ 10–12. Plaintiff Nevada State Democratic Party is an organization whose mission it is to "elect Democratic candidates to office across Nevada." Id., ¶ 16. Plaintiffs Chuck Schumer and Hakeem Jeffries are the Senate and House Minority Leaders. Id., ¶¶ 13–14. Jeffries is presently running for office, while Schumer has declared his candidacy for office in the 2028 election. Id., ¶¶ 13–14. Finally, Plaintiff Erick Jose Jimenez is a registered California voter who became naturalized in 2006. Id., ¶ 17.

They bring this suit against the Department of Justice, the Department of Homeland Security, the President, and other federal officials, alleging that the letters amount to election interference in violation of various constitutional provisions and principles — including the Elections Clause, the Tenth Amendment's anticommandeering doctrine, and the vertical separation of powers — and the Voting Rights Act. Id., ¶¶ 95–125. They seek, among other

things, declaratory and injunctive relief barring the federal government from "issuing demands and threats that States (i) remove registered voters from statewide voter registration lists; (ii) refuse to issue ballots to such voters; and (iii) segregate (and ultimately not count) ballots cast by such voters." Id. at 43 (prayer for relief).

On October 23, three days after filing this suit, Plaintiffs filed an Emergency Motion for Expedited Discovery "to assess the need for — and scope of — emergency relief." ECF No. 16 (Disc. Mot.) at 6. The Court ordered the Government to file any opposition by October 27. See Minute Order of Oct. 26, 2026. Plaintiffs sought two types of documents and answers to two "parallel interrogatories." Disc. Mot. at 2. In essence, they requested that the federal government reveal all non-privileged communications sent to states demanding that they remove lists of purported non-citizens from their voter rolls and segregate and not tabulate their ballots and answer interrogatories identifying the states where the federal government had sent or was planning to send such communications. See id. at 4–5.

Plaintiffs contended that such information would allow them to better determine "whether, where, and how Defendants have intruded [on state election administration] and where they intend to intrude next" — such that Plaintiffs could better tailor their request for emergency relief. See ECF No. 24 (Disc. Reply) at 1–2. They argued in the alternative that their "discovery motion bears upon facts implicating jurisdiction," particularly their standing to seek emergency relief. Id. The Government opposed the Motion. See ECF No. 23.

While discovery was being briefed, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction. See ECF No. 19 (TRO/PI Mot.). They explained that, since filing the Discovery Motion, facts on the ground had materially changed. Id. at 2. Most significantly, on October 26, the federal government sent a letter to Washington state officials

modeled on the one sent to California. See Nkwonta Decl. at ECF pp. 175–76. It gave the state a list of 400 purported non-citizens on its voter-registration list and demanded that officials review it within 24 hours and segregate and refuse to tabulate any ballot from anyone whose citizenship could not be confirmed. Id. So Plaintiffs believed that their TRO/PI Motion was necessary and contended that they will "suffer irreparable harm" absent swift relief. Id. at 3. The Government opposed that Motion as well. See ECF No. 25 (Gov. Opp.).

On October 29, this Court held a hearing on Plaintiffs' TRO and PI Motion, as well as their Motion for Expedited Discovery. See Minute Entry of Oct. 29, 2026. At that hearing, the Court, in the exercise of its discretion, granted in part and denied in part Plaintiffs' Motion for Expedited Discovery. See Minute Order of Oct. 29, 2026; see also Guttenberg v. Emery, 26 F. Supp. 3d 88, 97 (D.D.C. 2014) (explaining that courts consider "reasonableness" factors when assessing motion for expedited discovery, which include whether preliminary-injunction motion is pending); Hussain v. Nicholson, 435 F.3d 359, 363 (D.C. Cir. 2006) (explaining that district court "has broad discretion in its resolution of discovery problems that arise in cases pending before it") (citation omitted). It ordered the Government to respond to just one of Plaintiffs' four discovery requests — Interrogatory No. 1, which asked the federal government to list the states to which it had sent letters demanding citizenship verification and ballot segregation, see Minute Order of Oct. 29, 2026, because Plaintiffs had established that they had a "good faith" belief that discovery of that information would enable them to establish jurisdiction — namely, Article III standing. Gligorov v. Nation of Brunei, 185 F.4th 1169, 1184 (D.C. Cir. 2026) (citation omitted). The Court also ordered the parties to file supplemental briefing on standing in light of that discovery. See Minute Order of Oct. 29, 2026.

As changes were rapidly unfolding on this Court's docket, so, too, were they shifting elsewhere. On October 28, Judge David O. Carter of the Central District of California denied the Government's request for a TRO in the California litigation, concluding that it had not demonstrated a likelihood of success on the merits. See United States v. California (California I), --- F. Supp. 3d ---, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026). That same day, Washington state officials told the federal government that they, too, would not comply with its requests. See ECF No. 27-2 (Washington Letter) at ECF pp. 2–4. On October 30, Judge Trina L. Thompson of the Northern District of California issued a temporary restraining order in a case brought by, among others, unions representing election workers. Service Employees International Union, AFL-CIO v. United States Department of Justice, No. 26-12800, ECF No. 26 (N.D. Cal. Oct. 30, 2026). The TRO directed the federal government, *inter alia*, not to "demand that any state or local election official (i) remove specific registered voters from their statewide voter registration lists; (ii) refuse to issue ballots to specific registered voters; or (iii) segregate or otherwise not count any ballots cast by specific registered voters for the November 3, 2026 General Election, solely on the basis that the ballot belongs to an individual alleged by Defendants to be ineligible to vote." Id. at 6–7. That same day, Judge Carter's decision denying the federal government's request for a TRO was affirmed on appeal. See United States v. California (California II), --- F.4th ---, 2026 WL 3268272 (9th Cir. Oct. 30, 2026).

And on October 31, discovery in this case revealed that the federal government has sent formal demand letters only to Washington and California. See ECF Nos. 30 (Pl. Supp. Br.) at 17; 31 (Def. Supp. Br.) at 1; see also ECF No. 29 (federal government's notice of compliance with discovery order). Against that backdrop, the Court is now prepared to rule on Plaintiffs' Motion for emergency relief.

## II. Legal Standard

Courts analyze motions for temporary restraining orders and preliminary injunctions using the same standards. See Dunlap v. Presidential Advisory Comm'n on Election Integrity, 319 F. Supp. 3d 70, 81 (D.D.C. 2018). Preliminary injunctions and temporary restraining orders are "extraordinary" remedies "never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). A court may therefore not grant such a "drastic" remedy "unless the movant, by a clear showing, carries [its] burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (cleaned up). To do so, a movant must show that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the movant's] favor"; and (4) such order "is in the public interest." Winter, 555 U.S. at 20. Where, as here, the "government is the opposing party," the latter two factors "merge." Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025). A court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits." Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (citation omitted).

## III. Analysis

Defendants offer a number of bases on which the Court should deny the TRO/PI, but it need look no further than likelihood of success on the merits, the "first and most important factor" here. Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

"[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," which, of course, includes standing. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation

omitted). That "irreducible constitutional minimum" has three familiar requirements. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). A plaintiff must establish that (i) it "has suffered or likely will suffer an injury in fact," (ii) "the injury likely was caused or will be caused by the defendant," and (iii) "the injury likely would be redressed by the requested judicial relief." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024). To meet the injury-in-fact requirement, a plaintiff must allege that it has suffered an injury that is (1) "concrete and particularized" and (2) either "actual or imminent." Lujan, 504 U.S. at 560 (emphasis added) (quotation marks and citation omitted). Where, as here, a plaintiff seeks injunctive relief, the threatened injury must be ongoing, "certainly impending," or there must be a "substantial risk" that harm will occur. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation omitted). Put another way, allegations of "possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quotation marks and citation omitted). Those injury-in-fact requirements "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." All. for Hippocratic Med., 602 U.S. 367 at 381.

The causation and redressability requirements, meanwhile, "are often flip sides of the same coin." Id. at 380 (quotation marks and citation omitted). If a plaintiff can establish that its "injury likely was caused or likely will be caused by [a] defendant's [action]," "enjoining the action . . . will typically redress that injury." Id. at 380–81. Redressability becomes "substantially more difficult to establish," however, when the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." Lujan, 504 U.S. at 562. That is because, in such cases, "redressability . . . hinge[s] on the response of the regulated (or regulable) third party," "whose exercise of broad and legitimate

discretion the courts cannot presume either to control or to predict." Id. Courts have thus "routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." Johnson v. Becerra, 111 F.4th 1237, 1244 (D.C. Cir. 2024).

A party seeking a preliminary injunction or restraining order, moreover, must "show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 377 (D.C. Cir. 2017) (quotation marks and citation omitted). In other words, it must put forth "affadivit[s]" or other "evidence" detailing "specific facts" that, if true, "demonstrate a substantial likelihood of standing." Id. "[O]nly one plaintiff" needs to show a substantial likelihood of success on standing. Bost v. Illinois State Bd. of Elections, 607 U.S. 71, 76 n.3 (2026); see Hall v. D.C. Bd. of Elections, 141 F.4th 200, 209 (D.C. Cir. 2025). Plaintiffs advance four theories of standing here, tethered to various Plaintiffs in the case. The Court examines each separately.

A. Harm to Candidates

Plaintiffs' leading theory of standing is that political candidates — two of whom are named Plaintiffs and others of whom are members of the political organizations that are Plaintiffs in this suit, see Compl., ¶¶ 10–16 — have suffered an injury-in-fact as candidates forced to compete in an election allegedly affected by Defendants' conduct. That theory takes two forms, one of which is rooted in the Supreme Court's recent decision in Bost v. Illinois State Board of Elections, the other of which relies on a more traditional competitor theory of standing.

1. Bost *Standing*

In Bost, the Supreme Court held that a political candidate "has standing to challenge the rules that govern the counting of votes in his election" because he has a "concrete and particularized interest in [those] rules." Id. at 82–83. The Court reasoned that an unlawful election rule can injure a candidate not only by diminishing his margin of victory or requiring him to spend additional resources, but also by "depriv[ing] the candidate of a fair process and an accurate result" and "undermin[ing] the 'integrity of the electoral process.'" Id. at 77–78 (quoting Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008)). In so doing, the Court underscored that those process-related injuries exist regardless of whether the challenged procedures "help, hurt, or have no effect on a candidate's electoral prospects." Id. at 77.

Plaintiffs contend that Bost is on all fours here, as Defendants' "unlawful interference and federalization of state procedures for elections and ballot counting" has injured them by depriving them of a fair process that is consistent with the law. See TRO/PI Mot. at 32. That is, they maintain that by "exceeding federal authority and improperly intruding into state election administration, Defendants have deprived Plaintiffs 'of the opportunity to compete for election under the Constitution and laws of the United States.'" Id. at 32–33 (quoting Bost, 607 U.S. at 79). The cognizable harms that Plaintiffs assert, then, are to their "concrete and particularized interest in the" processes — namely, the rules concerning voter registration, ballot mailing, and ballot counting — "that govern" their candidates' elections. Bost, 607 U.S. at 82.

The trouble for Plaintiffs, however, is that Defendants' attempted interference has yet to alter a single rule or process governing the upcoming election. On the contrary, Plaintiffs' own pleadings establish that the states targeted by Defendants have so far rebuffed the Government's efforts to dictate changes to their voting procedures. See, e.g., Compl., ¶¶ 60–63 (describing

California's refusal to collaborate with DHS in response to letter); ¶¶ 64–68 (same for Nevada); ¶¶ 69–71 (same for Pennsylvania); Washington Letter at ECF pp. 2–4 (same for Washington). Plaintiffs offer no evidence that any state election official has segregated or refused to tabulate the ballot of purported non-citizens on these lists.

Nor have Plaintiffs established that modification of state election procedures is "certainly impending" or that there is a "substantial risk" of it. Driehaus, 573 U.S. at 158. Plaintiffs urge that state and local election officials will "predictably acquiesce to Defendants' pressure campaign." Disc. Reply at 4; see Pl. Supp. Br. at 9–11 (reiterating this argument). That remains highly doubtful on the record before the Court. Yet even if some officials are reviewing the lists, that does not amount to an imminent Bost injury. Under Bost, a candidate's "interest in the electoral process" is linked to how a state has *ex ante* "chose[n] to conduct its elections" through its "rules" and "procedure[s]." 607 U.S. at 74, 76–77; see id. at 79 ("Departures from the preordained rules cause them particularized and concrete harm."). In order for the Bost theory of standing to apply, then, there would need to be an imminent risk not only that election officials would review the proffered lists of suspected non-citizens, but that they would adopt a widespread procedure or rule of segregating ballots. Plaintiffs offer nothing in the record to support the notion that such an alteration to the "preordained rules" is likely, id. at 79 — especially given the states' general steadfast refusal to acquiesce to Defendants' demands and the lack of any evidence in the record that local election officials are segregating or are substantially likely to segregate ballots of registered voters.

Still, Plaintiffs insist that they assert a here-and-now injury, cognizable under Bost, because Defendants' mere attempts to allegedly interfere with the election have diminished "fair process" and "erode[d] public confidence" in the results of the election, see Pl. Supp. Br. at 6

(quoting Bost, 607 U.S. at 77–78), "forcing Plaintiffs' members to compete in a warped electoral process." Id. Bost provides no basis for such a sweeping conception of standing, and Plaintiffs identify no case that extends Bost so far. Again, Bost made its holding clear: "Candidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections." 607 U.S. at 82 (emphasis added); id. at 79 ("Departures from the preordained rules cause them particularized and concrete harm."); DSCC v. Trump, 2026 WL 2168617, at *4 n.8 (D.C. Cir. July 28, 2026) ("Bost held that candidates have a concrete and particularized interest in the 'process' of elections sufficient on its own to challenge an extant election rule.").

Courts, including in this circuit, have since extended Bost to other election rules — including rules about how mail-in ballots are transmitted — that inflict such process-related harms. See DSCC v. Trump, 2026 WL 2681471, at *5 (D.D.C. Sep. 13, 2026). But they have not extended it to government attempts — unsuccessful at that — to alter election rules or procedures simply because they cast a shadow of unfairness over an election and change the atmosphere in which plaintiffs must compete for votes at the ballot box. See, e.g., Democratic Nat'l Comm. v. Trump, 2026 WL 3228366, at *8, *9 n.9 (D.D.C. Oct. 28, 2026) (declining to decide whether "Bost extends" to challenges to alleged unlawful use of government funds to support "political ads advancing Republican electoral interests" that unfairly altered electoral playing field). And for good reason. Bost did not hold that every governmental action alleged to undermine electoral fairness inflicts a concrete injury on a plaintiff. It concluded only that candidates experience a concrete and particularized harm when the "preordained rules" governing a candidate's election actually depart from law. See 607 U.S. at 79 (emphasis added); see also id. at 74 (referring to election "procedure[s]").

It is those rules or procedures that undermine "fair process" in a concrete way and "erode[] public confidence that the election results reflect the people's will." Id. at 77–78; see, e.g., id. at 78 (discussing "[r]ules that undermine the integrity of the electoral process") (quotation marks and citation omitted). And if attempts to alter the rules are never successful, the candidate has not actually been deprived of his concrete interest in lawful procedure. If the Court were to embrace Plaintiffs' much more expansive conception of Bost, candidates would have standing to challenge every Tweet, Truth Social post, or campaign speech that deploys rhetoric that undermines confidence in the election or "casts a pall over ballots being cast." Pl. Supp. Br. at 8. While such rhetoric may undermine election fairness and have a lamentable effect on our democratic process, Bost does not support the notion that Plaintiffs have standing to challenge it.

2. *Competitor Standing*

The D.C. Circuit has held that candidates have standing to challenge election-related rules or conduct that they allege unlawfully alter the environment in which they must compete for votes against their rivals. See Shays v. FEC, 414 F.3d 76, 82–85 (D.C. Cir. 2005). That is because candidates suffer a cognizable "injury" when they are forced to compete in an electoral environment that has been "illegally structured." Id. at 90. In Shays, the D.C. Circuit found injury-in-fact where the plaintiff candidates challenged an agency rule that permitted "competitive tactics" broader than what "federal law" allegedly permitted, thus "fundamentally alter[ing] the environment in which rival parties defend their concrete interests." Id. at 86. The Circuit has made clear that, to assert competitor standing, the same "actual or imminent" injury requirements apply. Sherley v. Sebelius, 610 F.3d 69, 73 (D.C. Cir. 2010). That is, plaintiffs must demonstrate that a defendant's conduct is actually "provid[ing] a competitive advantage to

[their] . . . opponents" or that there is a substantial risk that it will. LaRoque v. Holder, 650 F.3d 777, 786 (D.C. Cir. 2011).

Plaintiffs insist that Shays establishes standing here, as Defendants' letters have a clear partisan aim and are "seeking to disenfranchise large numbers of Democratic and Democratic-leaning voters — thus harming Plaintiffs' electoral prospects." TRO/PI Mot. at 33. Yet Plaintiffs run into the same trouble here as with their Bost theory. They have not established that Defendants' conduct has caused or is imminently likely to cause a change to the "rules of the game" that would actually disenfranchise Democratic voters. Shays, 414 F.3d at 85. Again, Plaintiffs have not demonstrated that any state has altered its election rules, nixed voters from the rolls, or segregated ballots in acquiescence to Defendants' demands. Nor have Plaintiffs established, as discussed above, that there is a "substantial risk" that such changes will occur. Driehaus, 573 U.S. at 158. As such, although Plaintiffs decry the "partisan and electoral motives behind the conduct at issue," TRO/PI Mot. at 33, they have not demonstrated that there is any rule or procedure that is actually or imminently likely to be adopted, thus harming Democratic candidates' electoral competitiveness.

As with their Bost theory, Plaintiffs resist this conclusion by maintaining that Defendants' conduct is harming Democratic candidates right now by forcing them to "anticipate and respond to" threats to election officials and voter intimidation to remain competitive. See Pl. Supp. Br. at 12 (quoting Shays, 414 F.3d at 86); see also id. at 11–14. As for the alleged anti-competitive harm created by threats to election officials, Plaintiffs do not explain how that has concretely and materially altered the environment in which they are competing for votes, besides their fear that it may "disrupt[] . . . ballot counting." Id. at 12. But for that to be true, a state would need to

acquiesce to the federal government's demands to segregate ballots, which, as discussed above, Plaintiffs have not established is more than a speculative possibility.

As for the alleged anti-competitive harm prompted by voter chill, that theory does not work either. Plaintiffs offer nothing in the record to substantiate — as they must at this stage — that there is a "substantial risk" that Democratic support will be suppressed via the letters. Driehaus, 573 U.S. at 158. Instead, they offer only speculation that voters will be intimidated from heading to the polls. See, e.g., ECF Nos. 19-4 (Declaration of Lillie Snyder Boss), ¶ 9 ("The administration's campaign of intimidation and election interference also harms DSCC and its candidate members' competitive prospects. It threatens to disenfranchise large numbers of Democratic and Democratic-leaning voters."); 19-7 (Declaration of Daniele Monroe-Moreno), ¶ 9 ("Even voters who are not disenfranchised will nonetheless likely be discouraged from voting based on a belief that their votes will not be counted, confusion about the status of their voter registration, or fear of reprisals from DHS and DOJ."); 19-6 (Decl. of Jillian Edelman), ¶ 11 (same); 19-5 (Decl. of Caitlin Remmel), ¶ 11 (same). To the extent Plaintiffs feel anti-competitive pressure and are thus changing their campaign tactics based on such speculation, that does not suffice to support standing. They cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper, 568 U.S. at 416.

Plaintiffs fight this speculative characterization, insisting that their "electoral prospects are . . . presently suffering" from voter intimidation. See Pl. Supp. Br. at 13. They lean on Jimenez's declaration that Latino voters in his community "have expressed serious apprehension about voting in the upcoming election." ECF No. 19-8 (Decl. of Erick Jose Jimenez), ¶ 8. Yet Jimenez linked alleged community fears not to the federal government's demands that states

segregate ballots of purported non-citizens but to citizens' beliefs that they will be "arrest[ed] . . . for voting." Id., ¶ 8. That does not give the Court a basis to infer that the fears expressed are attributable to letters targeting election officials regarding non-citizens. In any case, the community fears cited, while regrettable, appear to rest on the assumption that the government will go after even legal voters. Courts evaluating standing typically do not "assume" that the "government will violate the law." Or. State Police Officers Ass'n v. Peterson, 979 F.2d 776, 778 (9th Cir. 1992). It follows that political candidates do not have standing simply because their supporters fear that the government "might in the future take some . . . action detrimental" to them that is predicated entirely on speculation — and speculation that the government will violate the law to boot. Clapper, 568 U.S. at 418 (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)).

In short, Plaintiffs cannot establish candidate standing.

B. Harm to Voters

Plaintiffs next urge that they have standing because the conduct that they seek to enjoin "directly harms the right of Plaintiffs' members and supporters" to vote. See TRO/PI Mot. at 33. Plaintiffs advance two distinct theories here.

First, Jimenez himself claims standing because the letters make it "likely" that he will "need to respond to Defendants' errant accusations by collecting proof of [his] citizenship." TRO/PI Mot. at 34 (citing Dep't of Homeland Security v. League of Women Voters, 2026 WL 2879700, at *2 (U.S. Sept. 25, 2026)). It is true that, where it is "likely," as opposed to speculative, that a citizen will "need to take . . . affirmative steps" to "provide additional proof of citizenship" in order to exercise her right to suffrage, that "affirmative step" constitutes a "cognizable injury supporting standing." League of Women Voters, 2026 WL 2879700, at *2

(quotation marks and citation omitted). The key emphasis, though, is on the word "likely." There, the Court found it "likely" that the plaintiff voter would need to take such steps, as she demonstrated that (1) she was registered to vote in a state that had adopted the challenged program at issue, and (2) the program's records to verify voters did "not accurately reflect" her citizenship. Id.

Here, however, Defendants represent that Jimenez is not on the list. See ECF No. 25-1 (Declaration of Nathaniel Stiefel), ¶¶ 4–5. Therefore, he has not established that it is likely, as opposed to speculative, that he will be in a position where he will need to gather his documents to confirm his citizenship. This case is thus readily distinguishable from Coalition for Humane Immigrant Rights v. Department of Homeland Security, No. 26-3072, ECF No. 48, where the Court today found that an organization had associational standing based on the likelihood that one of its voter members had faced or would face this injury, and thus would have standing in his own right. Id. at 7–8. There, the organization had established that at least one of its members was indeed erroneously on the list California had received, and in a county where officials were working the list no less. Id. at 7–9. Those two combined facts made the risk that an individual would need to take steps to prove his citizenship in order to vote sufficiently substantial, constituting a cognizable injury. Id. Here, because Jimenez is not on the list, the risk that he will be in a similar position is far too speculative.

Nor would Jimenez have standing if he has already "incurred certain costs" gathering his documents out of fear that he will face barriers to voting nonetheless. Clapper, 568 U.S. at 416. Any such conduct would be based only on his subjective fear about "hypothetical future harm" that is not certainly impending or reasonably likely. Id. It is axiomatic that Plaintiffs cannot end-run the imminence requirement by choosing to incur injuries to guard against the future

possibility that the Government may adopt an injurious policy that is presently only conjectural. Id.

Second, DSCC, DCC, DGA, and NSDP claim that they can assert associational standing on behalf of "members and supporters" who face harm to their right to vote from Defendants' "meddling." TRO/PI Mot. at 33. "An organization can assert associational standing on behalf of its members if: (1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." Elec. Privacy Info. Ctr., 928 F.3d at 101 (quotation marks and citation omitted). At the preliminary-injunction stage, the question is whether it is "likely" that Plaintiffs will be able to identify a member with standing in his own right. Centro de Trabajadores Unidos v. Bessent, 167 F.4th 1218, 1229 (D.C. Cir. 2026).

DSCC, DCCC, or DGA — whose members are senators, representatives, and governors, see Compl., ¶¶ 10–12 — cannot assert associational standing on behalf of supporters of their electoral mission. See, e.g., Mecinas v. Hobbs, 468 F. Supp. 3d 1186, 1203 (D. Ariz. 2020), rev'd and remanded on other grounds, 30 F.4th 890 (9th Cir. 2022) (finding DSCC did not have associational standing based on individual voters' alleged injuries). Plaintiffs respond by invoking cases holding that the Democratic Party has standing to assert the rights of its members. See TRO/PI Mot. at 33–34 (citing League of United Latin Am. Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135, 191 (D.D.C. 2025); Crawford v. Marion Cnty. Election Bd., 472 F.3d 949, 951 (7th Cir. 2007)). Yes, voters can become members of a political party, but Plaintiffs offer nothing to suggest that voters can become members of DSCC, DCCC, or DGA,

and indeed have since appeared to back away from the position that DSCC, DCCC, or DGA can assert associational standing on behalf of voters. See Pl. Supp. Br. at 19.

Only the Nevada State Democratic Party, then, has a potential basis to assert associational standing here. That means that the Court could, at most, enjoin Defendants from strongarming that state into altering its voting procedures. Even still, the Court cannot conclude that it is likely that NSDP will be able to identify a voter member who has standing in her own right. The reason is now familiar. It has not established that any voter in Nevada faces a "substantial risk" that she will face barriers to voting as a result of Defendants' conduct. Driehaus, 573 U.S. at 158. Indeed, although Plaintiffs contend that the conduct they challenge is a "voter restriction," TRO/PI Mot. at 34, in reality, they challenge only the federal government's efforts to bully states into removing certain voters from registration lists, refusing to issue them ballots, and segregating their ballots if they do cast a vote. See Compl. at 43 (prayer for relief) (requesting injunction preventing federal government from "issuing demands and threats" to states). Just as Plaintiffs were unable to demonstrate that candidates would be subject to an unfair election process, they offer nothing to suggest that it is likely that voters will in fact be disenfranchised or face heightened barriers to voting as a result of these demands.

Examined closely, Plaintiffs' theory is that Defendants, if allowed to send additional letters, could send one to Nevada; could coerce state election officials there into segregating ballots, removing registered voters from their lists, or declining to issue ballots to certain registered voters; which could ultimately exclude eligible voters or make it harder for such voters to vote, depending on how Nevada officials ended up verifying those on the lists. It is certainly possible that DOJ may end up sending such a letter to Nevada, particularly given that the state was originally one of DHS's targets. See Pl. Supp. Br. at 18–19. Even then, Plaintiffs' theory of

injury would still hinge on Nevada's not only capitulating to Defendants' demands but also implementing Defendants' demands in a way that rejects citizens' lawful votes or places at least a proof-of-citizenship burden on voters. That chain of causation is simply too speculative to support standing, particularly given that it requires the Court to engage in "guesswork as to how independent decisionmakers will exercise their judgment." Clapper, 568 U.S. at 413.

Plaintiffs' reliance on DSCC, 2026 WL 2681471, at *6, offers no aid. There, the district court held that voters who planned to vote by mail had standing to challenge a rule requiring "all absentee and mail-in ballots for federal elections" to be transmitted only in certain envelopes, via the U.S. Postal Service, and only to people who had "been enrolled in newly created" portal. Id. at *1. That rule injured those voters, the court concluded, because it would make "voting by mail more difficult and, for some voters, effectively foreclose that option altogether." Id. at *6. There, unlike here, the rule was in place, so any harms to the plaintiffs were actual or imminent. In contrast, Plaintiffs have provided no evidence demonstrating that there is a substantial risk that Nevada will adopt the Government's agenda and attempt to remove NSDP's supporters from the voter rolls or segregate their ballots, unless they provide additional proof of their right to vote.

The voting-rights theory is thus insufficient to support standing.

C. Harm to Organization's Core Activities

Finally, Plaintiffs contend that the organizations have standing in their own right because Defendants' conduct "will directly interfere with their core activities," forcing them to divert resources to respond to voter suppression. See TRO/PI Mot. at 35 (citation omitted). An organization may not "spend its way into standing" simply by putting money into "opposing those policies" that it "dislike[s]." All. for Hippocratic Med., 602 U.S. at 399–95. The Supreme Court has, however, recognized that a government action inflicts a cognizable harm on an

organization when it "'directly affects and interferes with' an organization's 'core business activities,' requiring the organization to 'divert[] its resources' to continue pursuing those activities." Center for Taxpayer Rights v. IRS, 190 F.4th 990, 1001 (D.C. Cir. 2026) (quoting All. for Hippocratic Med., 602 U.S. at 395) (cleaned up). Plaintiff contends that its injury here fits that bill, as Defendants' letters will force it to "reallocate resources against voter suppression at the expense of other mission-critical work." TRO/PI Mot. at 35.

As with Plaintiffs' other theories of harm, this one, too, runs aground on speculation. Just as with individuals, organizational plaintiffs cannot establish standing by spending money to hedge against a "highly speculative fear" that government conduct will, in the future, potentially harm the members they serve. Clapper, 568 U.S. at 410; see Ariz. All. for Retired Ams. v. Mayes, 186 F.4th 622, 634 (9th Cir. 2026) (*en banc*) (holding that organization's expending resources to address hypothetical effect of challenged action "cannot support standing" when alleged impact "lacks record support and is highly speculative") (quotation marks and citation omitted). Here, Plaintiffs aver that they "will be forced to" beef up spending on activities and messaging that is directly "respon[sive] to voter suppression," which "come[s] at the cost of [their] other critical programs and expenditures," because they fear that the letters will cause such suppression or disenfranchisement. See Remmel Decl., ¶¶ 11–12; Edelman Decl., ¶¶ 11–12 (same); Snyder Boss Decl., ¶ 11 (same); Monroe-Moreno Decl., ¶¶ 9–10 (similar). Any dollars spent are thus predicated on their speculative fear that states will acquiesce to the letters, thus segregating ballots or erecting barriers at the ballot box, and thus causing voter disenfranchisement or suppression.

Those averments stand in stark contrast to those at issue in Coalition for Humane Immigrant Rights, No. 26-3072, ECF No. 48, where the Court found that an organization with

newly naturalized citizen members had organizational standing to challenge letters issued to California. Id. at 10–11. There, the organization declared that it had diverted its resources to respond to its members' numerous phone calls expressing concern that they were on the lists — concerns that discovery showed were non-speculative, as many of its members indeed were — and to help its members check the status of their registration before they voted. Id. That organization was thus actively diverting its resources to respond to a here-and-now injury, rather than to its own speculation that the Government may in the future adopt a policy that injures its supporters. As "[s]peculative harms are no more cognizable [when] dressed up as an organizational injury," the averments here are insufficient to support standing. City of S. Miami v. Governor, 65 F.4th 631, 638 (11th Cir. 2023).

Resisting that conclusion, Plaintiffs lean on Center for Taxpayer Rights, but that case is distinguishable given the record developed in this case. See Pl. Supp. Br. at 15. There, the Internal Revenue Service adopted a policy of disclosing taxpayer information, including addresses, to Immigrations and Custom Enforcement. See 190 F.4th at 999. That new policy "made many immigrant taxpayers less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach" — its *raison d'être* — and thus forced the Center to divert "its limited resources to counteract" these effects. Id. at 1001 (cleaned up). Those facts are materially different from the ones here. The policy in that case had actually taken effect, and the Center was experiencing actual declines in public engagement with their resources given the policy. Here, in contrast, Plaintiffs offer no evidence that they are diverting resources in response to such actual harms to their core business. Instead, again, they declare only that they will divert resources in the future based on a speculative fear that the letters will result in states' adopting procedures that suppress or disenfranchise voters. An

organization cannot bootstrap its way to standing by incurring costs to mitigate a speculative fear: "Spending money to hedge against a speculative threat does not constitute an Article III injury." Trump v. California, 2026 WL 2473573, at *3 (U.S. Aug. 24, 2026) (cleaned up). As in Hippocratic Medicine, then, the organizations' expenditures to "better inform their members and the public about" their right to vote and to "engag[e] in public advocacy and public education" combatting the Governments' letters are at most a self-inflicted injury that do not confer standing. See 602 U.S. at 394. Organizational standing therefore does not work either.

* * *

In short, Plaintiffs have not made a clear showing on this record that at least one plaintiff is likely to establish standing, which bars this Court from giving them the relief they seek at this stage. See Food & Water Watch, 808 F.3d at 913. The Court pauses to note the narrowness of this holding. The demand letters issued to the state elections officials may indeed be unlawful. But this Court has an obligation to scrutinize closely "whether the plaintiff is a proper party to bring a particular lawsuit" and is experiencing the kind of injury that is cognizable and redressable by an Article III court. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 799 (2015) (cleaned up). Had state officials capitulated in the face of the Administration's browbeating, this may well have been a different case. At this stage in the litigation, however, Plaintiffs present no evidence demonstrating that any state has acquiesced and removed a voter from the rolls or segregated her ballot based on the Government's letters. Nor, as the Court has explained, have Plaintiffs shown that such modification to state procedures is certainly impending or substantially likely to occur. Absent such an actual or imminent injury traceable to Defendants' alleged misconduct, Plaintiffs are not entitled to the extraordinary relief they seek.

Plaintiffs ask the Court in the alternative to enjoin the federal government "from continuing to make demands of and threats to election officials in California, Washington, and Nevada," given that it has already sent letters there. See Pl. Supp. Br. at 17 (formatting altered). For the reasons already explained in this Opinion, the Court does not believe that Plaintiffs have established that, simply because letters have been sent to those states, it is likely that officials there will capitulate to Defendants' entreaties. Still, the Court concludes today in a related case brought by different California plaintiffs that they are likely to establish standing and likely to succeed on the merits of their claim in seeking to enjoin Defendants from sending further letters to California. Coalition for Humane Immigrant Rights, No. 26-3072, ECF No. 48. The Court thus issued a TRO in that case barring the federal government from continuing to make demands of officials in California. Such a ruling does provide Plaintiffs here some modest relief as well.

## IV. Conclusion

The Court thus will deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: November 2, 2026